*Jennifer Louise Jenkins, Administrator ad Litem of the Estate of Sterling L. Higgins*
*v. Obion County, Tennessee, et al.*


No. 20-cv-01056 STA-atc


Declaration of Edwin S. Budge

Exhibit G

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION AT JACKSON

| | | |
|---|---|---|
| JENNIFER LOUISE JENKINS, **Administrator *ad Litem* of the** ESTATE OF STERLING L. HIGGINS, | § § § § | |
| Plaintiff, | § § | |
| v. | § § § | Case No. 20-CV-01056 STA-dkv |
| OBION COUNTY, TENNESSEE, UNION CITY, TENNESSEE, ROBERT THOMAS ORSBORNE, individually, MARY BROGLIN, individually, WAYLON SPAULDING, individually, and BRENDON SANFORD, individually, | § § § § § § § § § | |
| Defendants. | § § | |

## EXPERT REPORT OF MICHAEL LEONESIO

I, Michael Leonesio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following are my true and correct expert report findings in the above-listed case.

## INTRODUCTION

On 4/22/2020, I was retained by plaintiff's counsel to provide opinions related to the following:

1. Evaluation, and analysis of Union City, Tennessee Police Officer Robert Orsborne's arrest and use of force relating to Sterling Higgins on the morning of March 25, 2019;

2. Evaluation and analysis of Obion County Tennessee Correctional Officer Waylon Spaulding's use of force against Sterling Higgins on the morning of March 25, 2019;

-1-

3.  Evaluation and analysis of Obion County, Tennessee Correctional Officers Mary Brogglin, Waylon Spaulding, and Brendon Sanford's use of the emergency restraint chair upon Sterling Higgins on the morning of March 25, 2019;

4.  Evaluation and analysis of Obion County, Tennessee Correctional Officers Mary Brogglin, Waylon Spaulding, and Brendon Sanford's response to the circumstances relating to Sterling Higgins' medical emergency while in custody at the Obion County Detention Center on March 25, 2019.

5.  Evaluation, and analysis of Union City, Tennessee Police Officer Robert Orsborne's response to the circumstances relating to Sterling Higgins' medical emergency while in custody at the Obion County Detention Center on March 25, 2019.

6.  Evaluation and analysis of Obion County, Tennessee Sherriff's Department Detention Center policy and training related to the use of force, use of the emergency restraint chair, and medical response in force on the morning of March 25, 2019.

**SOURCES OF INFORMATION**

I have reviewed and analyzed the following incident related documents and materials in my preparation of this report:

1.  First Amended Complaint;
2.  Responses to Plaintiff's Discovery Requests – Waylon Spaulding;
3.  District Attorney General TBI Request for Investigation letter (3/25/19);
4.  TBI Investigative Report #JA-5V-000008;
5.  Bodycam videos for UCPD calls for service #201902473 and #201902474;
6.  Jail security camera video (6) of the sally port, intake, and holding cell 15 areas;
7.  Scene photos (51) of the Obion County Detention Center;
8.  Officer Orsborne UCPD Incident Report for incident #I201900443 (3/25/19);
9.  Officer Duncan UCPD Incident Report for incident #I201900443 (3/25/19);
10. Sergeant Simmons UCPD Incident Report for incident #I201900443 (3/25/19);
11. CO Waylon Spaulding written post-incident statement (3/25/19);
12. CO Mary Brogglin written post-incident statement (3/25/19);
13. CO Brendon Sanford written post-incident statement (3/25/19);
14. CO Stormy Travis written post-incident statement (3/25/19);

15. Obion County Emergency Communications records for incident #283086;

16. Obion County Emergency Communications records for incident #283087;

17. Obion County Emergency Communications records for incident #283088;

18. Obion County Emergency Communications records for incident #283089;

19. UCPD CAD printout for call #201902473;

20. UCPD CAD printout for call #201902474;

21. Union City Fire Department Incident Report for incident #66372;

22. TBI statement of Mary Brogglin (dated 3/25/19);

23. TBI statement of Waylon Spaulding (dated 3/25/19);

24. TBI statement of Robert Orsborne (dated 3/25/19);

25. TBI statement of Brendon Sanford (dated 3/25/19);

26. TBI statement of Talmadge Simmons (dated 3/25/19);

27. TBI statement of Scott Duncan (dated 3/25/19);

28. TBI statement of Nicole Higgins (dated 3/25/19);

29. Medical Examiner's report for Sterling Higgins (MEC2019-0508, dated 8/7/19);

30. Autopsy photos (144) of Sterling Higgins;

31. Baptist Memorial Emergency Department medical records for Sterling Higgins (3/25/19);

32. Baptist Ambulance Service Patient Care Report  for run #39725;

33. Post-mortem emergency department photos (26) of Sterling Higgins;

34. Deposition transcript of Mary Brogglin with exhibits (dated 10/29/20);

35. Deposition transcript of Waylon Spaulding with exhibits (dated 10/26/20);

36. Deposition transcript of Robert Orsborne (dated 10/27/20);

37. Deposition transcript of Brendon Sanford with exhibits (dated 10/29/20);

38. Deposition transcript of Stormy Travis with exhibits (dated 10/30/20);

39. Deposition transcript of Talmadge Simmons with exhibits (dated 10/30/20);

40. Expert report of Dr. J.C. Upshaw Downs;

41. Scientific Journal article: Mash, Deborah C. 2016. Excited Delirium and Sudden Death: A Syndromal Disorder at the Extreme End of the Neuropsychiatric Continuum. Frontiers in Physiology 7:435;

42. TCI Basic Training approval letter (4/25/12);

43. Obion County Detention Center Use of Force policy (9/11/13);

44. Obion County Detention Center Force Continuum policy diagram (no date);

45. Obion County Detention Center Use of Force 1 hour lesson plan (no date);

46. Obion County Detention Center Emergency Restraint Chair Policy Overview (9/1/18);

47. Obion County Detention Center Emergency Restraint Chair Instructions (no date);

48. TCI Stress Management training approval letter (7/20/12);

49. Stress Management training document (no date);

50. Suicidal Inmates course description document (no date);

51. Suicide Behind Bars training document (no date);

52. Suicide Prevention in a Correctional Setting training document (2011);

53. Professionalism and Ethics 1 hour lesson plan (no date);

54. Civil Rights Act of 1964 training document (no date);

55. District Attorney General TBI Case Determination letter re: JA-5V-000008 (10/29/19);

56. Obion County Sheriff's Office personnel and training records for CO Mary Brogglin;

57. Obion County Sheriff's Office personnel and training records for CO Waylon Spaulding;

58. Obion County Sheriff's Office personnel and training records for CO Stormy Travis;

59. Obion County Sheriff's Office personnel and training records for CO Brendon Sanford;

60. Discrimination, Inmate Supervision, Inmate Property, Inmate Programs, Inmate Labor, Inmate Discipline, Inmate Visitation policy excerpts (no date); and,

61. Clarified video and image files from Conor McCourt.

## **METHODOLOGY**

I have reviewed and analyzed the above-listed documents and materials and have prepared this report based on that effort. The opinions expressed in this report are held to a reasonable degree of professional certainty. In this report, and in subsequent testimony related hereto, I may cite or refer to court rulings, legal principles, or legal concepts. I am not a lawyer. I do not offer legal opinions. I cite these rulings and refer to these concepts strictly as a law enforcement professional.

As a law enforcement officer, I am expected to have a working knowledge of clearly established laws and court rulings as they relate to the core tasks of the profession. As a law enforcement trainer, I teach to these laws, rulings, and concepts and have done so for many years. As a law enforcement use of force subject matter expert, I have applied these laws, rulings, and concepts in my evaluation of policies, procedures, training materials, and individual officer performance.

## QUALIFICATIONS

I am a California Commission on POST (Peace Officer Standards and Training) police academy instructor; tactical firearms instructor; critical incident response instructor; response to active shooter instructor; and defensive tactics and baton instructor. I am a graduate of various TASER® International user, instructor, master instructor, and armorer courses. I am certified as a forensic analyst and am an instructor in *Identification, Prevention, Management and Investigation of Sudden and In-Custody Deaths*, and *Excited Delirium and Agitated Chaotic Events* courses. I am a co-developer and instructor of the *ESW Forensic Analyst* course through the Institute for the Prevention of In-Custody Deaths.[1]

I am a former Emergency Medical Technician and spent nearly 14 years working in pre-hospital and hospital settings before becoming a police officer. My medical training and experience include basic life support (BLS) and advanced life support (ALS) patient contacts.

Since 2002, I have developed and provided entry-level, in-service, instructor-level, and command-level law enforcement instruction to agencies throughout the United States and Canada and have trained thousands of officers. Areas of training and instruction have included: critical incident response; use of force; baton/impact weapons; weapon retention and disarming; tactical firearms; response to active shooter; defensive tactics and arrest control; responding to emotionally disturbed persons (EDP); the use of electroshock weapons (ESW), forensic analysis of ESW devices and related evidence; prevention and investigation of in-custody death.

In addition to providing law enforcement personnel training, I have developed and offered medical, scientific, and civilian personnel training in ESW evidence collection, preservation and

---

[1] ESW, or electroshock weapon, is the internationally recognized term for electronic weapons commonly used by law enforcement.

analysis, law-enforcement response to EDPs, and in-custody death investigation.

As a member of the San Carlos and Oakland, California police departments, I was tasked with researching, writing, reviewing, and implementing department training curriculum, policy, and rules and procedures related to use of force, use of force reporting, and use of force investigation. I sat as a subject matter expert on the Use of Force Review Boards at both departments and have reviewed, analyzed, and rendered opinions in thousands of use of force cases.

Based on my specialized training and experience, I am familiar with generally accepted law enforcement and corrections standards and practices for detentions, arrests, use of force and restraint, and the use of weapons and tactics. These commonly accepted law enforcement standards flow from decisions of the United States Supreme Court and lesser courts, state and federal government agencies, and national and international law enforcement research organizations, and include law enforcement best practice principles. My opinions in this matter are informed by and are based upon such generally accepted standards and legal mandates.

A copy of my Curriculum Vitae, which states my qualifications to render this opinion, is attached. Also attached is a list of publications I have authored in the previous ten years, my fee schedule, and my previous testimony

## RIGHT TO AMEND

I reserve the right to amend this report's contents should new information become available.

## OPINIONS

The opinions expressed in this report are informed by, and are based upon, my training and experience as outlined in the *Qualifications* section; my review and analysis of the materials listed in the *Sources of Information* section; cited legal decisions, scientific writings, policy, and training references, and accepted law enforcement standards and industry best practices.

**Note:** The following opinions include references to jail video timestamps. While I have made every effort to accurately report these times, the quality of the video renderings and frame rates variances and are beyond my control. Therefore, these times should be considered approximate.

-6-

**Opinion 1: Union City officers' arrest of Mr. Higgins was reasonable and lawful based on the facts and circumstances known to them at the time of their contact.**

In addition to being tasked with recognition and action relating to criminal behavior, law enforcement officers are trained to evaluate subjects displaying obvious psychological or medical distress symptoms. These psychological or medical evaluations are based upon specific and narrow criteria and generally include establishing whether or not the person's behavior or condition represents a danger to themselves or a danger to others. Officers are bound by statute and are granted specific and limited scope in these matters.

Officers may not involuntarily commit a person unless these specific criteria are met.

Arresting Officer Robert Orsborne, in his October 2020 deposition, testified that after interacting with Mr. Higgins on the morning of the incident, he did not believe Higgins to meet the criteria for involuntary committal, stating at one point, "I deemed him not to be a danger to himself or others."[2] Sergeant Talmadge Simmons, shift supervisor and ranking officer on-scene at the time of the arrest, in his deposition, testified that he also questioned Mr. Higgins, "I'd ask him questions, trying to maybe kind of see how his mental capacity was. He seemed to be all right[sic]." [3,4]

After coming to these independent conclusions and resolving property issues between Higgins and his female companion, Mr. Higgins was advised by officers that he must leave the premises or face criminal trespass charges.[5,6] Higgins voluntarily departed, and officers cleared the scene.

Minutes later, officers responded back to Pocket's Market on a report of a "crazy man."[7] They arrived and found Mr. Higgins hiding in a walk-in freezer. Higgins was arrested without incident for criminal trespass and transported to the Obion County Detention Center.

My analysis of the circumstances surrounding the arrest of Mr. Higgins by UCPD officers found their actions reasonable, given the circumstances, and consistent with generally accepted policy,

---

[2] Orsborne deposition pgs. 93;17-94;5, 97;2-3, 99;24-100;3.
[3] Simmons deposition pgs. 21;9-11.
[4] This was further demonstrated on officers' body cam video of the contact.
[5] Orsborne deposition pgs.95;22-96;2.
[6] See officer body cam video.
[7] Union City Police call sheet report for incident #201902474.

practice, training, and legal mandates trained to officers for application in field operations.

**Policy & Training:** At the time of this writing, I did not have access to Union City Police Department policies or training materials related to arrest or mental health committal procedures and therefore offer no opinion(s) on these subjects.

**Opinion 2: Officer Orsborne's trampling of Mr. Higgins' lower torso and standing on his shackled lower extremities constituted excessive force and served no legitimate law enforcement purpose.**

The United States Supreme Court in *Graham v. Conner* (490 U.S. 396 (1989)) instructed that all excessive force claims be evaluated under the Fourth Amendment's reasonableness standard: "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[8] In establishing whether officers' actions were objectionably reasonable, we are directed to balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."[9] This dynamic standard directs that officers adjust (evaluate, initiate, escalate, de-escalate, cease, etc.) their force response(s) according to the circumstances they face while recognizing that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation."[10]

In establishing whether an officer's use of force was objectively reasonable, the Court directs that we evaluate the force used with respect to the following criteria:

- Severity of the crime at issue;

- Immediate threat to the safety of officers or others; and,

- Active resistance, or attempts to evade arrest by flight.

And, as with any Fourth Amendment analysis, we must also look at "whether the totality of the

---

[8] *Graham,* 490 U.S. at 397.
[9] *Graham,* 490 U.S. (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)); also see *Scott v. Harris*, 550 U.S. 372, 383 (2007).
[10] *Graham,* 490 U.S. at 396-97.

circumstances justifies a particular sort of seizure."[11]

At timestamp 01:49:02 of the booking camera video, we see COs Brogglin and Sanford stand up after placing shackles on  Mr. Higgins' legs. Officer Orsborne still kneels on Higgins' right side after assisting in their application. Mr. Higgins is lying supine on the jail floor, hands handcuffed behind his back, shackles now restraining his legs. CO Spaulding is on top of Higgins, his gloved hands grasping Mr. Higgins' jaw in an unorthodox and unrecognized but firm hold.[12]

At timestamp 01:49:05 of the video, Officer Orsborne is on his feet, standing between the handcuffed and shackled Mr. Higgins and the wall as he attempts to capture Higgins' legs with his hands. At 01:49:20, we see Officer Orsborne raise his right leg. As his thigh rises past horizontal, Orsborne makes a hard stepping, or trampling, motion onto Mr. Higgins' lower torso; once, then twice. Seven seconds later (01:49:27), the video shows Officer Orsborne stepping up onto Mr. Higgins' shackled leg(s) where he remained, standing with his full body weight, for the next two minutes and thirty-six seconds.

Officer Orsborne testified that standing on Mr. Higgins' legs, with his full 250-plus pound bodyweight for over two and a half minutes, was necessary to "gain control" of him. [13] Orsborne offered no explanation for trampling Higgins' legs.

It is clear from the video evidence that at the time that Officer Orsborne trampled and stood upon Mr. Higgins' legs that Higgins was handcuffed and shackled. But CO Spaulding's testimony calls Officer Orsborne's explanation further into question as he testified that Mr. Higgins was "under control" by timestamp 01:47:05 of the same video, a full fifteen seconds before Orsborne stomped on Higgins, and twenty-two seconds before standing on him.[14]  These facts are significant because they speak to the gratuitous nature of  Officer Orsborne's unnecessary use of force and the dishonesty of his explanation.

---

[11] *St. John v. Hickey*, 411 F.3d at 771 (6th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).
[12] Reference was made in the depositions of Orsborne, Spaulding, and Waylon to a "mandibular control hold" or "mandibular hold." This is not a recognized control hold in any law enforcement defensive tactics or arrest control system teaching current modern tactics or techniques.
[13] Orsborne deposition pg. 146;18-19.
[14] Spaulding deposition pg. 93;15.

My *Graham* analysis of Officer Orsborne's actions examined the required criteria, as outlined above, and found the following:

**Severity of crime at issue:** At this stage of the incident, Mr. Higgins was in-custody for criminal trespass, a class C misdemeanor. There has been no claim, that I am aware of, that Mr. Higgins committed any additional criminal offenses.

**Immediate threat to officers or others:** When Officer Orsborne trampled Mr. Higgins' legs and mounted and stood upon them, Mr. Higgins was handcuffed, leg shackled, and - per CO Spaulding - under control. There simply was no immediate threat to officers or others at the time of Officer Orsborne's use of force upon Mr. Higgins that would justify his actions.

**Active resistance or attempting to evade arrest by flight:** There is certainly an argument to be made that Mr. Higgins was actively resisting officers' attempts to control him. But Mr. Higgins was handcuffed behind his back, leg shackled, and held - wedged between the floor and wall - by his jaw and neck as CO Spaulding laid across his torso. This resistance, such as it was, presented no immediate threat to officers or others that would justify Officer Orsborne's actions.

In fact, Mr. Higgins' resistance could be more simply and justifiably attributed to the fact that because of CO Spaulding's body and hand positions, Mr. Higgins was being strangled and compressionally asphyxiated by Spaulding and was fighting to breathe.

To the point of evading arrest by flight, Higgins was handcuffed and leg shackled in a secure detention facility when Orsborne used force against him. There was no credible flight risk.

Mr. Higgins was handcuffed behind his back, shackled, and under control, fifteen seconds *before* Officer Orsborne trampled and mounted his legs. Given this evidence and looking at the totality of circumstances as analyzed above, it is clear that Officer Orsborne's actions against Mr. Higgins were excessive, unnecessary, and utterly inconsistent with generally accepted policy, practice, training, and legal mandates trained to officers for application in field operations.

**Policy & Training:** At the time of this writing, I did not have access to Union City Police Department policies or training materials related to use of force and therefore offer no opinion(s) on this subject.

**Opinion 3: Correctional Officer Spaulding's improper use of his hands to hold Mr. Higgins' jaw resulted in compression of Mr. Higgins' neck, causing prolonged blood flow constriction to and from Mr. Higgins' brain.**

In *Kingsley v. Hendrickson,* 135 S.Ct. 1039 (2015), the U.S. Supreme Court ruled that, like law enforcement officers in a patrol setting, correctional officers' use of force upon pre-trial detainees must be analyzed using the objectively reasonable officer standard as outlined in *Graham v. Connor,* 490 U.S. 386 (1989).

The Court ruled that, unlike convicted prisoners serving a sentence, a pre-trial detainees' force incident must be analyzed from: '…the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.' And will apply the consideration that '…for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' while appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'[15]

As the Court laid out, the first step in evaluating the objective reasonableness of a correctional officer's force response is to establish whether or not a "reasonable officer" would believe that the force used was necessary under the circumstances to achieve one or more legitimate correctional objectives. If the legitimate objective or "purpose" requirement is not met, the force response must be deemed unreasonable.

The required objective analysis is based upon the totality of the circumstances known to the officer at the time the force was used and includes the following factors:[16]

- Relationship between the need for the use of force and the amount of force used;
- Extent of the [inmate's] injuries;

---

[15] See *Kingsley v. Hendrickson, et al.,* 135 S.Ct. 1039 (2015) at 1046, citing *Graham v. Connor,* 490 U.S. 386 (1989) 396 and *Bell v. Wolfish,* 441 U.S. 520 (1979) 540, 547.
[16] *Kingsley v. Hendrickson* at 1046.

- Effort made by the officer to temper or to limit the amount of force;
- Severity of the security problem at issue;
- Threat reasonably perceived by the officer; and,
- Whether the inmate was actively resisting.

My review of the case materials in this matter revealed that CO Spaulding, after separating Mr. Higgins from CO Brogglin, used an improper and unjustified technique in an alleged attempt to gain *compliance* of an already *controlled* and restrained Mr. Higgins. CO Spaulding's improper hand positioning on Mr. Higgins' jaw area fixed bilateral pressure and compression from the heels of Spaulding's hands directly onto the areas of the carotid arteries, the carotid sinus, and the external jugular veins of Mr. Higgins' neck. The prolonged pressure on these sensitive areas led to a rapid decline in blood pressure, leading to unconsciousness. And because CO Spaulding continued this errant neck compression for over seven and a half minutes, Mr. Higgins was unable to recover.

Pressure point compliance techniques have been a part of law enforcement training for decades and can be an effective short-term tool for subjects who are actively resisting or assaulting an officer. These pressure-sensitive areas occur throughout the human body and, because of their triggering mechanism, are useful in producing pain or distraction.

Accessing and effectively activating these sensitive pain triggers takes training, skill, and practice to create safety and proficiency. This is, at least partially, due to the location of these sensitive areas on the body and their relationship to body regulating chemical and pressure receptors, major vessels, and nerve plexi.

Pressure point compliance techniques differ from their control counterparts in that control techniques typically rely more on mechanical advantage or brute force than pain itself. All this is not to say that compliance and control techniques cannot be used together; in fact, they often are. And more often than not, the two are accompanied by mechanical restraint.

An example of a common pressure point compliance/control hold/mechanical restraint scenario might involve a mandibular nerve pain compliance technique. This pain compliance technique is

used when an active resister is taken down with arms locked under their body. If the officer cannot secure the arms from underneath the arrestee, he might activate this pressure point and clearly command the suspect to remove their arms from underneath their body. The technique is applied for only a few seconds, just enough time to allow the subject to reasonably comply. If compliance is obtained, the officer transitions to a control hold and handcuffs the subject. If the subject refuses to comply, the officer transitions to another force option.

As noted previously, pressure points generally produce compliance rather than control. They do this by introducing a painful stimulus. This stimulus operates as a kind of reward feedback loop; person complies, pain stops. But this type of technique has obvious limitations, specifically, for the purposes of a law enforcement or corrections discussion: objective reasonableness.

Officers are trained that pain compliance, and control hold options, are used to facilitate legitimate law enforcement objectives. That use of force must always be objectively reasonable given the circumstances. And that force is never used for the sole reason of obtaining compliance or as punishment.

Pain compliance techniques work, or they don't. They are not intended to be used for extended periods.

Persons unfamiliar with modern law enforcement training and practices, and even practicing law enforcement officers or administrators, sometimes confuse or mistakenly interchange compliance and control. But the difference between these two concepts is essential for officers to understand as it can mean the difference between a reasonable force encounter and an unreasonable one.

It became obvious to me through my review of the case materials that the personnel on-duty in the Obion County Detention Center at the time of this incident, and most notably, CO Spaulding, were grossly underqualified and dangerously underskilled in the areas of defensive tactics and arrest control, among others.

CO Spaulding demonstrated no understanding of the concepts of objective reasonableness, control versus compliance, compressional asphyxia, or the relationship between the need for force and the

amount of force used. He mounted the handcuffed Mr. Higgins, applying compressive body weight to his torso as he compressed Higgins' neck with the heels of his hands. And he continued these tactics even after he had determined that Higgins was under control and, therefore, posed no immediate threat.

CO Spaulding claims these maneuvers were necessary, even beyond when Mr. Higgins was controlled, because he [Higgins] continued to resist. But the evidence reasonably points to the conclusion that Higgins' "resistance" was an attempt to breathe and remain conscious as CO Spaulding compressed his torso with his body weight and constricted the blood flow to his brain with his hands, and not an effort to fight or escape.

My *Graham* analysis of CO Spaulding's actions against Mr. Higgins examined the required criteria, as outlined above, and found the following:

> **Relationship between the need for the use of force and the amount of force used:** Due to Officer Orsborne's failure to control his prisoner during the transfer process with jail personnel, Mr. Higgins was permitted to move unencumbered toward CO Brogglin as he entered the jail facility. Higgins approached CO Brogglin, moving around her left side and, with a twisting motion, grabbed hold of  Brogglin's uniform jacket with his handcuffed hands. CO Brogglin immediately pushed Higgins off of her and turned to face him. Higgins lunged toward Brogglin and grabbed hold of CO Brogglin's hair, which was incautiously down and quickly accessible. As this occurred, CO Spaulding grasped Higgins and pulled him away from Brogglin. As this was occurring, Officer Orsborne, still holding Mr. Higgins' belongings in his hand, delivered a knee strike to Higgins' right leg sending Higgins and Spaulding to the floor. Ten seconds later, at timestamp 01:47:05 on the jail video, Mr. Higgins was deemed under control.[17]

This needless and avertible series of events was made possible because Orsborne failed to control his prisoner, and Brogglin failed to practice suitable grooming habits for her work environment and was unable to adequately defend herself. And while I consider these officer-safety deficiencies serious, they are training, policy, and tactics issues, not

---

[17] Spaulding deposition pg. 93;10-15.

reasonableness ones.

Despite the serious deficiencies shown by the involved officers at this stage of the incident - timestamp 01:47:05 on the jail video - the relationship between the need for the use of force and the amount of force used by the involved officers was reasonable given the circumstances. This relationship, however, collapses quickly moving forward.

CO Spaulding testified that Mr. Higgins was controlled at timestamp 01:47:05. Yet despite having him under control, CO Spaulding continued to apply hand pressure to the area of Higgins' jaw and neck for another seven minutes and twenty-seven seconds. This action extended Mr. Higgins' neck compression, starving his brain of oxygen, while his body weight compressed Higgins' torso, limiting his ability to breathe.

After achieving control of the handcuffed Mr. Higgins, Spaulding had no legitimate need to continue his force application. And because the need for force was no longer present, the amount of force must decrease accordingly to maintain the proper relationship between need and amount that would assure objective reasonableness. This did not happen.

**Extent of the [inmate's] injuries:** Mr. Higgins died as a result of CO Spaulding's improper use of his hands to the area of Higgins' neck, direct body compression, the inappropriate use of the restraint chair, and the subsequent failure to render timely medical assistance to the obviously unconscious and apneic Mr. Higgins.

**Effort made by the officer to temper or to limit the amount of force:** No officer on-scene during this incident – police or correctional – made any effort to temper or limit the level, quality, or quantity of force that was delivered to Mr. Higgins by Police Officer Orsborne, CO Brogglin, CO Spaulding, or CO Sanford.

**Severity of the security problem at issue:** CO Spaulding, in his deposition testimony, attempted to justify his actions by claiming he was "trying to keep him [Mr. Higgins] from running off, getting up and running off."[18]  But the evidence reasonably points to the

---

[18] Spaulding deposition pg. 95;7-10

conclusion that Higgins' "resistance" was an attempt to breathe and remain conscious as Spaulding compressed his torso and constricted the blood flow to his brain, and not an effort to fight with him or get away.

The following timeline of events makes clear that Mr. Higgins was at no time during this incident a credible security risk:

| Video Timestamp | Security Measure | Comments |
|---|---|---|
| 01:46:25 | Enters secure booking facility | Handcuffed behind his back |
| 01:46:38 | Spaulding compressing Higgins' torso | On ground |
| 01:47:05 | "In control" | Per CO Spaulding testimony |
| 01:49:02 | Leg irons applied | Still in jaw/neck "control hold" |
| 01:52:30 | Unconscious | Still in jaw/neck "control hold" |
| 01:54:32 | Put in restraint chair | Unconscious and apneic |

**Threat reasonably perceived by the officer:** CO Spaulding testified in his October 2020 deposition that Mr. Higgins was controlled within the first ten seconds of the floor struggle.[19]  At all times during this incident, Mr. Higgins was restrained in handcuffs, leg irons, and/or a restraint chair. During the floor struggle, Higgins was held – head wedged between the floor and wall - by his jaw and neck as CO Spaulding compressed his torso with his body weight. At no time during the floor struggle did Mr. Higins present a reasonably perceived immediate threat to officers or others that would justify CO Spaulding's gratuitous actions.

**Whether the inmate was actively resisting:** Mr. Higgins was indeed actively resisting CO Spaulding's attempts to control him, but only due to his human need for oxygen. By CO Spaulding's accounting of the event, Mr. Higgins was controlled within the first ten seconds of the struggle.[20]  The remaining five minutes and thirty-four seconds of "resistant" behavior was directly attributable to Mr. Higgins being compressionally asphyxiated by CO Spaulding's body weight and strangled by CO Spaulding's improper application of force.

---

[19] Spaulding deposition pg. 93;10-15.
[20] Spaulding deposition pg. 93;10-15.

-16-

During the remaining one minute and fifty-three seconds of CO Spaulding's compliance technique debacle, Mr. Higgins laid unconscious.

In *Kingsley*, the Court laid out that the first step in evaluating the objective reasonableness of a correctional officer's force response is to establish whether or not a "reasonable officer" would believe that the force used was necessary under the circumstances to achieve one or more legitimate correctional objectives. There is no legitimate correctional objective to be served by compressionally asphyxiating and strangling a handcuffed and leg ironed man whom the offending officer deemed under control - and continuing those actions until the subject was unconscious, unresponsive, and not breathing. Any "reasonable officer" would understand this.

**Policy & Training:** The Obion County Use of Force policy is essentially one paragraph plus a three-page continuum. My initial impression of the policy finds its language ambiguous and entirely too open to officer interpretation or unfettered discretion.

But I am even more concerned with how the document's materials are trained - if that is even possible. My review of the Obion County training lesson plan, as approved by TCI in April 2012, lists **Force Continuum Policy = 1 hour**.  As previously stated, Obion County's Use of Force policy and continuum documents total the better part of 4 pages. Given that Use of Force is arguably one of the most liability laden areas of law enforcement and one of the most complex from a legal concepts perspective - especially in the corrections arena - I find it hard to fathom that this material could be adequately covered in one hour. Even if the policy and continuum were crystal clear and not open to vast interpretation and unfettered discretion – *and they are not* – one hour is clearly not enough time to cover the material and assure that officers have a satisfactory level of understanding.

My other concern with this training plan is its lack of performance objectives or measurable training goals. Reenforcing my previous concern regarding adequate time to assure that officers have a sufficient understanding of the materials, this training is deficient in quantitative or competency-based testing methods. I am also concerned that there are no references to use practices or guidance regarding early intervention, de-escalation, or crisis management.

-17-

**Opinion 4: The use of the restraint chair upon the unconscious and apneic Mr. Higgins by Obion County Correctional Officers Brogglin, Spaulding, and Sanford constitutes excessive force, violated agency and TCI standards, and substantially delayed life-saving measures.**

Six minutes and thirty seconds after arriving in the Obion County Detention Center, the handcuffed and leg shackled Mr. Higgins was unconscious on the floor. CO Spaulding sat across Higgins' torso while still compressing his neck with the heels of his hands. Spaulding would continue these actions on the unconscious Higgins for another minute, fifty-three seconds. At timestamp 01:54:32 of the jail camera video, COs Spaulding and Sanford are seen dragging Mr. Higgins' lifeless body to the waiting restraint chair.

Common sense would dictate that an unconscious, unresponsive prisoner who is not breathing would present no threat, present no security risk, and could not be combative, violent, or resistant. Yet this is precisely how Mr. Higgins presented when he was strapped into the Obion County Detention Center emergency restraint chair by COs Spaulding, Brogglin, and Sanford.

The required objective analysis of an officer's use of force is based on the totality of the circumstances known to the officer at the time the force was used and includes the following factors: [21]

- Relationship between the need for the use of force and the amount of force used;
- Extent of the [inmate's] injuries;
- Effort made by the officer to temper or to limit the amount of force;
- Severity of the security problem at issue;
- Threat reasonably perceived by the officer; and,
- Whether the inmate was actively resisting.

My *Graham* analysis of COs Spaulding, Brogglin, and Sanford's use of the restraint chair against Mr. Higgins examined the required criteria, as outlined above found the following:

> **Relationship between the need for the use of force and the amount of force used:** The relationship between the need to use the restraint chair and how the chair was used is nonexistent. Because Mr. Higgins was unconscious, unresponsive, and not breathing, there

---

[21] *Kingsley v. Hendrickson* at 1046.

was no legitimate need to use the chair.

**Extent of the [inmate's] injuries:** The extent of Mr. Higgins' injuries is clear; he was in the process of dying when he was inappropriately placed in the restraint chair and, because of the lack of adequate and timely medical care, completed that process while in the chair.

**Effort made by the officer to temper or to limit the amount of force:** As summarized throughout this document, neither COs Spaulding, Brogglin, Sanford, nor Officer Orsborne made any attempt to temper or limit the use of the restraint chair on Mr. Higgins.

**Severity of the security problem at issue:** After being deemed under control by CO Spaulding ten seconds after dropping to the floor, the handcuffed and leg shackled Mr. Higgins was rendered unconscious by CO Spaulding's continued body compression and the use of an inappropriate force option. He presented no credible security risk.

**Threat reasonably perceived by the officer:** Due to Mr. Higgins' unconscious state when strapped into the restraint chair, there was no reasonable perception of a threat by any of the officers on-scene.

**Whether the inmate was actively resisting:** Mr. Higgins, in his unconscious state, was incapable of active resistance.

In every Court mandated element my examination found that the use of the restraint chair on Mr. Higgins was excessive and unnecessary, violated agency policy and State and industry standards, and completely defied logic. As previously discussed in this report, the Court in *Kingsley* laid out that the first step in evaluating the objective reasonableness of a correctional officer's force response is to establish whether or not a "reasonable officer" would believe that the force used was necessary under the circumstances to achieve one or more legitimate correctional objectives. There is no legitimate correctional objective to be served by placing an unconscious and unresponsive man who is not breathing into a restraint chair. Any "reasonable officer" would understand this.

**Policy & Training:** My initial impression of the Obion County Emergency Restraint Chair policy,

like its Use of Force counterpart, found its language to be ambiguous and entirely too open to officer interpretation or unfettered discretion. It lacks a required direct observation requirement and the necessity of medical staff approval, as required by TCI state standards.[22] And it does nothing to ensure accountability, as evidenced by the low level of department approval needed for its deployment.

Further specific deficiencies of the policy include:
- The need to notify healthcare staff to evaluate health status following application;
- Monitoring procedures, specifically relating to healthcare staff during restraint;
- Required documentation during the restraint period – including any less restrictive treatment alternatives and de-escalation actions taken before physical restraint;
- Release criteria; and,
- After-incident review process.

A review of the user-level restraint chair training revealed that the materials were not training documents as much as a manufacturer's instruction manual. The "training document" contained no performance objectives or measurable training goals. It was deficient in quantitative or competency-based testing methods necessary to test officers' competencies. There were no references to use practices or guidance regarding early intervention, de-escalation, or crisis management. In my estimation, if this is the extent of Obion County correctional officers' training, concerning restraint chair use, it is grievously inadequate.

**Opinion 5: The failure of Obion County correctional personnel to render timely and appropriate medical assistance to the obviously unconscious and apneic Mr. Higgins represents a gross dereliction of duty, violates agency policy, and disregards established industry standards and guidelines.**

Law enforcement and corrections agencies are responsible for providing reasonable medical care to prisoners in their custody. This care includes competent application of state and department mandated CPR, first aid, and other required medical training.[23]

---

[22] TCI Standard 1400-01-.07 #22a (2018).
[23] See TCI 1400-01, Minimum Standards For Local Adult Correctional Facilities (2018), Section 1400-01-.13 #15a-d.

The video evidence and involved officers' testimonies regarding Mr. Higgins' condition prior to being placed into the restraint chair convey obvious signs and symptoms consistent with, and indicative of, a life-threatening medical emergency. In fact, the signs and symptoms of Mr. Higgins' life-threatening condition – unconsciousness, unresponsiveness, loss of muscle tone, pulselessness, agonal respirations[24], and apnea[25] - were so apparent that correctional officers with no medical training or experience recognized that *something* was wrong, even if they didn't know the what or why. This was clearly evidenced by the repeated medical assessments - verbal stimuli, pulse checks, painful stimuli, Narcan® administration - performed by officers over the course of the more than 20 minutes that Mr. Higgins sat strapped and dying in the chair. [26]

After dragging Mr. Higgins' lifeless body to the restraint chair COs Spaulding, Brogglin, and Sanford spent the roughly the 7 minutes meticulously strapping and cuffing Mr. Higgins into the chair, searching him, and assessing his unresponsive condition. As Higgins was being strapped into the chair, he exhibited signs of agonal respirations, a sign that his heart was no longer pumping oxygen-rich blood to his brain. Agonal respirations - a brainstem reflex associated with cardiac arrest, and a signal of imminent death - produces gasping "breaths," which are often described as snoring, groaning, or moaning, as the body struggles to breathe. All of the officers described hearing such sounds from Higgins during this incident. But by timestamp 01:57:35, Mr. Higgins' upper body and head movements had stopped; a clear indication that Higgins' breathing attempts had ceased.

At timestamp 02:00:50, CO Spaulding checks Mr. Higgins for a carotid pulse, then coldly bats Higgins' head to the right. From timestamp 02:00:58 to 02:01:12, CO Sanford pokes around Mr. Higgins' neck, presumably searching for a carotid pulse.

At timestamp 02:01:29, Officer Orsborne - the only CPR trained officer on-scene - performs a

---

[24] Agonal respiration (agonal breathing) - is a term used to describe a struggle to breathe, or gasping. It is a symptom of a severe medical emergency, such as stroke or cardiac arrest. But the term can be somewhat of a misnomer because the gasping and snoring (also described as snorting, labored breathing, groaning, or moaning) associated with agonal breathing is not *true* breathing, but rather a brainstem reflex. Agonal breathing often occurs because the heart is no longer pumping oxygen-rich blood to the brain. Agonal respiration and other breathing abnormality recognition is a component of CPR training.
[25] Apnea is the cessation of beathing. Mechanically induced apnea is a common side effect of strangulation.
[26] Spaulding deposition pg. 29;17-22, 78;20-24, Brogglin deposition pgs. 64;11-23, 85;19-25, Sanford deposition pg. 75;4-18, Orsborne deposition pgs. 153;16-154;19, 155;22-25, 156;11-24, 157;2-19, 158;14-21

sternal rub on Mr. Higgins. There was no response by Higgins.

Timestamp 02:01:38 sees CO Spaulding wheeling the lifeless Mr. Higgins down the hall and into Cell 15. Spaulding sets Mr. Higgins in the middle of the room facing the door and collects the lone bunk's mattress. CO Spaulding carries the mattress out of the cell and down the hallway as CO Sanford secures the door to Cell 15 at 02:02:06. Mr. Higgins has shown no voluntary movement for nine minutes and thirty-six seconds, and there have been no life-saving measures initiated.

For the next two minutes and fifty-four seconds, Mr. Higgins sat lifeless, strapped into a restraint chair in Cell 15. At timestamp 02:05:00, CO Brogglin, the officer-in-charge of the shift, peered through the cell door window at Mr. Higgins. Soon after, CO Brogglin directs CO Sanford to check on Mr. Higgins.

At 02:05:34, Sanford and Officer Orsborne enter Cell 15. CO Spaulding joins them twenty-three seconds later.

Inside Cell 15, Officer Orsborne and COs Spaulding and Sanford each search Mr. Higgins for a carotid pulse. Higgins remains slumped in the restraint chair, head hanging to his left side. Officer Orsborne leaves the cell at timestamp 02:06:11.

At 02:06:27, CO Sanford pushes Mr. Higgins' open mouth shut with the back of his hand only to have it fall open again when he removes his hand.

At timestamp 02:06:59, CO Spaulding repositions Mr. Higgins' head as he searches for a pulse on Higgins' left carotid artery.

At 02:07:05, CO Sanford inexplicably grabs Mr. Higgins' chin - opening and closing Higgins' mouth as if he were operating a doll's mouth to make it speak.
At timestamp 02:07:21, CO Spaulding moves his pulse search to Mr. Higgins' left wrist.

By 02:07:51 on the video clock, it appears COs Spaulding and Sanford have run out of ideas as the two men stand looking at the lifeless Mr. Higgins. It has been fourteen minutes and fifty-one

seconds since Mr. Higgins demonstrated voluntary movement, and still, no life-saving measures have been initiated.

At timestamp 02:08:40, CO Spaulding retires to the cell's lone bench where he sits, hands in his lap, for the next forty-five seconds. CO Sanford rests against the wall as Mr. Higgins sits lifeless in the center of the room, still strapped into the restraint chair.

Timestamp 02:09:30 again sees CO Spaulding checking Mr. Higgins' right carotid pulse. At 02:09:36, Spaulding moves his right hand to Higgins' chest as if to feel for a heartbeat. At 02:09:37, he adds his other hand. 02:09:46 sees Spaulding performing a sternal rub on Higgins with no response.

At timestamp 02:10:12, we see CO Brogglin enter the cell with a dose of Narcan.® She hands the Narcan® to CO Spaulding, who administers it to Mr. Higgins at 02:10:20. Mr. Higgins has shown no voluntary movement for seventeen minutes and fifty seconds.

The administration of Narcan® was the first affirmative medical intervention provided by officers during this incident. Narcan® is a brand name for naloxone hydrochloride. It is an opioid antagonist that is most often used to reverse opioid overdose effects.

I find officers' decision to administer Narcan® interesting because after nearly eighteen minutes of the most objective signs of life-threatening medical distress - unconsciousness, unresponsiveness, agonal respiration, apnea, and pulselessness – and keeping in mind that, to this point, no one had attempted *any* life-saving measures on the lifeless Mr. Higgins, the first medical intervention officers think of is a treatment for a condition that no one even suspected Mr. Higgins of suffering. But Officer Orsborne, in his October 2020 deposition testimony, offered an explanation. He stated that while COs Spaulding and Sanford were "attending" to Mr. Higgins in Cell 15, Brogglin approached him, asking if Narcan® might be an option. Orsborne's reply: "It could not hurt."[27] So Brogglin retrieved the drug from the control room and delivered it to CO Spaulding.

---

[27] Orsborne deposition pg. 187;14-17.

With Narcan® administered, COs Spaulding, Brogglin, and Sanford stood and watched Mr. Higgins for the next minute and twenty-three seconds. At this time, CO Sanford can be seen checking Mr. Higgins' carotid artery for a pulse. The video clock time is 02:11:54. For the next minute and seven seconds, the COs do nothing to assist Mr. Higgins.

At timestamp 02:13:01, Union City Police Sergeant Simmons enters the cell. Simmons immediately makes his way to Higgins and checks for a carotid pulse. Simmons leaves the cell at 02:13:40. At timestamp 02:13:55, Simmons reenters the cell and directs the correctional officers to remove Mr. Higgins from the restraint chair.

Fire Department personnel enter the cell and contact Mr. Higgins at timestamp 02:15:10 as correctional officers, assisted by Sergeant Simmons, continue to extricate Higgins from the chair.

At timestamp 02:15:50, Mr. Higgins is freed from the chair, and firefighters move Higgins to the hallway for treatment.

Based on the objective evidence, it is abundantly clear that CO's Spaulding, Brogglin, and Sanford knew, or reasonably should have known, that Mr. Higgins was in medical distress. It is further understood that Obion County Detention Center policy requires that necessary medical services be provided as needed to all inmates. Yet, no Obion County Detention Center employee took any reasonable affirmative action to assist Mr. Higgins and, in fact, allowed him to die while in their custody.

**Policy & Training:** The Obion County Detention Center Policy & Procedure Manual (2009), Section 12 states: "Necessary medical service will be provided as needed to all inmates incarcerated in the Obion County Detention Center." But no on-duty Detention Center personnel were trained in life-saving procedures as required by agency policy and Tennessee Corrections Institute (TCI) standards at the time of Mr. Higgins' medical emergency.

TCI minimum standards (2018), in force at the time of this incident, and Obion County Sheriff's Department policy require at least one person per shift assigned to the facility, be trained in CPR

and first aid.[28] The TCI standard further requires that this minimum one-person-per-shift's training shall also include:[29]

    a.   Awareness of potential emergency situations;

    b.   Transfer to appropriate health care provider;

    c.   Recognition of symptoms of illness most common to the facility; and,

    d.   Giving of medication to inmates.

But as each of the correctional officers testified, no one on-duty at the Obion County Detention Center at the time of Mr. Higgins' admission and subsequent death had *any* medical training other than in the administration of Narcan®.[30]

It is clear from the evidence that Obion County Sheriff's Department Correctional Officers Spaulding, Brogglin, and Sanford violated agency policy and state standards during their interactions with Mr. Higgins. It is equally clear that the Obion County Detention Center was out of compliance with agency policies and Tennessee Correctional Institute standard 1400-01-.13 #15 (2018).

**Note:** It is clear that Union City Police Officer Orsborne - the only CPR trained officer on-scene at the time of this incident - should have been aware of Mr. Higgins' medical emergency - given Higgins' objective signs and symptoms - and should have intervened to assist Mr. Higgins based on his specialized training. However, Orsborne was not an employee of Obion County at the time of this incident and therefore not subject to their policies and procedures. I did not have access to Union City Police policies related to the administration of first aid and CPR at the time of this writing. Therefore, I could not analyze whether Orsborne's failure to act violated Union City Police Department policy or training.

---

[28] TCI chapter 1400-01, Minimum Standards For Local Adult Correctional Facilities (2018), Section 1400-01-.13 #15, Obion County Detention Center Policy & Procedure Manual (2009), Section 12b (pg. 62).
[29] TCI 1400-01, Minimum Standards For Local Adult Correctional Facilities (2018), Section 1400-01-.13 #15 a-d.
[30] Spaulding deposition pgs. 39;17-51;21,   Brogglin deposition pg. 48;19-21, Sanford deposition pgs.32;16-33;19

That said, I want to be clear that I believe Officer Orsborne's failure to intervene and assist Mr. Higgins with his life-threatening medical emergency - especially given his specialized training - was a gross dereliction of duty, disregarded established industry standards and guidelines, and violated the core principles of public safety and security.

**Opinion 6: The Obion County Sheriff's Department failed to adequately train COs Spaulding, Brogglin, and Sanford in core job tasks.**

Agencies are obligated to train personnel in those recurring tasks and duties that officers will face in their job's normal course if it is foreseeable that the particular task may harm another person. This training must address how to conduct such tasks in a manner consistent with Constitutional principles and generally accepted practices and standards.

A disturbing theme emerged as I reviewed officer testimony related to this incident; officers frequently appeared unable to answer even the most basic policy, procedure, and/or training questions with any degree of specificity. This is troubling as it almost certainly ensures that Obion County Detention Center personnel are, were, and/or will continue to violate the constitutional rights of the persons they encounter.

This theme continued in my review of the Obion County Detention Center jail camera video files. After watching correctional officers' performance in response to what could only be considered ordinary core job tasks, it became clear that these officers were grossly deficient in the most basic of skills. This level of deficiency, demonstrated in so many areas by so many people, can only be attributed to a lack of and/or an inferior level of training and supervision.

The United States Supreme Court has held that a municipality may be liable for violations of constitutionally guaranteed rights whose violations result from the municipality's failure to adequately train its employees if that failure reflects a deliberate indifference on the part of the municipality to the constitutional rights of its citizens.[31]

To establish whether training falls under this standard, we are instructed to ask the following three

---

[31] *City of Canton v. Harris,* 489 U.S. 378 (1989).

questions: [32]

1. Does the department know, to a moral certainty, that its employees will confront a given situation?

2. Will the situation present the employee with a difficult choice of the sort that training or supervision will make less difficult, or that there is a history of employees mishandling the situation?

3. Is the wrong choice by the employee likely to cause a deprivation of a citizen's Constitutional rights?

In examining these questions in terms of the testimony of the involved officers and the incident video recordings; and based on the frequency with which I would expect officers would find themselves operating within these circumstances, it is clear that Obion County personnel are deficient in the following areas:

- Use of force;
- Defensive tactics and arrest control;
- Use of the restraint chair;
- First aid and CPR;
- Compressional and positional asphyxia;
- Protection against an in-custody death;
- Awareness of potential emergency situations;
- Transfer of prisoners to appropriate health care providers;
- Recognition of symptoms of illness; and,
- Giving medication to inmates.

**Opinion 7: Officers failed to intervene while observing Constitutional rights violations against Mr. Higgins on four occasions during this incident. These occasions were as follows:**

1. **COs Spaulding, Brogglin, and Sanford failed to intervene when they observed Officer Orsborne trample and stand upon Mr. Higgins' legs. See opinion 2.**

2. **Officer Orsborne, CO Brogglin, and CO Sanford failed to intervene when they observed**

---

[32] *Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992).

**CO Spaulding using excessive and unnecessary force upon Mr. Higgins. See opinion 3.**

3. **Officer Orsborne had an affirmative duty to intervene when he observed COs Spaulding, Brogglin, and Sanford strapping the unconscious and apneic Mr. Higgins into the emergency restraint chair. See opinion 4.**

4. **Officer Orsborne, CO Spaulding, CO Brogglin, and CO Sanford all had affirmative duties to intervene to secure timely and appropriate emergency medical assistance to the dying Mr. Higgins. See opinion 5.**

An officer who purposefully allows a fellow officer to violate a victim's Constitutional rights may be held liable for failure to intervene to stop the violations. This duty to intervene applies if the officer knows - or reasonably should have known - that the Constitutional violation is occurring, had an opportunity to intervene, and chose not to do so. This charge is often applied to supervisory officers who observe uses of excessive force without stopping them or who actively encourage uses of excessive force but do not directly participate in them. But it can also apply in cases of officer to officer observations where violations are witnessed and not acted upon and/or reported. In each instance cited above, Officer Orsborne, or COs Spaulding, Brogglin, and Sanford, or all of them, were aware - or reasonably should have been - that Mr. Higgins Constitutional rights were being violated. Yet, not one of these officers made any effort to temper or limit the amount of force used upon Mr. Higgins or assist him in any substantive way.

Signed under penalty of perjury this 8th day of February 2021.

_____

Michael Leonesio

# CURRICULUM VITAE

## Michael Leonesio
**412 South White Street, Suite 210, Athens, Tennessee 37303**
**Phone: (423) 933-1911**
**Email: mike@leonesio.com**
**Web: www.leonesio.com**

**Professional Experience:**
2008-present: **Founder/President, Leonesio Consulting, LLC, Athens, Tennessee**
Duties include:
- Electroshock weapon (ESW) testing and analysis;
- ESW probe and wire analysis;
- Digital evidence retrieval, analysis, verification and authentication;
- Law enforcement training review, analysis, development and implementation;
- Law enforcement policy review, analysis, development and implementation;
- Litigation consultation and expert services.

2005-present: **Consultant, Institute for the Prevention of In-Custody Death, Inc. (IPICD), Henderson, Nevada.**

2009-2012: **Staff Instructor, Institute for the Prevention of In-Custody Death, Inc. (IPICD), Henderson, Nevada.**
Duties included:
- Curriculum review, analysis, development and implementation;
- Instructional presentation.

2005-2012: **Police Officer, Oakland Police Department, Oakland, California**
Summary: General law enforcement and crime investigation responsibilities. Additional duties included the research, development, and implementation of the Department's ESW program including establishment and direction of the first, police department based, ESW exclusive, weapon and evidence analysis laboratory in the U.S.
Duties included:
- Electroshock Weapon (ESW) Program Coordinator;
- Department subject matter expert in ESW use and operation;
- Department subject matter expert for in-custody death prevention/investigation;
- Department use-of-force subject matter expert;
- Subject matter expert, Force Review Board;
- Subject matter expert in forensic analysis of ESWs and related evidence;
- Policy consultation, development, and implementation;

- Classroom and scenario based training curricula development and implementation;
- Police academy and in-service staff instructor;
- Community and outside agency educational staff;
- Review, analysis, and evaluation of all ESW related use of force reports;
- Force options training program development and implementation.

2001-2005: **Police Officer, San Carlos Police Department, San Carlos, California**
Summary: General law enforcement and crime investigation responsibilities.
Duties included:
- Research, development, design, implementation, and management of the Department's electroshock weapon (ESW) program;
- Lead ESW instructor;
- ESW subject matter expert;
- Use-of-force subject matter expert;
- Policy consultation, development, and implementation;
- Defensive tactics and arrest control techniques instructor;
- Firearms/tactical rifle instructor;
- Critical incident response instructor;
- President, San Carlos Police Officer's Association, 2002-2005.

1987-1990: **Flight Medic, East Bay Regional Park Police, Hayward, California**
Summary: Helicopter based emergency medical response, treatment, rescue, and transportation.

1985-2001: **Emergency Medical Technician**
Summary: Emergency and non-emergency, advanced and basic life support, medical treatment and transportation in field and hospital based settings. During my tenure as an Emergency Medical Technician I was employed by:
- Acme-Western Ambulance Service, Oakland, CA, 1985-1988;
- LifeStat Ambulance Service, Oakland, CA, 1988-1995;
- Children's Hospital and Medical Center, Oakland, CA, 1995-1997;
- MedStat Emergency Medical Services, Oakland, CA, 1997-1998;
- Alta Bates-Summit Medical Center, Berkeley, CA, 1998-2001.
Duties included:
- Field preceptor/skills instructor;
- CME instructor;
- Field Supervisor.

**<u>Consulting:</u>**
I have consulted with various international, federal, state, and municipal law enforcement agencies and associated organizations on police use of force, police practices and electroshock weapon (ESW) subjects including:

- Use of Force analysis and evaluation;
- Training review and analysis;
- Policy review and analysis;
- ESW program review and analysis;
- ESW program development, maintenance, and monitoring;
- ESW testing and forensic analysis;
- ESW evidence collection, processing, analysis, and storage;
- Development and standardization of ESW maintenance and testing protocols.

**Continuing Professional Training:**
*Negotiating with Suicidal Individuals* (PATC, 2020)
*The Forensic and Medical Evaluation of Chokehold Patients* (AFN, 2020)
*Examining Violent Prone Restraint Incidents in Policing* (AELE, 2020)
*Video Evidence Training Symposium* (iNPUT-ACE, 2020)
*Administrative Investigations for In-Custody Deaths* (PATC, 2020)
*Law Enforcement Officer's Safety Act Certification* (Tennessee POST, 2020)
*Law Enforcement Use-of-Force Accountability* (AELE, 2020)
*Suicide Awareness and What We Can Do to Lessen Our Liability* (PATC, 2020)
*Law Enforcement Officer's Safety Act Certification* (Tennessee POST, 2019)
*One Breath: The Importance of Recognizing Agonal & Other Breathing Problems* (IPICD, 2019)
*Law Enforcement Officer's Safety Act Certification* (Tennessee POST, 2018)
*Arrest-Related Death, Excited Delirium, Agitated Chaotic Events & Sudden In-Custody Death Conference* (IPICD, 2017)
*Law Enforcement Officer's Safety Act Certification* (Tennessee POST, 2017)
*Law Enforcement Officer's Safety Act Certification* (Tennessee POST, 2016)
*Excited Delirium, Arrest-Related and Sudden In-Custody Death Conference* (IPICD, 2014)
*Suicide Identification, Prevention, Management, and Investigation* (IPICD, 2014)
*Excited Delirium, Agitated Chaotic Event Instructor Requalification* (IPICD, 2014)
*Excited Delirium, Arrest-Related and Sudden In-Custody Death Conference* (IPICD, 2013)
*Piexon JPX Master Instructor Course* (Piexon AG, 2013)
*Deadly Force in the Digital Era* (Rains Lucia Stern Symposium, 2013)
*Sudden Death, Excited Delirium, and In-Custody Death Conference* (IPICD, 2012)
*Sudden Death, Excited Delirium, and In-Custody Death Conference* (IPICD, 2011)
*Practical Solutions: Mental Health, Excited Delirium & Facts about the Combative and Vulnerable Patient* (CCPICD, 2010)
*Sudden Death, Excited Delirium, and In-Custody Death Conference* (IPICD, 2009)
*45th Annual Training Institute, Equipment, and Services Expo* (CNOA, 2009)
*Use of Force by the Numbers: 4, 8, 14* (IPICD, 2009)
*Forensic Analyst: Excited Delirium, In-Custody Deaths* (IPICD, 2009)
*Stinger S200AT/S200C Update* (Stinger Systems, 2009)
*Stinger TruVu Video System Update* (Stinger Systems, 2009)
*TASER X3 Operator Update* (TASER International, 2009)
*Electrical Biomedicine Conference* (IEEE, 2009)
*Force Science Research Update* (Force Science Institute, 2009)
*Are You Prepared? Excited Delirium Update* (CCPICD, 2009)
*International Bioelectrics Symposium* (Bioelectrics International, 2009)
*Scenario Based Training Principles* (Ti Training, 2009)

*TASER Use of Force, Risk Management, and Legal Strategies* (TASER International, 2009)
*Psychological and Biomechanical Aspects of Officer Involved Lethal, Less-Lethal Force* (AELE, 2009)
*Sudden In-Custody Death, Excited Delirium Conference* (IPICD, 2008)
*Heart Rhythm Society 29th Annual Scientific Sessions* (HRS, 2008)
*TASER Master Instructor Update and Conference* (TASER International, 2008)
*TASER Shockwave Instructor Update* (TASER International, 2008)
*TASER X12/XREP Instructor Update* (TASER International, 2008)
*Stinger S200 Operator/User* (Stinger Systems, 2008)
*Stinger S200 Instructor* (Stinger Systems, 2008)
*CA POST Instructor Development Course* (Napa Valley College, 2008)
*Psychological and Biomechanical Aspects of Officer Involved Lethal and Less-Lethal Force* (AELE, 2007)
*TASER Master Instructor Update and Conference* (TASER International, 2007)
*Terrorism Liaison Officer Course* (USDHS, 2007)
*Incident Command System* (USDHS, 2007)
*National Incident Management System* (USDHS, 2007)
*In-Custody Death/Excited Delirium Investigation Instructor Update* (IPICD, 2007)
*Sudden In-Custody Death, Excited Delirium Conference* (IPICD, 2007)
*In-Custody Death/Excited Delirium Investigation Instructor* (IPICD, 2006)
*TASER Instructor Update* (TASER International, 2006)
*TASER Armorer/Technician* (TASER International, 2006)
*Firearms/Tactical Rifle Instructor* (ALCO SO, 2005)
*Street Drug Use and Sales* (SMSO NTF, 2004)
*Defensive Tactics & Baton Instructor* (SBRTA, 2004)
*Defensive Tactics Instructor* (ALCO SO, 2003)
*Critical Incident Response Instructor Course* (SCPD, 2003)
*Tactical Response to Active Shooter Incidents Instructor Course* (LAPD, 2003)
*TASER Instructor* (TASER International, 2004)
*TASER Operator/User* (TASER International, 2002)

**Professional Certifications:**
    **Tennessee Commission on Peace Officer Standards and Training (TNPOST):**
- Law Enforcement Officer's Safety Act Certificate, 2020
- Law Enforcement Officer's Safety Act Certificate, 2019
- Law Enforcement Officer's Safety Act Certificate, 2018
- Law Enforcement Officer's Safety Act Certificate, 2017
- Law Enforcement Officer's Safety Act Certificate, 2016

    **U.S. Department of Homeland Security:**
- Incident Command System (ICS) Certification, 2007
- Initial Action Incidents Certification, 2007
- National Incident Management System (NIMS) Certification, 2007
- Terrorism Liaison Officer (TLO) Certification, 2007

    **California Commission on Peace Officer Standards and Training (CAPOST):**
- Advanced Peace Officer Certificate, 2010

4

- Academy Instructor, 2008
- Terrorism Liaison Officer, 2008
- Intermediate Peace Officer Certificate, 2007
- Firearms/Tactical Rifle Instructor, 2005
- Defensive Tactics & Baton Instructor, 2004
- TSA Law Enforcement Officer Flying Armed, 2004
- Basic Peace Officer Certificate, 2003
- Drug Influence and Recognition (11550 H&S), 2003
- Defensive Tactics Instructor, 2003
- Critical Incident Response Instructor, 2003
- Tactical Response to Active Shooter Incidents Instructor, 2003
- Basic Academy Certificate, 2001

**Institute for the Prevention of In-Custody Deaths, Inc. (IPICD):**
- One Breath: The Importance of Recognizing Agonal & Other Breathing Problems, 2019
- Instructor Requalification, 2014
- Staff Instructor Appointment, 2009
- Forensic Analyst Designation, 2009
- Instructor Update, 2007
- In-Custody Death/Excited Delirium Investigation Instructor, 2006

**Karbon™ Arms, Inc.:**
- Operator/User, 2012
- Instructor, 2012
- Armorer/Technician, 2012
- Senior Instructor, 2012

**Stinger™ Systems, Inc.:**
- Senior Instructor, 2010
- TruVu™ Video System Update, 2009
- Operator/User, 2008
- Instructor, 2008
- Armorer/Technician, 2008

**TASER® International, Inc. (now Axon Enterprise, Inc.):**
- X3™ Weapon Update, 2009
- Extended Range Electronic Projectile System Instructor (XREP), 2008
- Shockwave Area Denial System Instructor, 2008
- Master Instructor, 2008
- Master Instructor, 2007
- Armorer, 2006
- Instructor Update, 2006
- Instructor, 2002
- Operator/User, 2002

**Professional Associations:**

5

Member, International Police Association (IPA)
Member, International Association of Law Enforcement Intelligence Analysts (IALEIA)
Member, International Association of Chiefs of Police (IACP)
Member, Police Executive Research Forum (PERF)
Member, National Association of Civilian Oversight of Law Enforcement (NACOLE)
Member, National Alliance on Mental Illness (NAMI)
Member, CIT (Crisis Intervention Team) International
Member, Institute of Electronic and Electrical Engineers (IEEE)
Member, National Tactical Officers Association (NTOA)

Retired Associate Member, Peace Officer's Research Association of California (PORAC)
Member, National Fraternal Order of Police (FOP)
Member, Retired Oakland Police Officers Association (ROPOA)
Member, Retired Peace Officers of California (RPOAC)
Member, Tennessee Association of Retired Law Enforcement Officers
Member, National Association of Emergency Medical Technicians (NAEMT)
Member, ASTM (American Society for Testing and Materials) International

**Professional Awards:**
Certificate of Appreciation; National Alliance on Mental Illness (2017)
Letter of Appreciation; Las Vegas Metropolitan Police Department (2010)
Outstanding Performance Award; Oakland Police Department (2010)
Advanced Peace Officer Certificate; California POST (2010)
Good Conduct Ribbon; Oakland Police Department (2009)
Chief's Letter of Commendation; San Francisco Police Department (2008)
Distinguished Service Award; Oakland Police Department (2007)
Intermediate Peace Officer Certificate; California POST (2007)
Captain's Certificate of Commendation; Oakland Police Department (2007)
Unit Citation Award (2); Oakland Police Department (2005, 2007)
Basic Peace Officer Certificate; California POST (2003)
Senate Certificate of Recognition; California State Senate (2003)
Certificate of Special Congressional Recognition; U.S. House of Representatives (2003)
Chief's Certificate of Commendation; San Carlos Police Department (2002)
Life Saving Award; San Carlos Police Department (2002)
Heroism Award; Peninsula Council of Lions Clubs (2002)
Basic Academy Certificate; California POST (2001)

**Published Works:**
*"Test Methods for Measuring the Electrical Output of Electroshock Weapons"*: Journal of Biomedical Systems & Emerging Technologies (July 2016)

*"Development of Training Philosophies for Electroshock Weapons (ESWs)"*: Defense Research and Development Canada (October 2011)

*"Revision to DGO K-3, Use of Force"* (OPD SO 9051) Oakland Police Department, Oakland, CA (October 2010)

*"Electronic Control Device Evidence: How to Collect, Analyze, and Use It"*: Police and Security News; IACP Edition (September/October 2010)

*"Electronic Control Devices: Evidence, Data and Weapon Analysis"* Forensic Analyst: Excited Delirium, Sudden, In-Custody Deaths. Baltimore, MD: Institute for the Prevention of In-Custody Deaths, Inc. (October 2009, April 2010)

*"Forensic Analysis Handbook: Electronic Control Devices"*: IPICD, Inc., Henderson, NV (August 2010)

*"Use of the Electronic Weapon"* Oakland Police Department, Oakland, CA (September 2010)

*"Reporting of In-Custody Injuries"* Oakland Police Department, Oakland, CA (July 2009)

*"Elements of Success: Design and Implementation of an Effective Electronic Weapons Program"* BioElectrics International Symposium. Columbia, MO: University of Missouri (June 2009)

*"Use of Electronic Weapons on Restrained Persons and Referrals of Electronic Weapons Incidents to the Force Review Board"* Oakland Police Department, Oakland, CA (December 2008)

*"Excited Delirium: A Medical Emergency"* Oakland Police Department, Oakland, CA (January 2007)

*"Use of the TASER®"* Oakland Police Department, Oakland, CA (September 2007)

*"Use of the TASER® ECD"* San Carlos Police Department, San Carlos, CA (August 2003)

**Professional Presentations:**
November 2013, Ottawa, Ontario, Canada: Royal Canadian Mounted Police; *ESW Measurement and Testing* presentation

May 2013, Concord, CA: Rains Lucia Stern, PC Deadly Force in the Digital Era Symposium; *How Technology Impacts Critical Incident Investigations*

October 2012, Las Vegas, NV: Las Vegas Metropolitan Police Department; *Karbon™ Arms MPID Technical Presentation*

August 2011, Hampton, VA: IPICD ECD Forensic Analyst Course; *ECD Forensic Analyst™*

March 2011, Town of Poughkeepsie, NY: IPICD ECD Forensic Analyst Course; *ECD Forensic Analyst™*

October 2011, Ottawa, Ontario, Canada: Defense Research and Development Canada Conducted Energy Weapons Strategic Initiative Meeting; *Testing Strategies for Conducted Energy Weapons*

January 2011, Gaithersburg, MD: United States Department of Commerce, National Institute of Standards and Technology (NIST), Office of Law Enforcement Standards (OLES); *Standard Test Methods; Electroshock Weapon Test Protocols and Analysis*

January 2011, Gaithersburg, MD: United States Department of Commerce, National Institute of Standards and Technology (NIST), Office of Law Enforcement Standards (OLES); *When Electroshock Weapons Fail; A Risk Management Perspective*

January 2011, Gaithersburg, MD: United States Department of Commerce, National Institute of Standards and Technology (NIST), Office of Law Enforcement Standards (OLES); *Operator Training; An Educational Approach*

December 2010, Las Vegas, NV: IPICD ECD Forensic Analyst Course; *ECD Forensic Analyst™*

November 2010, Las Vegas, NV: IPICD Annual Conference; *Electronic Control Devices: Evidence and Device Analysis*

September 2010, Gaithersburg, MD: United States Department of Commerce, National Institute of Standards and Technology (NIST), Office of Law Enforcement Standards (OLES), Detection, Enforcement, and Inspection Program; *Measurement of Electroshock Weapon Outputs*

July 2010, Oakland, CA: Law Offices of Meyers Nave, Litigation/Police Civil Rights Section; *ECD Weapon and Evidence Analysis*

April 2010, Woodland, CA: Yolo County Crisis Intervention Team Training; *Excited Delirium: A Field Guide to Recognition and Intervention*

April 2010, Las Vegas, NV: Clark County Crime Investigation Response Team (CIRT); *Electronic Control Device Weapon and Evidence Analysis*

April 2010, Niagara Falls, Ontario, Canada: CCPICD Practical Solutions; Mental Health, Excited Delirium & Facts about Combative and Vulnerable Patients; *Electronic Control Devices: Evidence, Data and Weapon Analysis*

October 2009, Baltimore, MD: IPICD Forensic Analyst Conference; *Electronic Control Devices: Evidence, Data and Weapon Analysis*

June 2009, University of Missouri, Columbia: 2009 BioElectrics International Symposium; *Elements of Success: Design and Implementation of an Effective Electronic Weapons Program*

October 2008, San Francisco, CA: San Francisco Police Department Conducted Energy Device Workshop; *CED Roundtable Presentation*

April 2007, Fresno, CA: Central San Joaquin Valley Risk Management Authority; *Electronic Control Device Risk Management Presentation*

November 2006, Oakland, CA: Oakland Police Department; *TASER® Use of Force, Risk Management and Legal Strategies*

August 2006, Oakland CA: Alameda County Medical Center, Highland Hospital Medical Staff; *TASER® Electronic Control Devices; EDP, Excited Delirium and In-Custody Death*

**Medical/Scientific Research:**

I have been, and continue to be, involved in electroshock weapon medical, scientific, and phenomenological research projects. The following are some of the projects in which I have participated:

- October 2010: University of Missouri; Columbia, MO
- July 27-31, 2009: TASER® International, Inc.; Scottsdale, AZ
- June 28, 2009: TASER® International, Inc.; Scottsdale, AZ
- February 3-4, 2009: TASER® International, Inc.; Tucson, AZ
- June 12, 2008: Stinger™ Systems, Inc.; Columbia, MO
- April 14, 2008: TASER® International, Inc.; Scottsdale, AZ
- April 7, 2008: TASER® International, Inc.; Scottsdale, AZ
- February 18, 2008: TASER® International, Inc.; Scottsdale, AZ

**Expert Testimony:**

I have qualified and testified as an expert in state and federal court proceedings, in the areas of police practices and procedures, law enforcement best practices, use of force analysis and investigation, law enforcement training, law enforcement policy, and all aspects of electroshock weapon use, training, policy, and testing.



**Leonesio Consulting, LLC**
412 South White Street • Suite 210
Athens • Tennessee 37303
Phone: (423) 933-1911 • Web: www.leonesio.com

_____

### Previous Testimony

1. **Norman v. Camden County et al.**
   **Case Number:** 2:2012-CV-04210
   **Court:** United States District Court, Western District of Missouri, Central Division
   **Retained By:** The Simon Law Firm
                   800 Market St.
                   St. Louis, MO 63101
   **Deposition Date:** June 18, 2013

2. **Rosenblatt v. City of Hillsborough et al.**
   **Case Number:** C12-5210 LB
   **Court:** United States District Court, Northern District of California
   **Retained By:** Casper, Meadows, Schwartz & Cook
                   2121 N. California Blvd.
                   Walnut Creek, CA 94596
   **Deposition Date:** October 8, 2013

3. **Martin v. City of Brea et al.**
   **Case Number:** SACV12-01846
   **Court:** United States District Court, Central District of California
   **Retained By:** White & Reed LLP
                   5757 W Century Blvd.
                   Los Angeles, CA 90045
   **Deposition Date:** December 9, 2013
   **Trial Date:** October 30, 2014

4. **Mitchell v. TASER International, Inc. et al.**
   **Case Number:** 09-CV-11480
   **Court:** United States District Court, Eastern District of Michigan, Southern District
   **Retained By:** Goodman & Hurwitz, PC
                   1394 East Jefferson Avenue
                   Detroit, MI 48207
   **Deposition Date:** January 6, 2014

5.  **Wilson v. St. Charles County et al. and TASER International, Inc.**
    **Case Number:** 4:11-CV-00790
    **Court:** United States District Court, Eastern District of Missouri, Eastern District
    **Retained By:** Williamson Law Firm
    　　　　　　　20750 Ventura Blvd.
    　　　　　　　Woodland Hills, CA 91364
    **Deposition Date:** February 20, 2014

6.  **Hesterberg v. United States (National Park Service) et al.**
    **Case Number:** C 13-01265 JSC
    **Court:** United States District Court, Northern District of California, San Francisco
    **Retained By:** Haddad & Sherwin
    　　　　　　　505 Seventeenth St.
    　　　　　　　Oakland, CA 94612
    **Deposition Date:** March 25, 2014
    **Trial Date:** August 12, 2014

7.  **McGinnis v. City of North College Hill, et al.**
    **Case Number:** 1:13CV423
    **Court:** United States District Court for the Southern District of Ohio
    **Retained By:** Gerhardstein & Branch
    　　　　　　　432 Walnut St., Suite 400
    　　　　　　　Cincinnati, OH 45202
    **Deposition Date:** March 27, 2014

8.  **Sterling, et al. v. City of Antioch, et al.**
    **Case Number:** 13 CV 00812 NC
    **Court:** United States District Court, Northern District of California
    **Retained By:** Casper, Meadows, Schwartz and Cook
    　　　　　　　2121 North California Blvd.
    　　　　　　　Walnut Creek, CA 94596
    **Deposition Date:** August 28, 2014

9.  **Salgado v. City of West Miami, et al.**
    **Case Number:** 12-CV-24458
    **Court:** United States District Court, Southern District of Florida
    **Retained By:** Gold & Gold P.A.
    　　　　　　　2700 North Military Trail
    　　　　　　　Boca Raton, FL 33431
    **Deposition Date:** September 8, 2014

**10. McElroy v. Joyner**
    **Case Number:** 3:13 CV 4576 CRB
    **Court:** United States District Court, Northern District of California
    **Retained By:** Burnham Brown
                P.O. Box 119
                Oakland, CA 94604
    **Declaration Date:** March 2, 2015

**11. Hardy v. City of Chicago, et al.**
    **Case Number:** 12 L 2632
    **Court:** Circuit Court of Cook County, Illinois
    **Retained By:** Foutris Law Office, Ltd.
                 53 West Jackson St.
                 Chicago, IL 60604
    **Deposition Date:** October 6, 2014
    **Trial Date:** March 12, 2015

**12. Shields v. State of California, et al.**
    **Case Number:** RG14-734700
    **Court:** Superior Court of the State of California
    **Retained By:** Williamson Law Firm
                 20750 Ventura Blvd., Suite 345
                 Woodland Hills, CA 91364
    **Deposition Date:** February 17, 2016
    **Trial Date:** April 21, 2017

**13. Rogers v. Board of County Commissioners of Torrance County, et al.**
    **Case Number:** D-722-CV-2014-00005
    **Court:** Seventh Judicial District Court, County of Torrance, State of New Mexico
    **Retained By:** Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP
                 P.O. Box 8180
                 Santa Fe, NM 87504
    **Deposition Date:** February 25, 2016

**14. Logan v. St. Louis County, et al.**
    **Case Number:** 4:15CV1712 HEA
    **Court:** United States District Court, Eastern District of Missouri, Eastern Division
    **Retained By:** The Simon Law Firm
                 800 Market St., Suite 1700
                 St. Louis, MO 63101
    **Deposition Date:** October 25, 2016

15. **Georgia v. Eberhart & Weems**
    **Case Number:** 15SC136846
    **Court:** Fulton County Superior Court
    **Retained By:** Fulton County District Attorney's Office
                    136 Pryor St., SW
                    Atlanta, GA 30303
    **Trial Date:** December 13, 2016

16. **Alcayde v. City of Ronan, et al.**
    **Case Number:** 9:16-CV-00086 DLC
    **Court:** United States District Court, District of Montana, Missoula Division
    **Retained By:** Bechtold Law Firm PLLC
                    317 E. Spruce St.
                    Missoula, MT 59807
    **Deposition Date:** June 27, 2017

17. **Hermiz v. City of Royal Oak, et al.**
    **Case Number:** 2:16-CV-11214-DML-SDD
    **Court:** United States District Court, Eastern District of Michigan, Southern Division
    **Retained By:** Giroux Ratton P.C.
                    28588 Northwestern Hwy, Suite 100
                    Southfield, MI 48034
    **Deposition Date:** March 31, 2017
    **Trial Date:** August 24, 2017

18. **Morad v. City of Long Beach, et al.**
    **Case Number:** 2:16-CV-06785-MWF-AJW
    **Court:** United States District Court, Central District of California
    **Retained By:** Hadsell Stormer Renick, LLP
                    128 North Fair Oaks Ave, Suite 204
                    Pasadena, CA 91103
    **Deposition Date:** November 7, 2017

19. **Taylor v. TASER International, Inc.**
    **Case Number:** 4:17-CV-00673-GHM
    **Court:** United States District Court, Southern District of Texas
    **Retained By:** Vickery & Shepherd
                    10000 Memorial Dr., Suite 750
                    Houston, TX 77024
    **Deposition Date:** March 7, 2018

20. **Cantu v. City of Dothan, et al.**
    **Case Number:** 1:16-CV-01003-MHT-DAB
    **Court:** United States District Court, Middle District of Alabama
    **Retained By:** Henry F. Sherrod III, PC
                     119 S. Court St.
                     Florence, AL 35630
    **Deposition Date:** March 21, 2018

21. **Gilbert v. St. Louis City, et al.**
    **Case Number:** 4:16-CV-01637-NCC
    **Court:** United States District Court, Eastern District of Missouri, Eastern Division
    **Retained By:** The Simon Law Firm
                     800 Market St., Suite 1700
                     St. Louis, MO 63101
    **Deposition Date:** April 27, 2018

22. **Aguilar v. City of Los Angeles, et al.**
    **Case Number:** CV-17-04382-CBM
    **Court:** United States District Court, Central District of California
    **Retained By:** Kaye, McLane, Bednarski & Litt, LLP
                     975 East Green St.
                     Pasadena, CA 91106
    **Deposition Date:** May 9, 2018
    **Trial Date:** April 25, 2019

23. **Gerling v. City of Hermann, et al.**
    **Case Number:** 4:17-CV-02702-JAR
    **Court:** United States District Court, Eastern District of Missouri, Eastern Division
    **Retained By:** The Simon Law Firm
                     800 Market St., Suite 1700
                     St. Louis, MO 63101
    **Deposition Date:** June 28, 2018

24. **Masters v. City of Independence, et al.**
    **Case Number:** 4:16-CV-01045-GAF
    **Court:** United States District Court, Western District of Missouri
    **Retained By:** Law Office of John Burton
                     128 North Fair Oaks Ave.
                     Pasadena, CA 91103
    **Deposition Date:** July 17, 2018
    **Trial Date:** December 10, 2018

25. **Ruda v. Boisvert, et al.**
   **Case Number:** 3:19-CV-232
   **Court:** United States District Court, Middle District of Alabama
   **Retained By:** Law Office of Griffin Sikes, Jr.
             P.O. Box 11234
             Montgomery, AL 36111
   **Deposition Date:** February 18, 2020

26. **Ramirez v. City of El Paso, et al.**
   **Case Number:** 3:17-CV-193
   **Court:** United States District Court, Western District of Texas
   **Retained By:** Law Office of Lynn Coyle
             2515 N. Stanton St.
             El Paso, TX 79902
   **Deposition Date:** July 23, 2020

**Leonesio Consulting, LLC**
412 South White Street • Suite 210
Athens • Tennessee 37303
Phone: (423) 933-1911 • Web: www.leonesio.com

_____

## Fee Schedule

**Initial Consultation:** No charge.

**Case Review:** A complete review of all materials furnished will be done in a timely manner, and a written opinion will be completed as required.  A review of the materials provided will be performed at the rate of $300.00 per hour.  A non-refundable $5000.00 case review and retainer fee will be paid to Leonesio Consulting before any work, outside of the initial consultation, is started. This fee must accompany the signed *Professional Services Agreement*.

**Filing/Billing/Office Supply Fee:**  $175.00 (One-time fee per case)

**Reading, Consultation, Preparation, Research & Reports:**  $300.00 per hour to be billed against the services retainer. [1]

**Testimony:**  Actual testimony in a proceeding (i.e., trial, deposition, or hearing) will be billed at $400.00 per hour with a four-hour minimum.  Standby time at the venue of the proceeding will be billed at $300.00 per hour.  **Payment for testimony must be pre-paid.**

**Site Visit:**  $3,000.00 plus direct expenses if travel time is more than two hours, portal-to-portal.  $400.00 per hour plus direct expenses otherwise.  **Payment for site visits must be pre-paid.**

**Travel:**  $100 per hour of actual travel time plus direct expenses. Airfare will be booked at an unrestricted coach fare rate.  Mileage will be charged at the current IRS rate.

**Expenses:**  Billed as incurred.

**Weapon Testing and Inspection:**  See attached fee schedule as applicable.

**Billing:**  All hourly rates will be billed per tenth hour.  Invoices may be issued every 30 days when the case is active.  All invoices are due upon receipt.  Invoices unpaid after 45 days will be assessed a 10 percent late fee.  Invoices remaining unpaid after 90 days will be assessed an additional 10 percent late fee.

The hiring attorney/firm/organization is responsible for ensuring that all fees are paid in full in a timely manner.

---

[1] An Expedited-Report fee of $1,000.00 will be billed if a report is needed in less than 10 business days.