255-173-00

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JENNIFER LOUISE JENKINS,                    )
Administrator *ad Litem* of the              )
ESTATE OF STERLING L. HIGGINS               )
                                             )
         *Plaintiff*,                        )
v.                                           )          No. 20-cv-01056 STA-atc
                                             )
OBION COUNTY, TENNESSEE;                    )
UNION CITY, TENNESSEE;                       )
ROBERT THOMAS OSBORNE, Individually;        )
MARY BROGLIN, Individually;                  )
WAYLON SPAULDING, Individually; and,        )
BRENDON SANFORD, Individually               )
                                             )
         *Defendants*.                       )

---

**DEFENDANTS OBION COUNTY, TENNESSEE, WAYLON SPAULDING, MARY
BROGGLIN, AND BRENDON SANFORD'S MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Defendants Obion County, Tennessee, Waylon Spaulding ("Spaulding"), Mary Brogglin

("Brogglin"), and Brendon Sanford ("Sanford") file this memorandum in support of their motion

for summary judgment.

## BACKGROUND

I.   CLAIMS ASSERTED BY PLAINTIFF.

Plaintiff, Jennifer Louise Jenkins, as administrator *ad Litem* of the Estate of Sterling L.

Higgins, initiated this lawsuit against Defendants subsequent to Sterling Higgins ("Higgins")

dying after Officer Robert Orsborne of the Union City Police Department arrested Higgins and

brought him to the Obion County Jail. (Amended Complaint, ECF No. 37). Plaintiff claims that

Defendants violated Higgins's Fourth and Fourteenth Amendment rights to adequate medical care

and to be free from objectively unreasonable force. (*Id.* ¶¶ 68-77). Additionally, Plaintiff seeks to hold the individual defendants liable under Tennessee state law due to "intentionally, recklessly, or otherwise unlawfully causing the death and pre-death suffering of Mr. Higgins…." (*Id.* ¶¶ 78-79). Lastly, Plaintiff asserts claims under Title II of the Americans with Disabilities Act and the Rehabilitation Act against Defendant Orsborne. (*Id.* ¶¶ 80-83).

II.   FACTUAL BACKGROUND.[1]

During the early morning hours of March 25, 2019, Officer Robert Orsborne ("Orsborne") arrested Higgins at the Pockets Market in Union City, Tennessee. (Defendants' Statement of Undisputed Fact "SUMF" ¶ 1). After he arrested Higgins, Orsborne transported Higgins in his vehicle to the Obion County Jail ("the Jail") in Union City, Tennessee. (SUMF ¶ 2).

At the time Orsborne brought Higgins to the Jail, Correctional Officers Spaulding, Brogglin, Sanford, and Stormy Travis ("Travis") were working at the Jail. (SUMF ¶ 3). Orsborne arrived at the Sally Port of the Jail with Higgins shortly before 01:44:00 a.m. (SUMF ¶ 4). After exiting his vehicle, Orsborne ultimately led Higgins into a hallway in the booking area of the Jail while Higgins remained in handcuffs. (SUMF ¶¶ 6-7). At the time Higgins entered the Jail, none of the correctional officers on shift knew the circumstances surrounding Higgins's arrest. (SUMF ¶ 8).

As Higgins entered the booking hallway, Brogglin directed Higgins to walk down the hallway to the booking counter, but Higgins refused. (SUMF ¶¶ 9-10). Instead, Higgins started yelling, "That's her. She's got a gun!" (SUMF ¶ 11). Higgins then grabbed Brogglin by her jacket with his left hand. (SUMF ¶ 12). After Higgins grabbed Brogglin, Brogglin pushed Higgins away from her. (SUMF ¶ 13). In response, Higgins, who remained handcuffed, grasped and began

---

[1] Defendants more fully rely upon their contemporaneously filed Statement of Undisputed Facts, but summarize a portion of those facts here.

pulling Brogglin by her hair to the point that he ripped a portion of Brogglin's hair from her scalp. (SUMF ¶¶ 14-15).

At this time, Spaulding approached and ordered Higgins to let go of Brogglin. (SUMF ¶¶ 16-17). Higgins refused. Thus, Spaulding used both of his hands to remove Higgins from Brogglin. (SUMF ¶ 18). After Spaulding pulled Higgins away from Brogglin, Higgins and Spaulding fell to the floor. (SUMF ¶ 19). Thereafter, Higgins resisted Spaulding and attempted to move away from him. (SUMF ¶ 20). Spaulding endeavored to gain control of Higgins by straddling Higgins. In doing so, Spaulding placed his right leg on the floor next to Higgins and his left leg between Higgins's two legs. (SUMF ¶¶ 21-22). Still, Higgins attempted to get away from Spaulding and began fighting him by kicking and "squirming." (SUMF ¶¶ 23-25).

While Spaulding attempted to gain control of Higgins, Sanford approached them. (SUMF ¶ 26). Because Higgins continued kicking, Sanford, Brogglin, and Orsborne eventually placed leg shackles on Higgins. (SUMF ¶¶ 27-28). After officers placed leg shackles on Higgins, Higgins continued kicking and "flailing around." (SUMF ¶ 29). In response, Orsborne stepped on Higgins's right leg to prevent Higgins from continuing to kick. (SUMF ¶ 30). Nonetheless, Higgins remained combative and attempted to grab Spaulding. (SUMF ¶ 31).

While Spaulding continued to place Higgins under control, Higgins started spitting on Spaulding. (SUMF ¶ 32). Spaulding ordered Higgins to stop, but Higgins nonetheless continued. (SUMF ¶¶ 33-34). To prevent Higgins from further spitting on him, Spaulding placed his hand on Higgins's jaw and held Higgins's face away from him. (SUMF ¶ 36). Over the following several minutes, Spaulding alternated placing his right and left hands on Higgins's jaw and/or chin to prevent Higgins from spitting. (SUMF ¶¶ 37-40). In doing so, Spaulding never placed his hands on Higgins's neck or throat, never covered Higgins's nose, and took no action which led him to

believe that he was impairing Higgins's ability to breath. (SUMF ¶¶ 41-45). Because Higgins continued spitting on Spaulding, Spaulding eventually asked Sanford to bring a cloth or paper towel to wipe the spit off of him. (SUMF ¶ 46). After Sanford retrieved a cloth, Higgins began to calm down. (SUMF ¶ 48).

Due to Higgins's combative actions and his multiple assaults on officers, Spaulding decided that the officers needed to place Higgins in a restraint chair to prevent Higgins from beginning to fight and/or resist officers again. (SUMF ¶¶ 49-50). As a result, Brogglin retrieved a restraint chair and brought it to the booking hallway. (SUMF ¶ 51). Shortly thereafter, Spaulding and Sanford lifted Higgins up off the floor and placed him in the restraint chair. (SUMF ¶ 52). Higgins picked up his head on his own volition and moved his lips when Spaulding and Sanford moved him to the restraint chair. (SUMF ¶ 53-54).

After Spaulding and Sanford placed Higgins in the restraint chair, Spaulding, Sanford, and Brogglin began strapping Higgins into the restraint chair. (SUMF ¶ 55). While Brogglin assisted securing Higgins in the restraint chair, Higgins mumbled and moved in such a way that led Brogglin to believe Higgins was going to start fighting officers again. (SUMF ¶ 56). He also moved his hands, feet, and head while being strapped into the restraint chair. (SUMF ¶¶ 57-58). Officers also observed that Higgins breathing and believed Higgins had simply "calmed down" after struggling with officers. (SUMF ¶¶ 59 & 64).

At approximately 2:01:30 a.m., after officers fully restrained Higgins in the restraint chair, Orsborne performed a sternum rub on Higgins and did not get a reaction from him. (SUMF ¶ 60). Eighteen seconds later, Spaulding wheeled Higgins into Cell 15, a cell in the booking area that was equipped with cameras that allowed Travis to observe Higgins in the control room. (SUMF ¶ 61). From approximately 2:02:07 to 02:02:40 a.m., officers also observed Higgins in the window

of his cell. (SUMF ¶ 65). At approximately 2:02:40 a.m., Orsborne called his supervisor, Sergeant Simmons to inform him that Higgins appeared to be nonresponsive and to inquire into whether he should call for an ambulance. (SUMF ¶ 66). A minute later, he called dispatch and requested EMS be sent to the Jail. (SUMF ¶ 68). Shortly after 2:05 a.m., Spaulding, Sanford, and Orsborne entered Cell 15 and did not observe Higgins's chest expanding, nor were they able to detect a pulse. (SUMF ¶ 69). Subsequently, Brogglin called dispatch and requested EMS be sent to the Jail. (SUMF ¶ 71).

EMS arrived to the Jail after 02:14 a.m. and began performing CPR shortly thereafter. (SUMF ¶¶ 76-77). Subsequently, EMS transported Higgins to a nearby hospital where he was later pronounced dead. (SUMF ¶¶ 78-79). The Medical Examiner concluded that Higgins died of "excited delirium due to methamphetamine toxicity." (SUMF ¶ 80).

The Jail's video system captured Higgins's entry and time in the Jail. However, due to the variable image refresh rate of the Jail's video footage, the original video data from the Jail does not completely reproduce the experiences of the officers at the time of the events. (SUMF ¶ 86). For example, the Jail's image refresh rate video recordings do not reproduce motion accurately. (SUMF ¶ 87). Moreover, it is not possible to determine at what specific time Higgins's voluntary movement ceased by observing the video footage. (SUMF ¶ 90).

Importantly, at all times relevant, the Jail was fully accredited by the Tennessee Corrections Institute ("TCI"). (SUMF ¶ 125). Furthermore, the Jail followed policies and procedures accredited and approved by the TCI that governed among other things, the use of force, the use of restraint chairs, and detainees' access to medical care. (SUMF ¶¶ 94-107). Likewise, at all times relevant, the Jail's officer training program fully complied with TCI standards. (SUMF ¶¶ 111-123).

## STANDARD

There is no issue for trial unless sufficient evidence exists for a jury to reasonably reach a verdict in favor of the party producing such evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In considering whether to grant summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986). A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere existence of a scintilla of evidence in support of the plaintiff's position will not be sufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Id.*

## ARGUMENT

I.    PLAINTIFF'S *MONELL* CLAIMS AGAINST DEFENDANT OBION COUNTY FAIL AS A MATTER OF LAW.

Section 1983 places liability on a "person who, under color of any statute, ordinance, regulation, custom or usage, of any States" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or law." 42 U.S.C. § 1983. This statute "is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001). A successful § 1983 action establishes "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

A governmental entity cannot be found liable due to an employee's or agents' actions under a *respondeat superior* analysis. *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 694

(1978). A municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Id*. "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Accordingly, to prevail on a § 1983 claim against a governmental entity, a plaintiff must show that a policy or well-settled custom of the entity was the "moving force" behind the alleged deprivation of his or her rights. *Miller v. Sanilac Cnty*, 606 F.3d 240, 254-55 (6th Cir. 2010). To satisfy *Monell's* requirements, a plaintiff must "identify the policy, connect the policy to the municipality itself, and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

Here, Plaintiff brings *Monell* claims against Obion County under a number of different theories. Specifically, Plaintiff asserts that Obion County (1) maintained "unconstitutional policies and customs," (2) failed to appropriately train its officers, and (3) ratified the "unconstitutional conduct" of its employees. (ECF No. 37 ¶¶ 61, 62, 64, 65, 69).

### A. Obion County's written policies complied with constitutional standards.

#### i. Obion County's use of force policy complied with constitutional standards.

Under the Fourth and Fourteenth Amendments, the test for whether officers' use of force violated the Constitution is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Clay v. Emmi*, 797 F.3d 364, 370 (6th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Here, the Jail's use of force policy provides, in part, that any force applied to a detainee "shall only be as much as is reasonable and necessary to control a given situation." (SUMF ¶ 94). It further provides, in part, that "[p]hysical force may be utilized when a lesser

amount of force is inadequate to control a situation." (*Id.*). Said written policy mirrors the Supreme Court's directive that officers may only use force that is "reasonable" in light of the facts and circumstances in the given situation. Accordingly, the Jail's use of force policy complied with constitutional standards and did not act as the "moving force" of any alleged constitutional deprivation.

>    ii.    *Obion County's restraint chair policy complied with constitutional standards.*

In accordance with the Supreme Court's "objectively reasonable" standard, "A restraint chair may be properly used to restore control over an individual who is in custody or to prevent such an individual from harming himself." *Fletcher v. Vandyne*, 2009 U.S. Dist. LEXIS 49877 (S.D. Ohio June 11, 2009). *See also Grinter v. Knight*, 532 F.3d 567, 573-74 (6th Cir. 2008) (finding that the "Due Process Clause does not give rise to a liberty interest in freedom from four-point restraints where a plaintiff was placed in a four-point restraint chair for four hours after he was accused of assaulting a guard).

Here, the Jail's policy on the use of a restraint chair provided that the restraint chair should only be used to control "combative, self-destructive, or potentially violent detainees." (SUMF ¶ 97). The policy allowed officers to utilize the restraint char to prevent injury to the individual arrested as well as the officers around him. (SUMF ¶ 99). Clearly, such a policy conforms to constitutional standards and could not have acted as the "moving force" of any alleged constitutional deprivation.

>    iii.    *Obion County's access to medical care policies complied with constitutional standards.*

Pretrial detainees have a right under the Fourteenth Amendment to adequate medical treatment. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005). Importantly, it is

well-settled that in order to fulfill its obligation to provide its detainees access to medical care, "municipalities may 'hire independent medical professionals to provide on-site health care to prisoners in their jails'." *Carson v. Hamblen Cty.*, 2017 U.S. Dist. LEXIS 110125, *21-22 (E.D. Tenn. July 17, 2017) (citing *Robbins v. Black*, 351 F. App'x 58, 63 (6th Cir. 2009) (internal citations omitted).

Here, at all times relevant, the Jail's medical services policy provided that medical services, including emergency medical services, would be provided as needed to all detainees. (SUMF ¶ 100). To that end, the Jail contracted with Nurse Practitioner Renee Terrell ("Nurse Terrell") to provide medical care to the detainees of the Jail. (SUMF ¶ 103). Pursuant to her contract, Nurse Terrell was on "emergency call" for the Jail at all times. (SUMF ¶ 104). In turn, Jail officers possessed the authority to contact Nurse Terrell or other medical professionals if a detainee was in need of emergency medical care and/or summon Emergency Medical Services ("EMS") when necessary. (SUMF ¶¶ 105-106).

In the Amended Complaint, Plaintiff criticizes Obion County for failing to have an officer at the Jail on the night in question who was CPR certified. (ECF No. 37 ¶ 44). Such criticisms fail to state a *Monell* claim. An officer is not under a constitutional obligation to render CPR, even if a detainee is in need of CPR. *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 846 (6th Cir. 2018). Rather, "[d]ue process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured . . . by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Id.*; *see also Tatum v. City and Cnty. of S.F.*, 441 F.3d 1090, 1099 (9th Cir. 2006) (holding that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR.").

Here, the Jail's policies went beyond the Constitution's requirements. In accordance with TCI standards, the Jail required there be at least one staff member on each shift who was trained in first aid and CPR.[2] While Plaintiff criticizes the County for failing to have a CPR-certified officer on shift on the night in question, such a failure does not constitute a policy. To the contrary, the written policy *required* a CPR-certified officer's presence. Notwithstanding, even if such failure could constitute a county policy, per *Stevens-Rucker*, failing to have a CPR-certified officer at the Jail could not lead to a constitutional deprivation because an officer is not under a constitutional duty to render CPR. His obligation is merely to "summon[] the necessary medical help or by taking the injured detainee to a hospital." *Stevens-Rucker*, 739 F. App'x at 846. As set forth above, the Jail's policies required emergency medical services be provided to detainees and allowed officers to summon emergency care when needed. Accordingly, the Jail's access to medical care policies clearly conformed to constitutional standards and did not act as the "moving force" of any alleged constitutional deprivation.

**B.    Plaintiff cannot show that any Obion County custom acted as a moving force for any alleged constitutional deprivation.**

Where the identified policy is itself facially lawful, the plaintiff "must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). To that end, a plaintiff may establish *Monell* liability by showing, despite appropriate written policies, the existence of a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a custom or

---

[2] The Jail assigned Ralph Molands, a CPR-certified officer, to work the night shift at the Jail on March 24, 2019, and into the morning hours of March 25, 2019. Prior to his shift beginning, Molands called in sick. (SUMF ¶¶ 108-109). However, Orsborne was CPR-certified. (SUMF ¶ 110).

usage with the force of law" if that custom actually caused the constitutional violation at issue. *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). The notion of "law" must include "deeply embedded traditional ways of carrying out" policy. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507-08 (6th Cir. 1996). It must reflect a course of action deliberately chosen from among various alternatives. *Id.* (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985)).

To show a custom or policy, a plaintiff must prove "a clear and persistent pattern" of unconstitutional conduct. Thus, in order to show a custom, a plaintiff cannot rely simply on the facts of his own case. Instead, he must reach beyond the facts of his case to show "several" separate incidents of the alleged rights violation. *Thomas v. City of Chattanooga*, 398 F.3d 426, 434 (6th Cir. 2005). Even offering examples of multiple discrete instances is not enough to reasonably draw such a conclusion. *Peet v. City of Detroit*, 502 F.3d 557, 568 (6th Cir. 2007) (concluding that three instances of misconduct is not enough to establish a "custom"); *See also Pineda v. City of Houston,* 291 F.3d 325, 329 (5th Cir. 2002) (determining that evidence of eleven incidents of unconstitutional conduct by police officers was insufficient to establish a "custom"). Here, Plaintiff pled in her Amended Complaint that Obion County maintained "unconstitutional…customs that resulted in the violation of Mr. Higgins's clearly established Fourth and Fourteenth Amendment rights…" (ECF No. 37 ¶ 69.) Despite Plaintiff's allegations of unconstitutional "customs," Plaintiff uncovered no prior instances of Jail deputies using excessive force or failing to provide detainees access to medical care. Accordingly, there is no proof whatsoever in the record of any prior incidents involving Jail deputies violating a detainees' constitutional rights. Without such proof, Plaintiff cannot establish *Monell* liability against Obion County based upon an "unconstitutional custom."

Moreover, even if Plaintiff could show prior instances of Jail officers using excessive force

or failing to provide its inmates access to medical care, she still cannot establish *Monell* liability because she cannot show that an Obion County policymaker acquiesced in such conduct. A municipality can be shown to have a "custom" causing constitutional violations only if the plaintiff offers proof of a policymaking officials' knowledge and acquiescence to the established practice. *Monell*, 436 U.S. at 690-691. Indeed, it is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694. In other words, in order to establish that a government's "custom" caused the constitutional deprivation at issue, the plaintiff must prove that the proper policymaking officials acknowledged and acquiesced in the custom. *See e.g.*, *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) ("A municipality can be shown to have a 'custom' causing constitutional violations…provided that the plaintiff offers proof of policymaking officials' knowledge and acquiescence to the established practice."); *Gregory*, 444 F.3d at 752 ("A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers."); *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice.").

Here, Plaintiff has offered no proof whatsoever to show that an Obion County policymaker approved and/or acquiesced in a custom of allowing excessive force against detainees or refusing to provide them medical care. To the contrary, the proof shows that at all times relevant, the Jail implemented constitutionally appropriate policies prohibiting officers from using excessive force

and requiring officers to provide detainees access to medical care. Accordingly, Plaintiff cannot succeed on her *Monell* claims based upon a theory that Obion County adopted a "custom" of allowing officers use excessive force and/or of refusing detainees access to medical care.

### C.    Plaintiff cannot show that Obion County's training was deliberately indifferent to the constitutional rights of others.

It is only in limited circumstances that "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In fact, a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *Id.*; *Oklahoma City* v. *Tuttle*, 471 U.S. 808, 822-823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

To succeed on a failure to train or supervise claim, a plaintiff must prove: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

### i.    Plaintiff cannot show that the Jail's training was inadequate.

In Tennessee, the Tennessee Corrections Institute ("TCI") establishes minimum standards for all local jails. Tenn. Code Ann. § 41-4-140. Courts have consistently refused to find municipal liability when the proof showed that a defendant jail implemented training that complied with TCI standards. *See Roberts v. Coffee Cty.*, 2020 U.S. Dist. LEXIS 7696, at *31 (E.D. Tenn. Jan. 16, 2020) (finding no *Monell* liability on a failure to train theory when the proof showed that the Coffee County Jail provided its officers TCI training); *Nance v. Griffin*, 1991 U.S. App. LEXIS 15036, at

*9 (6th Cir. July 3, 1991) (finding no *Monell* liability on a failure to train theory when the proof showed that the City of Knoxville provided its jailers TCI and in-house training).

Here, it is undisputed that the Jail's training, including its training on the use of force and providing detainees access to medical care met TCI standards. (SUMF ¶ 111). In accordance with TCI standards, all Obion County Jail officers underwent forty (40) hours of TCI basic training within one (1) year of being hired. (SUMF ¶ 114). Additionally, all newly hired correctional officers underwent on-the-job training for up to ten (10) weeks after they were first hired under the guidance of a Field Training Officer and as required by TCI, the Jail required all of its jail officers to undergo at least forty (40) hours of TCI in-service training every year. The training provided by the Jail was annually approved by TCI and included training on the use of force and summoning emergency medical care when needed. (SUMF ¶¶ 117-118). In light of TCI approving the Jail's training program and annually finding that it met Tennessee's minimum standards, Plaintiff cannot show that the relevant training the Jail implemented was inadequate.

> ## ii.   *Plaintiff cannot show that Obion County acted with deliberate indifference.*

Even if Plaintiff shows that the relevant training and supervision were in some way "inadequate," she must then show that they were inadequate due to the municipality's "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Connick*, 563 U.S. at 61. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. In requiring this stringent standard, the Court has rejected the notion that a negligent training program can create municipality liability, noting that federal courts should generally refrain from "second-guessing municipal employee-

training programs." *Canton*, 489 U.S. at 391-92; *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 Fed. App'x. 435, 449-50 (6th Cir. 2011).

Deliberate indifference can be shown only if the risk of a constitutional violation arising as a result of the inadequacies in the municipal training or supervision were "plainly obvious." *Gregory*, 444 F.3d at 752-53 (6th Cir. 2006). In other words, if the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, then the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390; *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). In order to impose such liability, the Supreme Court requires a plaintiff to show that the policymakers knew "for a moral certainty" that the training program was insufficient. *Canton,* 489 U.S. at 390 n.10.

The Sixth Circuit has recognized two ways of demonstrating that a municipality had the requisite notice that inadequacies in training or supervision would lead to a constitutional violation, thus constituting deliberate indifference. First, a plaintiff can show deliberate indifference through evidence of prior instances of unconstitutional conduct demonstrating that a municipality had notice that the training or supervision was deficient and likely to cause injury but ignored it. *Id.*; *Plinton v. Cnty. of Summit,* 540 F.3d 459, 464 (6th Cir. 2008). Here, Plaintiff can point to no proof whatsoever to show prior instances of unconstitutional conduct which should have put Obion County on notice that its training was so deficient that it would likely lead to constitutional injury. Thus, Plaintiff cannot successfully prove an inadequate training theory under the first avenue allowed by the Sixth Circuit.

Alternatively, a plaintiff could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the municipality failed to train employees to handle recurring situations presenting a "plainly obvious" potential for such a

violation. *Plinton,* 540 F.3d at 464. This second mode of proof is available "in a narrow range of circumstances," where a federal rights violation "may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Chase v. White*, 2016 U.S. Dist. LEXIS 172067, at *25-26 (M.D. Tenn. Dec. 13, 2016). The Sixth Circuit has explained that for liability to attach in the instance of a single violation, the record must show "a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey*, 453 Fed. Appx. at 567 (citing *Hays v. Jefferson Cnty.,* 668 F.2d 869, 874 (6th Cir. 1987)). In *Harvey,* the plaintiff brought claims under § 1983 against a county based in part on an inadequate training theory under the single violation approach as allowed by *Plinton*. The Sixth Circuit held that when a municipality has offered some training to its officers on the use of force, a plaintiff cannot succeed under the single violation theory. The Court explained:

> In *City of Canton,* the Court hypothesized that a history or pattern of prior violations might not be necessary to show deliberate indifference if the need for more or different training were "obvious." However, the Court's hypothesis was premised on the assumption that the municipality had decided *not* to train its officers about the constitutional limits of the use of force. Under such circumstances, the highly predictable consequence that deadly force could be misused in violation of citizens' rights could be deemed so obvious as to reflect deliberate indifference.

*Harvey*, 453 Fed. Appx. at 567 (citations omitted). Based on said reasoning, the Sixth Circuit reversed the district court's denial of the defendant's motion for summary judgment. The Court noted that the plaintiffs could not prove the county was on notice that it was "so highly predictable that sheriff's deputies would misuse deadly force" because the plaintiff failed to show past constitutional violations that would have placed the county on notice that its training was inadequate. *Id*.

Similarly, in *Berishaj v. City of Warren*, 2006 U.S. Dist. LEXIS 51088 (E.D. Mich. July 26, 2006), the plaintiffs sought to hold the defendant municipality liable under a failure to train theory because the city's training did not include training regarding the proper use of a restraint chair. In granting the city's motion for summary judgment, the Eastern District of Michigan explained:

> Plaintiffs Timothy and Djeto Berishaj contend that Defendants' use of force training is inadequate because it does not include training or a written policy regarding the proper use of the restraint chair. The question remains though, whether this alleged inadequacy is the result of deliberate indifference and whether it is the actual cause of Plaintiffs' alleged constitutional injury. Plaintiffs fail to make either showing.
>
> Deliberate indifference can only be established by showing that "in light of the duties assigned to specific officers or employees[,] the need for more or different training [was] so obvious, and the inadequacy [was] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. Plaintiffs have to show that the inadequacy of training was so likely to result in a constitutional injury that the City could be deemed "callous and indifferent to the need for training." *Russo v City of Cincinnati*, 953 F.2d 1036, 1049 (6th Cir. 1992) (J. Wellford concurring).
>
> Plaintiffs failed to present any evidence as to why it should have been obvious to the City of Warren that a constitutional violation was likely to occur without additional use of force training specific to the use of the restraint chair. There is no evidence that there were prior allegations of misuse of the chair, or that any of the Defendants was prone to the type of behavior alleged.

*Id.* at *57-59.

Furthermore, the inquiry into whether a training program could be deemed "deliberately indifferent" must extend beyond the question of whether the individual officers involved in the incident at issue were poorly trained. *Cooper v. Cty. of Washtenaw*, 222 F. App'x 459, 473 (6th Cir. 2007). Indeed, "just because a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton,* 489 U.S. at 390-91. Instead, the appropriate

question is "whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent city policy." *Id.* at 390; *see also*, *Eicher v. Toungette*, 2007 U.S. Dist. LEXIS 31364, at *40-42 (M.D. Tenn. Apr. 26, 2007).

In *Eicher*, the plaintiff brought a lawsuit seeking damages under 42 U.S.C. § 1983 after his son committed suicide in the Humphreys County Jail. *Id.* As part of his claim, the plaintiff sought to hold Humphreys County liable under a failure to train theory on the basis that three individuals at the jail had not received the 40 hours of training at the Tennessee Correctional Institute regularly required for jailers. *Id.* In granting the defendants' motion for summary judgment, the Court held that such facts were insufficient to prove *Monell* liability:

> The plaintiff's failure to train claim fails because the plaintiff has simply not set forth sufficient evidence upon which a reasonable jury could find in favor of the plaintiff on this claim. All that the plaintiff has shown is that three individuals at the Jail had not received the 40 hours of training at the Tennessee Correctional Institute regularly required for jailers. However, it is not enough to show that the individual officers in question were poorly trained. *See Cooper v. County of Washtenaw,* 222 Fed. App'x 459, 2007 U.S. App. LEXIS 3630, 2007 WL 557443 (6th Cir. 2007). The plaintiff has not shown an overall lack of training by Humphreys County of all the employees at the Jail. Nor has the plaintiff shown that the lack of training for these three individuals caused them to be unaware of the Jail's policies. Further, the plaintiff has not shown any evidence that the failure to have these three individuals trained was the result of a deliberate decision on the part of Humphreys County which was made with indifference to the consequences of failing to train these individuals. Mere negligence by Humphreys County in ensuring the training of its jail employees is not sufficient to support a Section 1983 claim. *See Molton,* 839 at 246-47

*Id.* at *40-42.

Here, Defendants Spaulding and Brogglin received training in accordance with TCI standards. (SUMF ¶ 120). Defendant Sanford had not yet received his TCI training, but only because at the time of the incident, he had worked for the Jail for a few weeks and per TCI standards, had twelve (12) months to complete his TCI training. (SUMF ¶¶ 121-123). Thus, unlike the plaintiff in *Eicher*, Plaintiff cannot show that Obion County failed to ensure that its officers

received TCI training. But even if Plaintiff could, per *Eicher*, such a showing falls well short of proving Obion County's training program was "deliberately indifferent" to the constitutional rights of Mr. Higgins.

It is undisputed that the Obion County Jail provided all officers training in compliance with TCI standards. (SUMF ¶ 111). Said training included training on the use of force as well as on summoning emergency medical care when needed. (SUMF ¶ 117-118). By providing such training, Obion County cannot be found to have acted with "deliberate indifference," especially considering Plaintiff can offer no proof of prior constitutional deprivations that should have placed Obion County on notice that its training was inadequate.

### D. Plaintiff cannot show any alleged ratification acted as a "moving force" of any alleged constitutional deprivation.

Plaintiff also seeks to place *Monell* liability on Obion County under a "ratification" theory. (ECF No. 37 ¶ 64). Ratification occurs when an individual with policymaking authority issues a final decision affirming a subordinate's decision, and thereby adopts it as municipal policy. *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013). An official with final decision-making authority ratifies a subordinate's action if the decision maker provides "affirmative approval of a particular decision made by [the] subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993).

Even under a ratification theory, proximate causation remains an essential element of a § 1983 claim for damages. *See Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir. 1994). Thus, even when a plaintiff can show an official with final decision-making authority ratified a decision, the plaintiff must still "prove that the ratification was a 'moving force' in causing the constitutional violation." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citing *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991)). Thus, it logically follows that a single,

isolated subsequent ratification by a policymaker is insufficient to demonstrate that the policymaker's decision was the moving force behind a constitutional violation. *Ellington*, 936 F.2d at 884-85. *See also*, *Tomazic v. City of Cleveland*, 2006 U.S. Dist. LEXIS 65682, at *16 (N.D. Ohio Sept. 14, 2006) ("Ratification of [the individual officer's] acts after the fact, even if it had happened, could not have been a direct cause of the shooting when it occurred"). Instead, for ratification by a policymaker's final approval to be the "moving force" behind a constitutional violation, the plaintiff must show that there was a history or pattern of unconstitutional decision-making by the policymakers. *Id*.

In *Ellington*, the plaintiff brought an action against a school board after the school board ratified a school administrator's partial strip search of the student plaintiff after the plaintiff's parent called and complained about the search. The plaintiff argued that the search violated her constitutional rights and because the school board ratified the administrator's decision after the plaintiff's parent complained, it was liable under a ratification theory. The Sixth Circuit rejected the argument and explained:

> Based on the facts, the Board believed Ellington and his colleagues were justified in conducting the search of Williams. There was no history that the policy had been repeatedly or even sporadically misapplied by school officials in the past. Consequently, the School Board cannot be held liable for the ratification of the search in question, because this single, isolated decision can hardly constitute the "moving force" behind the alleged constitutional deprivation.

*Ellington*, 936 F.2d at 884-885;

Similarly, in *Tomazic*, the plaintiffs argued the defendant city should be held liable for ratifying its officer's use of excessive deadly force. The court disagreed and held, "[a]bsent some showing that the [c]ity had a past history of ratifying the use of deadly force in situations similar to that which occurred in this case, and that Officer Jopek relied on this policy when making his decision to shoot Mr. Strand, there cannot be the necessary causal link to establish the [c]ity's

liability." *Tomazic*, 2006 U.S. Dist. LEXIS 65682 at \*15-16. *See also Alexander v. Beale St. Blues Co.*, 108 F. Supp. 2d 934, 949 (W.D. Tenn. 1999) ("Although ratification might tend to establish the existence of a policy of acquiescence that in itself was a 'moving force,' mere ratification of the conduct at issue by itself cannot legally suffice as a 'moving force.'"); *Buckley v. City of Memphis*, 2004 U.S. Dist. LEXIS 7773, at \*12 (W.D. Tenn. May 4, 2004) ("Ratification occurs after the conduct, making the municipality's ratification of the incident in question unable to be the moving force before the conduct."); *France v. Lucas*, 2012 U.S. Dist. LEXIS 151344, at \*41 (N.D. Ohio Oct. 22, 2012) ("Without evidence of ratification of similar conduct prior to Detective Metcalf's alleged violation, Plaintiffs' *Monell* claim based on alleged ratification falls short.").

Just as in *Ellington* and *Tomazic*, any alleged ratification of Obion County officers' conduct on the night in question cannot act as the moving force of an alleged constitutional deprivation. Plaintiff has shown no history of an Obion County officer "repeatedly or even sporadically" using excessive force or failing to provide detainees access to needed medical care, nor has Plaintiff shown past ratifications of the use of excessive force or failure to provide access to medical care to prove that any ratification actually acted as a "moving force" in this instant. Quite simply, Plaintiff can point to no facts to show that the officers acted due to their belief that he could "get away" with using excessive force or refusing to provide medical care because Obion County officials would ratify their actions.  Without this essential causation element, Plaintiff's ratification theory fails.

II.     PLAINTIFF'S EXCESSIVE FORCE, FAILURE TO INTERVENE, AND FAILURE TO PROVIDE MEDICAL CARE CLAIMS ASSERTED AGAINST THE INDIVIDUAL DEFENDANTS FAIL AS A MATTER OF LAW BECAUSE THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Under the doctrine of qualified immunity, "government officials…are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's

clearly established constitutional rights." *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010). Qualified immunity is an immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Once qualified immunity is raised, the plaintiff bears the burden to prove that the defendant is not entitled to it. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

To determine whether qualified immunity is warranted, a court must ask (1) whether the alleged facts, taken in a light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established in the specific context so that a reasonable official would understand that he is violating that right. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A court need not address these steps in any particular order, nor must a court address both steps if the defendant makes an insufficient showing on one. *Pearson v. Callahan*, 555 U.S. 223 (2009).

Importantly, the second element of qualified immunity establishes that if a reasonable person in the defendant's position could have failed to appreciate that a clearly established constitutional right would be violated by his conduct, he is protected by immunity and the plaintiff's claims fail. *Anderson v. Creighton*, 483 U.S. 635, 640, (1987). The court must employ a standard of objective reasonableness and analyze claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the officer's position could have believed that his or her conduct was lawful, in light of clearly established law and the information that he possessed. *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994). Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Qualified immunity is an "exacting standard" that gives officers lots of leeway, requiring their conduct to violate clearly established law to defeat the defense. *Rudlaff v. Gillispie*, 791 F.3d 638, 643 (6th Cir. 2015) (*citing City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *see also Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). Existing caselaw, in other words, must put the precise question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011).

**A.    Defendants did not violate Higgins's constitutional rights by using force, nor would a reasonable officer understand that Defendants' actions violated a clearly established constitutional right.**

Plaintiff's excessive force claims must be analyzed under the Fourteenth Amendment's "objective reasonableness" standard. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The inquiry is highly fact-dependent, and must take into account the "perspective of a reasonable officer on the scene, including what the officer knew at the time…" *Id*. Considerations that may bear on the reasonableness or unreasonableness of the force used include (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id*. at 2473. Said factors are not "exclusive." They merely "illustrate the types of objective circumstances potentially relevant to a determination of excessive force." *Id.*; *See also, Coley v. Lucas Cnty.*, 799 F.3d 530, 538 (6th Cir. 2015).

An officer's actions should be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Even if it turns out in hindsight that the plaintiff's "subjective intent" was not to attack or resist the officer, the court must view the officer's actions "objectively, from the perspective of a reasonable officer at the scene." *Rudlaff*, 791 F.3d at 642. Further, "The Fourth Amendment . . .

does not require police officers to take the better approach. It requires only that they take a reasonable approach." *Cook v. Bastin (In re Estate of Campbell)*, 590 F. App'x 523, 528 (6th Cir. 2014).

In light of these considerations, courts have noted, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the [Constitution]." *Parker v. Henderson County*, 2006 U.S. Dist. LEXIS 72891, *28-29 (W.D. Tenn. Oct. 5, 2006). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id*. As stated by the Sixth Circuit in *Griffin v. Hardrick*,

> Officials confronted with a prison disturbance must balance the threat [that] unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Because prison officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance, we must grant them wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

*Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (quoting *Combs v. Wilkinson*, 315 F. 3d 548, 557 (6th Cir. 2002)).

Of course, "Even if an officer's actions amount to unconstitutional excessive force, qualified immunity will still apply if the violated right was not 'clearly established.'" *Pennington v. Terry*, 644 Fed. Appx. 533, 541 (6th Cir. Tenn. Mar. 23, 2016). Qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174-75 (6th Cir. 2004) (quoting *Saucier*, 533 U.S. at 206). An officer is entitled to qualified immunity if he made an objectively reasonable mistake as to the amount of force that was necessary under the circumstances. To that extent, "[a]n

officer's conduct violates clearly established law 'when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id*. at 241-42 (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). "Although there need not be a case directly on point for the law to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. at 242 (citing *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013). "[I]t defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), [and] it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Bolick v. City of E. Grand Rapids*, 580 F. App'x 314, 320-21 (6th Cir. 2014).

Undoubtedly, Sixth Circuit precedent clearly establishes use of excessive force violates an individual's Fourth Amendment rights. *See e.g.*, *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). However, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Thus, the issue is not whether Defendants generally knew that excessive force would violate Higgins's Fourth Amendment rights, but rather, whether Higgins had a "clearly established right" to be free from the force utilized by Defendants. *See Cannon v. Licking Cty.*, 2019 U.S. Dist. LEXIS 103911, at *27-28 (S.D. Ohio June 21, 2019). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

     *i.*     *Spaulding's intervention to end Higgins's assault on Brogglin.*

The Sixth Circuit has repeatedly held that when a person actively resists an officer's commands by, for instance, struggling, verbalizing threats, or refusing to comply with officers' commands, the officer may use force without violating his constitutional rights. *See Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015) (holding that when a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him); *Standifer v. Lacon*, 587 F. App'x 919 (6th Cir. 2014) (holding that an officer performing a takedown on a detainee who was "twisting, turning, and kicking" did not constitute excessive force); *Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (finding the defendant officer did not use excessive force by using a straight arm takedown technique to neutralize and handcuff plaintiff, or by placing his knee on the back of a suspect who was being handcuffed but was not yet neutralized). Importantly, "active resistance" includes a detainee physically struggling with officers, threatening or disobeying officers, or refusing to be restrained. *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012). *See, e.g., Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012); *Foos v. City of Delaware*, 492 F. App'x 582, 589 (6th Cir. 2012) (suspect behaved "erratically and irrationally").

Notably, simple noncompliance absent an actual assault of an officer can justify the use of force – even force beyond "hands-on" techniques. *Rudlaff*, 791 F.3d at 642. In *Rudlaff*, the Sixth Circuit found the use of a taser was permissible due solely to the plaintiff having repeatedly refused officers' commands. *Id*. Specifically, prior to being tased, the plaintiff refused to place his hands on his vehicle, refused to place his hands behind his back, and swung his arms towards officers in a clear act of defiance. The Court ruled that the officers did not violate the plaintiff's constitutional

rights when they tased him because, "No matter how you cut it, [the plaintiff] actively resisted…" *Id*.

Here, Higgins's actions were more dangerous to the officers than the actions of the plaintiff in *Rudlaff.* Not only did Higgins disobey the officers' directives, he physically assaulted Brogglin on two separate occasions. Moreover, the use of force taken in response to Higgins's assault on Brogglin amounted to *less* force than what the officers utilized in *Rudlaff.* While the Sixth Circuit found the use of a taser in *Rudlaff* permissible, Spaulding responded to Higgins ripping hair from Brogglin's scalp, not by using a taser or any other weapon, but by using his hands to swiftly pull Higgins off of Brogglin in order to prevent Higgins from further harming her. Undoubtedly, Spaulding placing his hands on Higgins while Higgins was in the process of assaulting Brogglin and pulling Higgins off of her in an effort to protect her was objectively reasonable and no reasonable officer would understand that such an action would have violated Higgins's clearly established constitutional rights.

  ii.  *Spaulding's attempt to gain control of Higgins on the floor.*

It is reasonable for an officer to use physical force where an offender is resisting and creating a dangerous situation. *See Davis v. City of East Cleveland*, 2006 U.S. Dist. LEXIS 11913, at *33-34 (N.D. Ohio Mar. 21, 2006); *Ferguson v. Leiter*, 220 F. Supp. 2d 875, 883 (N.D. Ohio Sept. 18, 2002). "Restraining a detainee by bringing him to the ground so as to reduce any danger posed by him is a reasonable response and an action that cannot be accomplished with only a modicum of force." *Davis*, 2006 U.S. Dist. LEXIS 11913, at *33-34. In fact, it is reasonable for an officer to use a headlock on an offender who is resisting officers. *See Ferguson v. Leiter*, 220 F. Supp. 2d 875, 883 (N.D. Ohio September 18, 2002). Here, shortly after Spaulding pulled Higgins off of Brogglin, Spaulding and Higgins fell to the floor. After they did so, Higgins began

scooting away from Spaulding in an attempt to prevent Spaulding from gaining control of him. In response, Spaulding got on top of Higgins and straddled Higgins in an attempt to contain him. Such hands-on, weapons-free force was objectively reasonable in light of (1) Higgins having just assaulted Brogglin, and (2) Higgins continuing to resist Spaulding. Indeed, the video footage unequivocally reveals that Higgins resisted Spaulding after they hit the floor despite Spaulding's clear intention of placing Higgins under control. Further, in light of Sixth Circuit caselaw authorizing officers use of force on detainees who are resisting, a reasonable officer would not understand that such an action violated a clearly established constitutional right.

    iii.  *Placing leg shackles on Higgins.*

While Spaulding attempted to gain control of Higgins, Higgins continued fighting and began assaulting Spaulding. For example, he kicked and "squirmed" in resisting Spaulding's attempts to gain control of him. As a result, officers placed leg shackles on Higgins to further attempt to gain Higgins's compliance. Placing leg shackles on a disruptive, non-compliant and violent detainee in an attempt to gain control is likewise objectively reasonable and no reasonable officer would understand that such an action violated a clearly established constitutional right.

    iv.  *Spaulding using his hands to prevent Higgins from spitting.*

Courts across the Sixth and other circuits have found that using an appropriate level of force to prevent a detainee from spitting *is* objectively reasonable. *Jennings v. Fuller*, 659 F. App'x 867, 871 (6th Cir. 2016) (citing cases); *Crossett v. Emmet Cty.*, 2020 U.S. App. LEXIS 35657, at *11 (6th Cir. Nov. 12, 2020) (use of spit mask objectively reasonable after the detainee spit in the direction of the defendant officers); *Rich v. Palko*, 920 F.3d 288, 297 (5th Cir. 2019) (forcing a detainee to the floor after he spit on officers was constitutionally appropriate); *Crossett v. Emmet Cty.*, 2019 U.S. Dist. LEXIS 229078, at *21 (W.D. Mich. Aug. 12, 2019) (the use of a spit mask

was objectively reasonable after the plaintiff spit on officers); *Coleman v. Hatfield*, 2016 U.S. Dist. LEXIS 62448 (W.D.N.Y. May 10, 2016) (placing the detainee plaintiff on the floor with mechanical restraints was acceptable force in light of the plaintiff spitting an unknown object towards officers).

Here, during Spaulding's struggle to gain control of Higgins, Higgins started spitting on Spaulding – an act of defiance and a criminal assault. In response, Spaulding alternated placing his left and right hands on Higgins's chin and jaw to prevent Higgins from spitting on him.[3] Based upon the aforementioned precedent, Spaulding's use of his hands to prevent Higgins from spitting on him amounted to *less* force than what has previously been deemed constitutionally appropriate.

Despite the medical examiner determining that Higgins died of excited delirium due to methamphetamine toxicity, Plaintiff claims that Spaulding asphyxiated and ultimately killed Higgins. Defendants dispute Higgins died due to asphyxiation, but even if true, Defendants are entitled to qualified immunity because they would not have known that Spaulding's use of force violated Higgins's clearly established constitutional rights. While there is Sixth Circuit precedent related to positional asphyxiation, none of said cases prohibit the technique utilized by Spaulding in this case. For example, in 2004, the Sixth Circuit held that "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, *on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force*." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (emphasis added). Further, the Sixth Circuit noted that it is "clearly established that putting substantial or significant pressure *on a suspect's back while that suspect is in a face-down prone position* after being subdued and/or incapacitated constitutes excessive force." *Id.* at 903 (emphasis added). Similarly, the Sixth Circuit has noted

---

[3] While Plaintiff claims Spaulding placed his hands on Higgins's "throat," video footage confirms that Higgins's hands never grabbed Higgins's neck or throat. (SUMF ¶¶ 37-41).

"applying pressure *to the back of a prone suspect* who no longer resists arrest and poses no flight risk is an objectively unreasonable use of force." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013) (emphasis added). Indeed, Sixth Circuit precedent related to accusations that defendant officers killed a detainee via positional asphyxia prohibit leaving a bond suspect on *his stomach. Champion*, 380 F.3d at 903; *May v. Twp. of Bloomfield*, No. 11-14453, 2013 U.S. Dist. LEXIS 74437, at *35 (E.D. Mich. May 28, 2013)

On the other hand, it is *not* clearly established that the restraint technique utilized by Defendant Spaulding violates a detainee's constitutional rights. Defendant Spaulding did not place weight on Higgins' back, nor is there evidence to suggest that he placed weight on Higgins' chest. Instead, the video footage demonstrates that while holding Higgins on the ground, Spaulding's knees remained on the floor and his hands remained on Higgins's chin and/or jaw

The Western District of Kentucky's decision in *Simpson v. Thompson*, 2010 U.S. Dist. LEXIS 114941 (W.D. Ky. Oct. 27, 2010), is instructive. In *Simpson*, a defendant officer hog-tied a suspect by cuffing his handcuffs to his ankle cuffs. 2010 U.S. Dist. LEXIS 114941 at *3-*4. Officers placed the suspect on his belly in the rear of a police car for a fifteen-to-twenty-minute ride to the jail. 2010 U.S. Dist. LEXIS 114941 at *4. Once at the jail, the officer noticed discoloration in the suspect's face and the suspect was later pronounced dead at the hospital. *Id*. The Western District of Kentucky granted the officer's petition for qualified immunity, finding as follows:

> While some Circuits have questioned the constitutionality of the aforementioned restraint method, other[s] have found it constitutionally valid. *Compare Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274 (11th Cir. 2004); *Mayard v. Hopwood*, 105 F.3d 1226 (8th Cir. 1997) with *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001). The lack of precedent from either the Supreme Court or the Sixth Circuit, combined with the split of authority over the restraint method used by the officers qualifying as excessive force, requires a finding that no constitutional right was violated.

*Simpson v. Thompson*, 2010 U.S. Dist. LEXIS 114941, at \*16 (W.D. Ky. Oct. 26, 2010). Here, like in *Simpson*, there is no Supreme Court or Sixth Circuit precedent decrying the use of the restraint method employed by Spaulding while he held Higgins on the ground. Specifically, there is no precedent that prohibits an officer from placing his hand on a detainee's chin and jaw to prevent the detainee from spitting while the detainee is lying on his back. Thus, while Plaintiff claims that Spaulding's restraint "asphyxiated" Higgins, a reasonable officer would not have known, based upon current Sixth Circuit and other precedent, that Spaulding's use of force violated Higgins's constitutional rights.

v.      *Placing Higgins in a restraint chair.*

No doubt, "[a]ny restraint, no matter how comfortable, is unpleasant, but not all restraint is punitive." *Beyer ex rel. Estate of Beyer v. City of Johnson City, Tennessee*, 2003 U.S. Dist. LEXIS 25909 (E.D. Tenn. Feb. 24, 2003). "A restraint chair may be properly used to restore control over an individual who is in custody or to prevent such an individual from harming himself." *Kinsey v. Cty. of Lorain*, 2019 U.S. Dist. LEXIS 10871, at \*19-20 (N.D. Ohio Jan. 23, 2019). Accordingly, officers may place a detainee in a restraint chair to prevent a violent altercation after the detainee demonstrates noncompliance and/or violent behavior. *Degolia v. Kenton Cty.*, 381 F. Supp. 3d 740, 760 (E.D. Ky. 2019); *Crace v. Efaw*, 2012 U.S. Dist. LEXIS 128812, at \*31-32 (S.D. Ohio Sep. 10, 2012). For example, in *Degolia*, the District Court for the Eastern District of Kentucky granted the defendant officer summary judgment after the plaintiff alleged the defendant violated his constitutional rights by securing him in a restraint chair for over two hours because the defendant was justified in ensuring that the detainee plaintiff actually ceased his disruptive acts. *Id*. The court explained:

> [I]t was not objectively unreasonable for Crouthers to place Degolia in the chair and keep him in it for approximately two hours. The video, with the added benefit of audio, clearly shows that when Degolia was in handcuffs and positioned on his knees, he began struggling, yelling, and cursing at Crouthers. Thus, Degolia was actively resisting. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). It cannot be said that under these circumstances it was constitutionally impermissible for Crouthers to secure Degolia in the restraint chair in order to avoid another violent confrontation. Indeed, in a case involving a booking-room altercation, the Sixth Circuit observed that "pepper spray, Tasers, arm bars, restraint devices, spit hoods, etc. all have their legitimate place." *See, e.g., Jennings v. Fuller*, 659 F. App'x 867, 871 (6th Cir. 2016) (collecting cases).

*Degolia v. Kenton Cty.*, 381 F. Supp. 3d 740, 760 (E.D. Ky. 2019).

Similarly, in *Crace*, the Southern District of Ohio found that using a restraint chair after officers gained control of a detainee was objectively reasonable to ensure that the detainee remained compliant. The Court reasoned:

> In the view of this Court, even though plaintiff did not, during the 90 seconds that he was on the floor, actively resist or fight the officers, neither defendant - nor, indeed, a reasonable officer - could have confidently concluded that plaintiff was at that point "incapacitated or neutralized" had he been left unrestrained. *See Morrison v. Bd. of Trs.*, 583 F.3d at 404. Because this safety threat continued to exist even after plaintiff was pinned on the floor, there remained a legitimate government interest in the use of force that would remove this threat, namely, the use of the restraint chair. Moreover, plaintiff's restraint in the chair for 18 minutes was not excessive and, instead, lasted only long enough to assure that he was in fact calm and no longer posed a threat of danger. Accordingly, after weighing the use of the restraint chair against the government's interest in safety within the jail, the Court concludes that this use of force was reasonable and not excessive.

*Crace v. Efaw*, 2012 U.S. Dist. LEXIS 128812, at *31-32 (S.D. Ohio Sep. 10, 2012).

Here, Spaulding decided to place Higgins in a restraint chair to ensure that he would not begin fighting officers again. Spaulding's concerns were undoubtedly legitimate in light of Higgins inexplicably and immediately attacking Brogglin twice after entering the jail and then assaulting Spaulding by kicking and spitting while he was on the floor. Though Higgins had calmed down prior to being placed in the restraint chair, it was reasonable for the officers to place Higgins in the

restraint chair to ensure that he did not become violent once again. Notably, after officers began strapping Higgins to the restraint chair, Higgins started mumbling and moving in such a way that made Brogglin fear he was about to starting fighting again. Based upon the aforementioned Sixth Circuit precedent, placing Higgins in a restraint chair was constitutionally permissible, but at minimum, a reasonable officer would not have known that doing so violated Higgins's constitutional rights.

vi.       *Defendants did not fail to intervene to prevent excessive force on Higgins.*

"[A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Courts have only found a duty to intervene when the underlying episode of excessive force has spanned a sufficient period of time for a nearby defendant to both perceive what was happening and intercede to stop it. *See, e.g., Durham v. Nu'Man,* 97 F.3d 862, 868 (6th Cir. 1996) (reversing an award of summary judgment in a case where a beating "lasted approximately ten minutes" and the defendant nurse "watched the beating unfold on her monitor from the nurse's station, and then from the doorway of . . . the room where the beating took place").

Here, as set forth above, because none of the named defendants used excessive force on Higgins, Defendants cannot be held liable for failing to intervene to prevent excessive force. Moreover, the video footage confirms that none of the Defendants took action that a reasonable officer would have perceived as excessive force. Unlike typical failure to intervene cases, none of the officers used weapons on Higgins, none punched or otherwise struck Higgins, and none slammed Higgins to the floor or against the wall. Instead, the force utilized amounted to nothing

more than "hands-on" force designed to keep Higgins under control. Thus, none of the officers "observed or had reason to know" that excessive force was being utilized on Higgins at any point in time and therefore, had no duty to intervene to prevent such force.

### B. Defendants did not violate Higgins's right to access to medical care nor would a reasonable officer understand that their actions violated a clearly established constitutional right.

Traditionally, the Sixth Circuit analyzed Fourteenth Amendment pre-trial detainee claims under the same deliberate indifference rubric as Eighth Amendment prisoner claims. *See e.g.*, *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018); *Morabito v. Holmes*, 628 Fed. Appx. 353, 358 (6th Cir. 2015). Recently, however, the Sixth Circuit held that the objectively reasonable standard set forth in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) governs failure to provide medical care claims asserted by pre-trial detainees. *Brawner v. Scott Cty.*, 2021 U.S. App. LEXIS 28722, at *21 (6th Cir. Sep. 22, 2021).

Nonetheless, negligent acts do not "deprive an individual of life, liberty, or property under the Fourteenth Amendment," and thus, are not actionable under § 1983. *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *accord Davidson v. Cannon*, 474 U.S. 344 (1986). Consequently, the test to be applied under *Kingsley* must require a pretrial detainee who asserts a due process claim to prove more than negligence but less than subjective intent—something akin to "reckless disregard." *See Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016). Accordingly, in order for a pretrial detainee to prove a failure to provide medical care claim, he must show (1) that he suffered from an objectively serious medical condition, and (2) that the prison officials acted with reckless disregard. *Brawner*, 2021 U.S. App. LEXIS 28722, at *21 (citing *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc). *See also, Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) ("[T]he pretrial detainee must prove that the defendant-official acted [or failed

to act] intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.")).

Importantly, an officer is not under a constitutional obligation to render CPR, even if a detainee is in need of CPR. *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 846 (6th Cir. 2018); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986). In *Maddox*, the court addressed whether a jury instruction should have stated that "the fourteenth amendment due process clause requires officers to render CPR when a pretrial detainee in their custody is in need of CPR." *Id*. It held that no such instruction was required, stating, "We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances." *Id*. Rather, "[d]ue process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured . . . by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Id*. As explained by the Sixth Circuit in *Stevens-Rucker*:

> The logic that underlies these cases makes sense: an officer is charged with providing a detainee with prompt medical attention. However, this attention does not require the officer to intervene personally. Imposing an absolute requirement for an officer to do so ignores the reality that such medical emergency situations often call for quick decisions to be made under rapidly evolving conditions.

*Stevens-Rucker*, 739 F. App'x at 846.

Here, Plaintiff complains that Defendants failed to render CPR to Plaintiff, but per *Stevens-Rucker*, such a complaint does not state a due process violation. Moreover, Plaintiff cannot show that Defendants acted with "reckless disregard" towards Higgins's health at any point in time. Higgins began attacking Brogglin just seconds after he entered the Jail. He then attacked Spaulding for several minutes thereafter. Understandably, Defendants initially focused on bringing an out-

of-control inmate under control. After Higgins calmed down, they focused on ensuring Higgins stayed in compliance – not in "reckless disregard" for Higgins's health but due to concern for their own safety and the safety of the facility. Shortly after Higgins became fully constrained in the restraint chair, the officers began having concern for Higgins's health and took action in light of said concern. For example, Officer Orsborne performed a sternum rub at approximately 02:01:30. (SUMF ¶ 60). Eighteen seconds later, after Spaulding wheeled Higgins into a booking cell, officers continued observing Higgins through his cell window in light of Higgins not responding to the sternum rub. (SUMF ¶¶ 61-67). Their concerns led Orsborne to call his supervisor at 02:02:40. (SUMF ¶ 68). One minute later, he called for EMS. (SUMF ¶ 70). Shortly thereafter, officers entered Higgins's cell to evaluate him. (SUMF ¶ 71). After they found Higgins nonresponsive, Brogglin likewise called for EMS. (SUMF ¶ 73). Defendants' actions fall well-short of "reckless disregard" for Higgins's health and indeed, demonstrate they acted with concern for Higgins.

Notwithstanding, to the extent the Court believes Plaintiff could create an issue of fact about whether Defendants acted with "reckless disregard" towards Higgins's health, Defendants remain entitled to qualified immunity on Plaintiff's failure to provide medical care claims. As noted above, at the time the incident occurred, the Sixth Circuit applied a deliberate indifference standard to a pre-trial inmate's claims that defendant officers failed to provide him medical care. *Morabito v. Holmes*, 628 Fed. Appx. 353, 358 (6th Cir. 2015). Under said standard, in order to show a constitutional violation, a plaintiff would have to prove (1) that the detainee suffered from an objectively serious medical condition, and (2) that the prison officials subjectively perceived the risk of harm, and disregarded it. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *see also Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "Knowledge of the asserted serious needs or of circumstances clearly

indicating the existence of such needs, is essential to a finding of deliberate indifference." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 896 (6th Cir. Mich. 2004). To that end, the Sixth Circuit emphasized that it was not enough for a plaintiff to show that a defendant should have perceived the plaintiff's need for medical attention. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). In other words, Defendants *could not have known* that an objective "reckless disregard" for a detainee's medical condition could lead to a constitutional rights violation – meaning qualified immunity protects them from such a claim. Furthermore, the facts undoubtedly do not show that the Defendants "subjectively perceived" Higgins's need for medical attention, but nonetheless disregarded it. Instead, as set forth above, as soon as officers realized Higgins's need for medical attention, they responded by evaluating him and ultimately summoning emergency medical care.

III.   THE COURT SHOULD DECLINE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS.

In the event the Court chooses to dismiss all of Plaintiff's federal claims, the Court should decline to exercise its supplemental jurisdiction over Plaintiff's state law claims. The grant of supplemental jurisdiction over state claims that arise out of the same facts that form a basis for a federal claim is a matter of discretion with the court. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966); *Vandiver v. Hardin County Board of Education*, 925 F.2d 927, 935 (6th Cir. 1991). The factors to be analyzed in making that determination are judicial economy, comity, convenience and fairness to the litigants.  If all federal claims are dismissed before trial, the balance of factors will usually point toward dismissal of the state law claims. *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, n.7 (1988). Therefore, if this Court determines that Plaintiff's federal claims against Defendants should be dismissed, then it should decline supplemental jurisdiction over the remaining state law claims.

CONCLUSION

Based upon the foregoing and the entire record in this cause, Defendants' motion for summary judgment should be granted in its entirety.


Respectfully submitted,

PENTECOST, GLENN & MAULDIN, PLLC

By:  s/Nathan D. Tilly
     William B. Mauldin (#022912)
     Nathan D. Tilly (#031318)
     *Attorneys for Obion County, Tennessee, an entity named as Obion County Sheriff's Department, Mary Brogglin, Waylon Spaulding, and Brendon Sanford*
     162 Murray Guard Drive, Suite B
     Jackson, TN  38305
     Phone: (731) 668-5995
     Fax:    (731) 668-7163
     wmauldin@pgmfirm.com
     ntilly@pgmfirm.com

## **CERTIFICATE OF SERVICE**

This is to certify that I have served a copy of this paper or pleading via email and/or U.S. Mail, upon:

Edwin S. Budge                     John D. Burleson
Erik J. Heipt                      Dale Thomas
808 E. Roy Street                  Matthew Courtner
Seattle, WA 98102                  Rainey, Kizer, Reviere & Bell
                                   209 E. Main Street
David L. Cooper                    Jackson, TN 38301
The Law Office of David L Cooper
Third Avenue, North, Suite 300
Nashville, TN 37201


On this the 15th day of October, 2021.

PENTECOST, GLENN & MAULDIN, PLLC

By:    s/Nathan D. Tilly