*Jennifer Louise Jenkins, Administrator ad Litem of the Estate of Sterling L. Higgins*
*v. Obion County, Tennessee, et al.*

No. 20-cv-01056 STA-dkv

Exhibit 2
Excerpts from the Deposition of Robert Orsborne

```
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
          EASTERN DIVISION
```

JENNIFER LOUISE JENKINS,              )
Administrator *ad Litem* of the       )
ESTATE OF STERLING L. HIGGINS,        )
                                      )
    Plaintiff,                        )
                                      )
v.                                    ) CIVIL ACTION NO.
                                      ) 1:20-cv-01056-STA-dkv
OBION COUNTY SHERIFF'S                )
DEPARTMENT; OBION COUNTY,             )
TENNESSEE; UNION CITY POLICE          )
DEPARTMENT; UNION CITY,               )
TENNESSEE; ROBERT THOMAS              )
ORSBORNE, Individually; MARY          )
BROGLIN, Individually; WAYLON         )
SPAULDING, Individually; and          )
BRENDON SANFORD, Individually,        )
                                      )
    Defendants.                       )

**VIDEOTAPE DEPOSITION OF OFFICER ROBERT THOMAS ORSBORNE**

October 27, 2020

SCHAFFER REPORTING SERVICE
JILL A. SCHAFFER, RPR
P.O. Box 3214
Jackson, Tennessee 38303
(731) 668-6880

```
 1       Mr. Higgins there say -- again asked, "Did y'all get
 2       them?"
 3               And you said, "Yeah."
 4               And he said, "I'm scared."
 5               I guess you heard that.  Right?
 6       A   Yes, I heard that.
 7       Q   And did he appear to be genuinely scared to you,
 8       Mr. Orsborne?
 9       A   Yes, sir.
10       Q   He almost appeared childlike, didn't he?
11       A   (The witness nodded.)
12           Almost.
13       Q   Let's start it again at 1:55.
14                   (The video was resumed and paused.)
15       Q   (By Mr. Cooper)  Okay.  I've stopped it at 2:05.
16       And somebody has told him a couple of times to turn
17       around.  Was that you?
18       A   Yes, sir.
19       Q   All right.  And Mr. Higgins complied with that;
20       correct?
21       A   Yes, sir.  He had to be told several times, but he
22       did comply.
23       Q   Okay.  He wasn't being combative in any way, was
24       he?
25       A   No, sir.
```

```
 1      Q    He wasn't throwing anything, wasn't grabbing any
 2   of those boxes in that cooler, was he?
 3      A    No, he was not.
 4                 (The video was resumed and paused.)
 5      Q    (By Mr. Cooper)  Okay.  I'm stopping it at two
 6   oh -- 2:11.  It sounded like he said, "I want to go
 7   with you guys."
 8      A    To the best I can determine, that's kind of what
 9   it sounded like what he said.
10      Q    Let's wind it back so we can make sure.
11                 (The video was replayed and paused.)
12      Q    (By Mr. Cooper)  Did you hear him say, "I want to
13   go with y'all"?
14      A    Yeah.  He said, "I want to go with y'all."
15      Q    Let's start it again at two -- that's -- that's at
16   2:12.  I'm going to start again.
17                 (The video was resumed and paused.)
18      Q    (By Mr. Cooper)  I've stopped it at 2:30 now,
19   Mr. Orsborne.  Did you hear him -- he's still talking
20   about this debit card and his tablet?  Did you hear
21   that?
22      A    Yes, sir.
23      Q    And at this point where I've stopped it, at
24   2:30 on the counter, he's handcuffed behind his back;
25   correct?
```

89

```
1     A     Correct.
2     Q     Where he's talking about Keisha and wanting you to
3     check her out; right?
4     A     Correct.
5     Q     Would you agree with me that this was a pretty
6     bizarre behavior on Mr. Higgins' part up to this point,
7     Mr. Orsborne?
8     A     Yes, sir.  He was acting bizarre.
9     Q     Would you say he was paranoid?
10    A     Yes, sir.
11    Q     Would you say that he was somewhat delusional in
12    some of his thoughts and ideas?
13               MR. HILL:  Object to form.
14    A     Yes, sir.
15    Q     (By Mr. Cooper)  It seemed that he had a
16    particular -- or let me strike that.
17          It seemed that he was somewhat afraid of women
18    from the interactions that we've now looked at on two
19    different videos.  Would you agree with me on that?
20               MR. HILL:  Object to form.
21    A     Yes, sir.  Most of the time it was females that he
22    was afraid of.
23    Q     (By Mr. Cooper)  And I don't want to go back
24    through that whole laundry list that I asked you about
25    signs and symptoms of excited delirium, but up to this
```

92

1      I told him, "Hey, Sterling, there's no one around.
2  Just calm down. There's no one here." He insisted
3  that someone was out to get us, and they're coming to
4  get us. Again, there's no one around, don't see any
5  other cars on the highway at that time.
6      We continue on to the jail. As we turn in the
7  first gated area there at the jail, making my way to
8  the sally port, he sees some parked cars. He claims,
9  "There they are right there."
10      I said, "Sterling, do you know where you are?"
11      He said, "Yes. I'm at the Obion County Jail."
12      I told him, "The cars you're referring to are
13  actually marked patrol cars for the sheriff's
14  department."
15      We pull on into the sally port, and the gates shut
16  behind us, and then I get him out.
17  Q   Okay. And I want to stop you there because when
18  we get into the sally port, I think we actually have a
19  video of that. Is that correct, Mr. Orsborne?
20  A   That is correct.
21  Q   Okay. Now, you've testified that about halfway
22  over on the ride from Pockets Market to the jail that
23  Mr. Higgins was saying again that there were people
24  trying to kill him and you both. Is that correct?
25  A   That's what he was saying, yes, sir.

98

```
 1      to this point as rather bizarre?
 2      A    Yes, sir.
 3      Q    Start it at 2:10.
 4                 (The video was resumed and paused.)
 5      Q    (By Mr. Cooper)  All right.  Now, I froze it there
 6      at 2:14 on the counter and 1:45:23 in the lower
 7      right-hand corner.  Mr. Higgins is kind of up close to
 8      you at this point, Mr. Orsborne.  Would you agree with
 9      me on that?
10      A    That's correct.
11      Q    Did you feel threatened in any way when he was
12      standing there like that by you?
13      A    No, sir.
14      Q    Because it -- it was at this point or maybe some
15      other point -- excuse me -- when he was close to you
16      that that's when he was trying to protect you.  Right?
17      A    That is correct.
18      Q    Start again at 2:14.
19                 (The video was resumed and paused.)
20      Q    (By Mr. Cooper)  Now, I've stopped it there at
21      2:19.  So between 2:14 and 2:19 on the counter, it
22      looked to me like, Mr. Orsborne, that you may have put
23      your hands on him, but I wasn't sure about that.  Did
24      you see that?
25      A    It looked like I tried to grab him to escort him
```

109

1      head, but we'll see that in just a minute, if you agree
2      with me on that.
3      A      That could be.
4      Q      Okay.  Did you know Ms. Brogglin before March 25,
5      2019?
6      A      No, sir.
7      Q      Never met her in your life; is that correct?
8      A      Not that I'm aware of.
9      Q      Okay.  All right.  Well, let's run the video for a
10     little bit and let me ask a couple of questions.  I'm
11     going to start it at twenty -- at the 23 mark.
12                  (The video was started and paused.)
13     Q      (By Mr. Cooper)  All right.  Mr. Orsborne, I'm
14     stopping it at the 29 mark, which the time is 1:46:20.
15     And tell me what just happened.
16     A      Sterling Higgins stated, "That's her," and went up
17     toward her and tried to grab her, Ms. Brogglin.
18     Q      And when he -- when you're saying Sterling Higgins
19     says, "That's her," did that appear consistent with his
20     other statements about some sort of paranoid statements
21     involving females?
22     A      That's correct.
23     Q      Do you know if Mr. Higgins had seen Ms. Brogglin
24     through the glass door before he walked in, and did he
25     say anything about seeing her before he walked in?

123

1    A    That is correct.

2    Q    All right.  By this point is Mr. Higgins and

3    Mr. Spaulding down on the floor?

4    A    Yes, sir.

5    Q    Tell me how they got there.

6    A    There was a interaction between Mr. Spaulding and

7    Mr. Higgins.  He was trying to gain control of him.  I

8    performed a knee strike to Mr. Higgins' right leg in an

9    attempt to get him on the ground so he could be taken

10   under control.

11   Q    All right.  So it's your testimony that somewhere

12   in that last 10 to 15 seconds that you employed some

13   sort a knee strike.  Is that correct?

14   A    That is correct.

15   Q    And is that knee strike, is that a part of your

16   training?

17   A    Yes, sir, it is.

18   Q    So at this point, at 1:46:36, what -- what, if

19   anything, is Mr. Higgins saying?

20   A    Best I remember, he was doing a lot of yelling

21   and -- and screaming, no discernable words.

22   Q    And do you know where Ms. Brogglin is at this

23   point?  Is she down on the ground with them, or is she

24   somewhere else?

25   A    I'm really not sure where she is at this point.

128

1    Q    Right leg or left leg?

2    A    Should be the right leg.

3    Q    Was Mr. Higgins on his stomach, or was he lying on

4    his back?

5    A    Lying on his back.

6    Q    And so you're telling me that you're stepping up

7    on his right leg.  Is that correct?

8    A    Yes, sir.

9    Q    And you're saying it's the point of his leg above

10   his right knee.  Is that correct?

11   A    Yes, sir.

12   Q    And were you standing on -- on his right leg above

13   his right knee with -- with both your legs, in other

14   words, your full body weight?

15   A    Just enough to secure his legs to keep him from

16   kicking.  I don't know if it was my full body weight.

17   Q    All right.  And you told me this morning that you

18   weighed back then 247 pounds, I believe.  Is that

19   right?

20   A    Very close to that, yes, sir.

21   Q    All right.  And you're, of course, wearing

22   patrolman's gear.  You've got a -- a safety belt, and I

23   assume you've got a bulletproof vest on.  Correct?

24   A    Yes, sir.

25   Q    How much would that gear weigh, Mr. Orsborne.

```
1     A     15, 20 pounds.
2     Q     All right.  So you were placing well over
3     250 pounds on Mr. Higgins' right leg at that time;
4     correct?
5     A     I really don't know how much weight.  Just enough
6     to secure him from kicking.
7     Q     Well, I mean, you're -- you're balancing -- would
8     you agree with me you're sort of balancing yourself
9     with your left hand, and you're standing on
10    Mr. Higgins' right leg?  Correct?
11    A     Yes, sir.
12    Q     I mean, you're not holding yourself up with
13    anything, are you?
14    A     Just the support of the wall.
15    Q     And would you agree with me that the support of
16    the wall is really more for balance?  Would you agree
17    with me on that?
18    A     It's for balance.  Yes, sir, it's for balance.
19    Q     Now, what police training taught you to do that,
20    Mr. Orsborne?  And when I'm saying "that," I'm talking
21    about standing on a suspect that's been shackled.
22    A     I don't know there's any specific training that
23    says -- it's based on trying to gain control when you
24    use the necessary force to gain control of the support.
25    Q     And tell me again why you were standing on his
```

1       jawline.

2       Q    Does it appear to you that they're on his neck in

3       any way, Mr. Orsborne?

4       A    No, sir.

5       Q    Let's start it again.

6                 (The video was resumed and paused.)

7       Q    (By Mr. Cooper)   I've stopped it at 5:06.  You're

8       still leaning up against the wall, still have your body

9       weight on Mr. Higgins.  Is that -- is that correct?

10      A    Yes, sir, on his legs.

11      Q    Did you ever step on his left leg?

12      A    I may have during the process of him squirming

13      around.  He was still trying to grab Officer Spaulding

14      even though he was handcuffed.  He was trying to get

15      his hands around to grab Officer Spaulding.

16      Q    Did you ever step on his right leg and his left

17      leg at the same time?

18      A    Could have, yes, sir, during that trying to gain

19      control of him while he was still being combative.

20      Q    And is this always in the thigh area, or is it

21      some other area of the body?

22      A    Yes.  On the -- the quadricep muscle area of his

23      legs just above his knee.

24      Q    Keep running it at 5:06.

25                (The video was resumed and paused.)

```
1    Q    (By Mr. Cooper)  Mr. Orsborne, I'm stopping it now
2    at the 5:59 counting point, the counter, and it's
3    1:52:28 a.m.  It appears at this point that you may
4    have stepped off of Mr. Higgins.  Is that correct or
5    incorrect?
6    A    That's correct.
7    Q    So it appears from the counter that you stepped up
8    on him at about the 3:25 mark, and you stepped off of
9    him about the 5:59 mark.  Would you agree with me
10   generally on that?
11   A    Yes, sir, generally.
12   Q    So from that, you would have stood on him, what,
13   about 2 and a half minutes?
14   A    Yes, sir.
15   Q    Maybe 3?  Is that right?
16   A    That's correct.
17   Q    Now, when you got down off of him, as we can see
18   in this video that's stopped at the 5:59 mark, what
19   is -- what, if anything, is Mr. Higgins doing?
20   A    He's growling, making a lot of weird grunting
21   noises.  More like trying to -- the only expression I
22   know is hock up a loogie, where he's trying to gather
23   spit so he could spit.
24   Q    Was he moving in any way?
25   A    Yes, sir, he was still moving.  He had -- he was
```

147

1   Q   And could you tell at this point if he was
2   breathing or not?
3   A   (The witness shook his head.)
4       I could not tell.
5   Q   And I take it from the time that -- up to this
6   point you couldn't tell whether he was breathing or
7   not.  Is that correct?
8   A   That's correct.  I didn't check.
9   Q   I'm going to start it again.
10              (The video was resumed and paused.)
11  Q   (By Mr. Cooper)  Okay.  I'm stopping it there at
12  13:10.  Did you see where Waylon Spaulding went over
13  and sort of jiggled Mr. Higgins' head for a moment?
14  A   Yes, sir.
15  Q   Kind of touched it and moved it to the center, and
16  his head -- Mr. Higgins' head just fell right back to
17  the same place that it had been.  Correct?
18  A   Yes, sir.
19  Q   ==And, again, the same question I've been asking up==
20  ==to this point:  From the time that he'd gone into that==
21  ==restraint chair up to now at the 3 -- 2 a.m. mark,==
22  ==2 a.m. 54 seconds, you don't know whether Sterling==
23  ==Higgins was breathing or not, do you, Mr. Orsborne?==
24  A   ==No, sir.==
25  Q   ==Start it again.==

156

1                    (The video was resumed and paused.)

2     Q    (By Mr. Cooper)  All right.  Now I'm stopping it

3     there at 13:46 on the counter, 2:01 a.m. 33 seconds.

4     Mr. Orsborne, it appears that you went over and did

5     something to Mr. Higgins.  What did you do?

6     A    A sternum rub.

7     Q    All right.  And what is the purpose of a sternum

8     rub?

9     A    To try to get some kind of reaction.

10    Q    And did you get a reaction from Sterling Higgins?

11    A    No, sir.  He was strapped in the chair, and he

12    couldn't move.

13    Q    Okay.  So if he's strapped in the chair and

14    couldn't move, why did you do a sternum rub?

15    A    Just to try to check on him.

16    Q    All right.  And you checked on him.  What was your

17    conclusion from that sternum rub and checking him?

18    A    That there was no way for him to move the way he

19    was strapped down.

20    Q    Did you try to talk to him, yell at him, or

21    anything, wake him up?

22    A    No, sir, I didn't.

23    Q    You know, there's such a thing as verbal commands,

24    isn't there?

25    A    Yes, sir.

```
1     Q    Did you try any of that?
2     A    No, sir.
3     Q    So up to this point you've got a nonresponsive
4     detainee; correct?
5     A    Correct.
6     Q    Would that indicate that medical treatment needs
7     to at least be considered?
8     A    We was still unsure of his condition at that time.
9     Q    My question was did it appear to you at this point
10    that medical treatment should at least be considered?
11    A    No, sir.
12    Q    Now, let's start it again, 13:46.
13                (The video was resumed and paused.)
14    Q    (By Mr. Cooper)  All right.  Now, I'm going to
15    stop it at 13:54.  Mr. Orsborne, you've done the
16    sternum rub; you got no reaction because, you
17    testified, he's strapped in.  Right?
18    A    Correct.
19    Q    And at this point you still don't know if he's
20    breathing; correct?
21    A    Correct.
22    Q    Did you check for a pulse?
23    A    I did not.
24    Q    Why not?
25    A    Because the corrections officers did.
```

```
1      Q     Because his eyes and his mouth would not be
2      strapped down.  I mean, they -- they could move if, you
3      know, you applied the sternum rub; correct?
4      A     I'm assuming that, yes, sir.
5      Q     And the sternum rub, you're putting some pretty
6      good force on Mr. Higgins' chest.  I mean, you're not
7      just sort of lightly rubbing his chest; you're putting
8      some pressure on.  Right?
9      A     Your question bled out there at the end.  The
10     audio went out.
11     Q     Sure.  Be glad to try to repeat it.  You're
12     putting some pressure on Mr. Higgins' chest when you're
13     doing the sternum rub; correct?
14     A     Correct.
15     Q     And that pressure is designed to gain a reaction
16     from the individual to see if they're responsive;
17     correct?
18     A     Correct.
19     Q     And one of the things that would be responsive
20     with a sternum rub would be a person's eyes; correct?
21     A     It could be, yes, sir.
22     Q     And you didn't see any reaction with Mr. Higgins
23     in his eyes; correct?
24     A     No.  I was looking more for his hands, feet, any
25     kind of tensing up.
```

1    Q    Okay. Well, let's go with fingers. You didn't
2    see any reaction with his fingers in the sternum rub,
3    did you?
4    A    No, sir.
5    Q    And I think I asked you about his mouth. But you
6    didn't see him twitch his mouth or move his lips or
7    anything like that on the sternum rub, did you?
8    A    That's correct.
9    Q    So when he was wheeled into cell number 15, at
10   least from the objective test that you had given him,
11   he was a nonresponsive individual. Correct?
12   A    If he was -- he was not moving.
13   Q    Does that mean the same thing as nonresponsive?
14   A    I'm really not sure about that.
15   Q    Okay. And I think you have -- you told me earlier
16   that from the time they put him in the -- "they" being
17   Brogglin and Sanford and Spaulding -- put him in that
18   restraint chair until the time that he was wheeled into
19   cell number 15, you don't know whether he was breathing
20   or not, do you?
21   A    I do not know.
22   Q    All right. So we get to cell number 15. We've
23   got the video pulled up.
24              MR. COOPER: And so that I don't forget
25   about it, I'm going to ask that it be marked as the

```
                                )
     STATE OF TENNESSEE    )     C E R T I F I C A T E
                                )
```

I, Jill A. Schaffer, Registered Professional Reporter and Notary Public for the State of Tennessee, hereby certify that the witness in the foregoing deposition, **OFFICER ROBERT THOMAS ORSBORNE**, was first duly sworn by me, that the testimony of the witness was written stenographically by me, and that such deposition is a true and accurate record of the testimony given by said witness on the 27th day of October, 2020.

I further certify that I am neither related to nor employed by any of the parties to this cause of action or their counsel, nor am I financially interested in the outcome of this matter.

I further certify that in order for this document to be authentic it must bear my original signature and embossed notarial seal, that reproduction in whole or in part is not allowed or condoned, and that such reproductions are deemed a forgery.

Witness my hand and seal at my office on this the 14th day of November, 2020.

```
                                 _____
My Commission Expires:   Jill A. Schaffer, RPR, TN #375
   August 25, 2021       Notary Public at Large for the
My License Expires:      State of Tennessee
   June 30, 2022
```