*Jennifer Louise Jenkins, Administrator ad Litem of the Estate of Sterling L. Higgins*
*v. Obion County, Tennessee, et al.*

No. 20-cv-01056 STA-dkv

Exhibit 4
Excerpts from the Deposition of Waylon Spaulding

```
1   _____

2              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
3                      EASTERN DIVISION

4   _____

    JENNIFER LOUISE JENKINS,         )
5   Administrator ad Litem of the    )
    ESTATE OF STERLING L. HIGGINS,   )
6                                    )
           Plaintiff,                )
7                                    )
    v.                               )  CIVIL ACTION NO.
8                                    )  1:20-cv-01056-STA-dkv
    OBION COUNTY SHERIFF'S           )
9   DEPARTMENT; OBION COUNTY,        )
    TENNESSEE; UNION CITY POLICE     )
10  DEPARTMENT; UNION CITY,          )
    TENNESSEE; ROBERT THOMAS         )
11  ORSBORNE, Individually; MARY     )
    BROGLIN, Individually; WAYLON    )
12  SPAULDING, Individually; and     )
    BRENDON SANFORD, Individually,   )
13                                   )
           Defendants.               )
14  _____

15

16

17

18        THE VIDEOTAPE DEPOSITION OF OFFICER WAYLON SPAULDING

19                    October 26, 2020

20

21

22

23             SCHAFFER REPORTING SERVICE
                JILL A. SCHAFFER, RPR
24                   P.O. Box 3214
              Jackson, Tennessee 38303
25                  (731)668-6880
```

1      A    Yes, sir.

2      Q    Do you feel physically and mentally well enough to

3      give your best testimony today?

4      A    Yes, sir.

5      Q    And it's my goal today to ask questions that are

6      clear.  If at any time you do not understand a

7      question, please ask me to clarify it or rephrase it

8      for you, and I'll do so to the best of my ability.

9      Okay?

10     A    Yes, sir.

11     Q    Sometimes during this deposition I will refer to

12     the Obion County Detention Center as the Obion County

13     Jail or simply the jail.  If you're ever confused about

14     that, you let me know.  Okay?

15     A    Yes, sir.

16     Q    In fact, did you and your coworkers regularly

17     refer to the Obion County Detention Center as the Obion

18     County Jail or simply the jail?

19     A    Yes, sir.

20     Q    Sir, as of March 25th, 2019, was it important for

21     you in connection with your activities at the

22     Obion County Jail to follow the policies, procedures,

23     and protocols of the jail?

24     A    Yes, sir.

25     Q    As of March 25, 2019, was it important for you in

1    connection with your activities at the jail to follow

2    your County-provided training?

3    A    Yes, sir.

4    Q    Did you always do your best as of March 25, 2019,

5    to follow the policies, procedures, and procedures of

6    the jail?

7                    MR. MAULDIN:  Object to the form.

8                    You can answer.

9    A    Yes.

10   Q    (By Mr. Budge)  Periodically -- periodically

11   during a deposition, it's possible that an attorney

12   might object to the form of the question, and unless

13   you're instructed not to answer, you can just go ahead

14   and answer the question.

15       So let me just repeat it for you.  I think you did

16   answer it, but understanding that there's a form

17   objection, did you always do your best as of March 25,

18   2019, to follow the -- all of these procedures and

19   protocols at the jail?

20   A    Yes, sir.

21   Q    And did you always do your best as of March 25,

22   2019, to follow the training that was provided to you

23   by or through Obion County?

24                    MR. MAULDIN:  Object to the form.

25                    Go ahead.

7

1       A    Yes, sir.

2       Q    (By Mr. Budge)  As of March 2019, was there a

3       particular shift that you ordinarily worked at the

4       jail?

5       A    I was working third shift.

6       Q    And what were the hours of third shift?

7       A    It's midnight to 8:00 in the morning.

8       Q    Sir, it's been approximately 19 months since

9       Sterling Higgins died.  Reflecting on the events that

10      took place between you and Sterling Higgins on

11      March 25, 2019, is there anything that you would do

12      differently, looking back on it now?

13                  MR. MAULDIN:  Object to the form.

14      A    No, sir, there's not.

15      Q    (By Mr. Budge)  With regard to Sterling Higgins

16      and the events that took place between you and him on

17      March 25th, 2019, was it important to you that you

18      follow the policies and procedures and protocols of the

19      jail?

20                  MR. MAULDIN:  Object to the form.

21      A    Yes, sir.

22      Q    (By Mr. Budge)  Are you confident that everything

23      that you did on March 25, 2019, with regard to Sterling

24      Higgins was done according to the policies, procedures,

25      and usual customs at the Obion County Jail?

```
 1      training that was provided to you by the Tennessee
 2      Corrections Institute?
 3      A    Yes, sir.
 4      Q    Okay.  And have you been trained by the Tennessee
 5      Corrections Institute or by Obion County directly on
 6      any restraint techniques involving compression of the
 7      blood vessels in the neck?
 8                   MR. MAULDIN:  Object to the form.
 9      A    No, sir.
10      Q    (By Mr. Budge)  Have you been trained by the
11      Tennessee Corrections Institute or Obion County
12      directly on the dangers associated with compression of
13      tissues in the area of the neck or under the chin?
14                   MR. MAULDIN:  Object to the form.
15      A    No, sir.
16      Q    (By Mr. Budge)  Have you been trained by anybody
17      about the use of spit hoods or spit masks?
18      A    No, sir.
19      Q    Have you been trained by anybody about the use of
20      a restraint chair?
21                   MR. MAULDIN:  Object to the form.
22      A    Yes, sir.
23      Q    (By Mr. Budge)  And what training did you receive
24      and from whom about the use of a restraint chair?
25      A    There -- it was -a- it was a -- I can't remember
```

20

```
 1        came in?

 2                    MR. MAULDIN:  Object to the form.

 3        A    I -- I would say close to a year, yes, sir, at

 4        least.

 5        Q    (By Mr. Budge)  Were you trained anything about

 6        how long you could keep someone in a restraint chair if

 7        that person wasn't moving?

 8                    MR. MAULDIN:  Object to the form.

 9        A    When we put somebody in the restraint chair, they

10        are required to be able to stretch every hour, so every

11        hour you would go and let them stretch an arm, a

12        shoulder -- each arm, each leg, but it calls -- it

13        calls for every hour.

14        Q    (By Mr. Budge)  Were you trained about when you

15        should take somebody out of a restraint chair if they

16        were no longer moving?

17                    MR. MAULDIN:  Object to the form.

18        A    No, sir.

19        Q    (By Mr. Budge)  Were you ever trained by

20        Obion County or through Obion County about when to call

21        for emergency assistance for inmates or detainees who

22        might be limp or unresponsive?

23                    MR. MAULDIN:  Object to the form.

24        A    No, sir.  That's just a given.  When somebody

25        needs medical, you call medical.
```

1    Q     (By Mr. Budge)   Right.   But just to clarify my

2    question, you were never trained by Obion County or

3    through Obion County or by somebody on behalf of

4    Obion County about when to call for emergency

5    assistance for inmates or detainees who might be limp

6    or unresponsive.   Is that correct?

7                       MR. MAULDIN:   Object -- object to the

8    form.

9    A     No, sir.   Not a specific time, no.

10   Q     (By Mr. Budge)   Were you ever trained about what

11   to do if an inmate suddenly goes limp during a

12   restraint?

13                      MR. MAULDIN:   Object to the form.

14   A     No, sir.

15   Q     (By Mr. Budge)   Were you ever trained about when

16   to call for medical or mental help assistant --

17   assistance for inmates or detainees who might be

18   mentally impaired or under the influence of drugs?

19                      MR. MAULDIN:   Object to the form.

20   A     No, sir.

21   Q     (By Mr. Budge)   Were you ever trained about

22   something called positional asphyxia?

23                      MR. MAULDIN:   Object to the form.

24   A     Called what?   I couldn't hear you.

25   Q     (By Mr. Budge)   Positional asphyxia.

24

```
 1                    MR. MAULDIN:  Same objection.

 2    A     You'll have to elaborate on that.

 3    Q     (By Mr. Budge)  That's not a term you've heard

 4    before?

 5    A     Not frequently, no, sir.

 6    Q     Were you ever trained about something called

 7    compressional asphyxia?

 8                    MR. MAULDIN:  Object to the form.

 9    A     No, sir.  It don't sound familiar.

10    Q     (By Mr. Budge)  Were you ever trained before

11    March 25th, 2019, about any form of restraint related

12    to asphyxia or suffocation?

13                    MR. MAULDIN:  Object to the form.

14    A     No, sir.

15    Q     (By Mr. Budge)  Were you ever trained about

16    accommodation of arrestees or detainees who are

17    exhibiting signs of mental illness?

18    A     No, sir.

19                    MR. MAULDIN:  Object to the form.

20    A     No, sir.

21    Q     (By Mr. Budge)  Were you ever trained about

22    dealing with people who are exhibiting signs of

23    intoxication from drugs?

24                    MR. MAULDIN:  Object to the form.

25    A     No, sir.
```

1      Q      (By Mr. Budge)  Were you ever trained about

2      constitutional limits on the use of force against

3      inmates or detainees?

4                      MR. MAULDIN:  Object to the form.

5      A      Yes, sir.  It's in the use of force policy we've

6      got.

7      Q      (By Mr. Budge)  All right.  Was there a specific

8      training on the constitutional limits on the use of

9      force against inmates or detainees?  Do you recall

10     that?

11                     MR. MAULDIN:  Object to the form.

12     A      I do not, no, sir.

13     Q      (By Mr. Budge)  Were you ever trained on whether

14     officers had any duty to intervene if an officer saw a

15     fellow officer using excessive or unreasonable force?

16     A      Yes, sir.  I would -- I would hope so.  If an

17     officer has done something wrong, I would hope another

18     one would let him know, "Hey, you need to stop what

19     you're doing."

20     Q      All right.  But let me make sure you understand my

21     question as to the training.  Did you ever receive any

22     training about any duty to intervene if you saw a

23     fellow officer using excessive or unreasonable force?

24                     MR. MAULDIN:  Object to the form.

25     A      I -- I don't recall any training, no, sir.

                                                              26

1    Q    (By Mr. Budge)  Did you ever receive any training

2    on any constitutional obligation to summon or secure

3    medical care for inmates or detainees in need of care

4    for serious medical conditions?

5                        MR. MAULDIN:  Object to the form.

6    A    Training?  I don't remember any specific training.

7    Q    (By Mr. Budge)  So I -- I've asked a lot of

8    questions about training.  If you had any training

9    before March 25th, 2019, on any of the subjects that I

10   just mentioned, would you have endeavored to follow

11   that training?

12                       MR. MAULDIN:  Object to form.  Could

13   you -- could you repeat that question, Ed?

14                       MR. BUDGE:  Sure.

15   Q    (By Mr. Budge)  If you had any training on any of

16   the subjects that I mentioned before March 25th, 2019,

17   would you have endeavored to follow the training?

18                       MR. MAULDIN:  Object to the form.

19   A    So you're asking if I had had training on what you

20   asked, would I have had any problems following that

21   training?

22   Q    (By Mr. Budge)  Yes.  And would you have tried to

23   do so?

24   A    Yes, sir.  I would have followed my training.  I

25   wouldn't have had any problems trying to help someone.

27

1      Q     So if you had any training on any of those

2      subjects that I mentioned, you would have endeavored to

3      follow that training in connection with Sterling

4      Higgins?

5                        MR. MAULDIN:   Object to the form.

6      A     Yes, sir.

7      Q     (By Mr. Budge)  Did you have CPR certification on

8      March 25th, 2019?

9      A     No, sir.

10     Q     Did you have any CPR training before March 25th,

11     2019?

12                       MR. MAULDIN:  Object to the form.

13     A     No, sir.

14     Q     (By Mr. Budge)  Do you have CPR training and

15     certification now?

16     A     I...

17                       MR. MAULDIN:  Object to the form.

18     A     Honestly, I don't know, to tell you the truth,

19     Mr. Ed.

20     Q     (By Mr. Budge)  Do you know if any of the other

21     officers that were with you and who were present during

22     the events involving Sterling Higgins had CPR training

23     or certification?

24                       MR. MAULDIN:  Object to the form.

25     A     I -- I don't know.  I can't say.

1      an evaluation as soon as the person was put into the

2      restraint chair?

3                    MR. MAULDIN:  Object to the form.

4      A    Yes, sir.

5      Q    (By Mr. Budge)  But because there was no medical

6      person working at the jail when Mr. Higgins came into

7      the jail and when he was put in the restraint chair, no

8      medical person was called to evaluate him when he was

9      put in the restraint chair.  Correct?

10                   MR. MAULDIN:  Object to the form.

11     A    Correct.  We didn't have a nurse on that night

12     that I recall.

13     Q    (By Mr. Budge)  All right.  But if a nurse had

14     been on duty, you would have called him or her over to

15     look at him as soon as he was put in the restraint

16     chair?

17                   MR. MAULDIN:  Object to the form.

18     A    Yes, sir.

19     Q    (By Mr. Budge)  And if a medical person had been

20     on duty at the jail, you would have called him or her

21     to look at Mr. Higgins as soon as he stopped living;

22     correct?

23                   MR. MAULDIN:  Object to the form.

24     A    Absolutely.

25     Q    (By Mr. Budge)  And just for the record,

1     you.  I wanted to make sure you were done with your

2     answer.

3     A    I believe I was on third shift close to a year,

4     maybe.

5     Q    How many days a week did you come to work?

6     A    Five.

7     Q    And how many other employees worked with you at

8     the jail --

9                    MR. MAULDIN:  Object to the form.

10    Q    (By Mr. Budge)  -- on each shift that you worked

11    when you worked on third shift?

12                   MR. MAULDIN:  Object to the form.

13    A    When -- when a sergeant was there and not on their

14    days off, there would be five; but when a sergeant was

15    off, there would be four of us.

16    Q    (By Mr. Budge)  And on March 25th, 2019, when

17    Sterling Higgins came into the jail, was there a

18    sergeant on shift?

19    A    I -- I don't recall a sergeant, no, sir.

20    Q    Can you give me a sense of the Obion County

21    Jail's -- how many cells the jail has?

22    A    How many cells the jail has?

23    Q    Yes, in total.

24    A    Oh, in total I don't -- I don't know.

25    Q    Can you give me a sense of about how many inmates

1    would be in the jail at any one time?

2              MR. MAULDIN:  Object --

3    Q   (By Mr. Budge)  -- roughly?

4        I know you can't tell me for sure because it

5    varies.

6    A   I -- it -- it usually stays between, like, 140,

7    150 to 170 and 180, I think.

8    Q    All right.  So your best estimate would be that on

9    an average shift there would be somewhere between about

10   140 and 170 inmates in the jail?  Is that right?

11   A    Yes, sir.

12   Q    And on average what would be your best estimate

13   about how many new inmates would come into the jail per

14   shift that you worked when you worked the third shift?

15             MR. MAULDIN:  Object to the form.

16   A    On third shift it was -- it was pretty quiet most

17   nights.  A busy night you might get five, six, seven.

18   Q    (By Mr. Budge)  And then you had all the other

19   inmates who were confined in the jail, and if they had

20   any particular need during the course of your shift,

21   you'd have to take care of those needs?  Is that

22   correct?

23             MR. MAULDIN:  Object to the form.

24   A    Yes, sir.

25   Q   (By Mr. Budge)  What kind of medical staffing did

37

1    the Obion County Jail have?  Can you describe that for

2    me?

3                    MR. BUDGE:  Object to the form.

4    A    We had a -- an on-shift nurse, but they didn't

5    work night shift that I recall.

6    Q    (By Mr. Budge)  Okay.  So when you worked third

7    shift from 12 midnight to 8 a.m., there was no nurse on

8    shift?

9    A    Not that I recall --

10                    MR. MAULDIN:  Object to form.

11   A    -- no, sir.

12   Q    (By Mr. Budge)  And when you worked on third

13   shift, again, midnight to 8 a.m., there was no other

14   medical person at the jail; is that right?

15                    MR. MAULDIN:  Object to the form.

16   A    Not that I recall.

17   Q    (By Mr. Budge)  Do you know what the medical

18   staffing was like on the other shifts, the -- the first

19   shift and the second shift?

20   A    I'm sorry?

21   Q    Do you know what the medical staffing was like on

22   the first shift and the second shift?

23                    MR. MAULDIN:  Object to the form.

24   A    I believe it was just -- just one nurse.

25   Q    (By Mr. Budge)  Do you know if that nurse worked

38

1      school -- excuse me -- any formal education above high

2      school?

3      A    I went to a two-year diesel college.

4      Q    Okay.  And could you give me a -- a overview of

5      your employment history since high school up through

6      the present day?

7      A    After I got -- well, in order to go to that

8      college, you had to get sponsored by a -- an ag

9      company, I guess, for lack of a better term.  But

10     Tennessee Tractor was the one that sponsored me, sent

11     me to school.

12           Then once you get out of school, you work for them

13     for however long your contract that you signed was.

14     Then once that contract is up, if you want to stay with

15     them, you can; if you don't, you can go on to somewhere

16     else.

17           But after that I helped a ex-girlfriend of mine,

18     helped her family farm.  Then I started at the jail.

19     Q    So when did you first start working for the

20     Obion County Jail?

21     A    December 21st of 2015.

22     Q    And were you employed by the Obion County Jail

23     continuously from the time you started work up through

24     at least March 25th of 2019?

25     A    Yes, sir.

```
 1    A    Honestly -- honestly, I don't know, Mr. Ed.  I

 2    don't know.

 3    Q    Have you ever given any -- ever given any

 4    testimony, like to a grand jury or in connection with

 5    any other formal inquiry, into what happened involving

 6    Sterling Higgins?

 7    A    No, sir.

 8    Q    Did you know Thomas Orsborne before March 25th,

 9    2019?

10    A    No, sir.

11    Q    Before March 25th, 2019, how long had you worked

12    with Mary Brogglin?

13    A    I don't -- I don't know her exact hire-in date,

14    but I believe it was close to around mine, so I'd say

15    maybe two, two and a half, three years, maybe.  That's

16    just a guess.

17    Q    Did the two of you often work together on

18    third shift?

19    A    Yes, sir.  We were on the same shift for the

20    majority of the time when I was in the jail, I believe.

21    Q    Have you ever socialized with her outside of work?

22                   MR. MAULDIN:  Object to the form.

23    A    Yes, sir, just a handful of times.

24    Q    (By Mr. Budge)  What types of things have you done

25    together?
```

```
 1                    MR. MAULDIN:  Object to the form.
 2      A    I'm sorry?
 3      Q    (By Mr. Budge)  What types of things have you done
 4      together outside of work?
 5      A    Just go out to eat and hang out with her husband
 6      and my wife.  We'd just go out to eat and go back home.
 7      Q    So your families know each other?
 8      A    Yes, sir.
 9      Q    What about Brendon Sanford?  How long did you know
10      him before March 25th of 2019?
11      A    Just the time that he had worked at the jail,
12      which I don't know how long that had been.
13      Q    Was he one of the people that worked with you on
14      third shift in the months leading up to Sterling
15      Higgins' death?
16      A    Yes, sir.  He was on shift with us.
17      Q    Have you ever socialized with Mr. Sanford outside
18      of work?
19                    MR. MAULDIN:  Object to the form.
20      A    I'm -- I've seen him at the grocery store a couple
21      times, and we would talk for, like, maybe a couple
22      minutes, and we'd go our separate ways but never --
23      never planned to hang out.
24      Q    (By Mr. Budge)  What about Stormy Travis?  Was she
25      one of the people that you regularly worked with on
```

61

1      third shift before March 25th, two -- 2019?

2      A    Yes, sir.

3      Q    And have you socialized with her outside of work?

4                  MR. MAULDIN:   Object to the --

5      A    No, sir.

6                  MR. MAULDIN:   -- form.

7      Q    (By Mr. Budge)  Did you know Sergeant Talmadge

8      Simmons with the Union City Police Department before

9      March 25th of 2019?

10     A    Just on a work-related basis whenever he would

11     come to the jail.

12     Q    To bring somebody in to the jail?

13     A    Just any time he come to the jail.

14     Q    As it relates to Sterling Higgins and your

15     involvement with him at the Obion County Jail in March

16     of 2019, do you remember what happened?

17                 MR. MAULDIN:   Object to the form.

18     A    What happened with what?

19     Q    (By Mr. Budge)  Do you remember the event

20     involving Sterling Higgins and yourself on March 25th,

21     2019?

22     A    Bits and pieces of it, yes, sir.

23     Q    And what do you mean by "bits and pieces"?

24     A    Well, I mean, I remember the situation, but it --

25     I don't remember everything because it's been so long

1    aware that he was there until he was eventually taken

2    away on a stretcher.

3                MR. MAULDIN:  Object to the form.

4    A    Okay.  So if I remember correctly, Officer Travis

5    was on the control board, and I was in F pod, finishing

6    up a pod check.  And she come over the radio and said

7    Union City was bringing in one black male.

8         So I finish my pod check, and I turn around and go

9    to head out the door, and I shut the doors behind me.

10   And I walk into booking -- sorry -- and I believe I

11   walked behind the counter to get some gloves.  Then I

12   started down towards door 10, where Mr. Higgins was

13   being walked through the door.

14        Well, he didn't want to come in that door because

15   he thought Officer Brogglin was going to shoot him

16   because I do remember that he was saying she had a gun.

17   And he was pushing against Officer Orsborne, trying to

18   go back through the door.  So Officer Orsborne

19   stiffened up and got him inside the door.

20        Well, once he come in the door, he lunged and went

21   after Officer Brogglin.  Well, the first time she

22   moved, but the second time somehow he got a handful of

23   her hair.  And that's when I -- that's when I got

24   there, and I grabbed Mr. Higgins and telling him, "Let

25   her go.  Hey, you know, turn loose of her.  Let her

64

```
 1       time.

 2       Q     Do you remember where you put your hands when

 3       Mr. Higgins was on the floor with regard to what part

 4       of his body you put your hands?

 5                     MR. MAULDIN:   Object to the form.

 6       A     Yes, sir.   This part (indicating) was on the

 7       bridge of his nose.

 8       Q     (By Mr. Budge)   Okay.   And when you say "this

 9       part," what do you mean?

10       A     The bottom part of my hand right here

11       (indicating).

12       Q     Bottom part of your hand was on his nose?

13       A     It was -- well, I can't -- I can't do it to

14       myself, but...

15       Q     Well, you can -- you can demonstrate for me --

16       A     Like --

17       Q     -- if you want.

18       A     I had my -- I had my hand like this (indicating),

19       and this part was on -- on top of his nose above his

20       nostrils (indicating).   Then I kind of, like, bent it

21       down like that right there (indicating) to keep the

22       spit from flying out towards anybody.

23       Q     So your left hand was on the top of his nose?

24       A     To the best of my knowledge, yes, sir.

25       Q     Was your left hand ever on his neck or underneath
```

68

1    his body, do you -- do you recall, after he was -- as

2    he was being put over to the restraint chair?

3    A    No, sir, other than his legs being locked out

4    stiff, and me and Brendon were both holding an arm.

5    Q    How long did it take you to strap Mr. Higgins into

6    the restraint chair?

7                   MR. MAULDIN:   Object to the form.

8    A    I -- I don't know exactly.

9    Q    (By Mr. Budge)   What's your best estimate?

10   A    I'd say within 5, 7 minutes, maybe.

11   Q    Was Mr. Hudg -- Mr. Higgins handcuffed behind his

12   back during these events you described?

13   A    Yes, sir, he was.

14   Q    The whole time?

15   A    Until we put him in the restraint chair.

16   Q    How many times did Mr. Higgins spit?

17   A    I don't know exactly.

18   Q    What's your best estimate?

19   A    I would say at least two to three times, I would

20   say.

21   Q    Were you injured in any way?

22   A    No, sir.  I landed on my knee when I hit the

23   floor.  Other than that being a little sore, but I

24   don't really consider that being injured.

25   Q    To the very best of your ability, when exactly in

1   the course of events did Mr. Higgins spit at you?

2              MR. MAULDIN:   Object to the form.

3   A    It -- it wasn't long after he had got to the wall

4   and stopped than when I was going over to him.   It

5   wasn't long after that, the best of --

6   Q    (By Mr. Budge)   So --

7   A    -- my recollection.

8   Q    So when Mr. Higgins spit at you, was he still

9   standing?

10  A    No, sir.   He was laying down on his back.

11  Q    Okay.   So it was -- it was very soon after he was

12  on the floor on his back that he spit at you?

13  A    Yes, sir.

14  Q    Within, let's say, 30 seconds of going to the

15  floor, would you say?

16             MR. MAULDIN:   Object to the form.

17  A    Within 30 seconds?   I think that might have been a

18  little soon.   It might have been within a -- a minute

19  or however long it took him to get over to the wall

20  because it -- he didn't -- I don't think he spit until

21  we got to the wall, or if he did, I didn't see it.

22  Q    (By Mr. Budge)   All right.   So, best estimate,

23  maybe Mr. Higgins spit at you within about a minute of

24  the time he went on the ground and as he got to the

25  wall?

74

1    A    Yes, sir.  I would --

2                   MR. MAULDIN:  Object to the form.

3    A    I would say that would be a safe estimate.

4    Q    (By Mr. Budge)  And then you say he spit on you

5    maybe two to three times?  Is that right?

6                   MR. MAULDIN:  Object to the form.

7    A    I believe so, yes, sir.

8    Q    (By Mr. Budge)  And was that in quick succession,

9    like spit and then spit again and then maybe spit

10   again?

11   A    (The witness nodded.)

12        Um-hum.

13   Q    Meaning that those times where you say that he

14   spit on you would happen within just a couple seconds

15   of each other?

16   A    Yes, sir.  As soon as he could get some more spit

17   in his mouth, it was -- he was spitting again.

18   Q    Okay.  So after about a minute or so of going to

19   the ground, did he ever spit on you again?

20                   MR. MAULDIN:  Object to the form.

21   A    Not -- not after those first few initial times,

22   no.

23   Q    (By Mr. Budge)  And is it fair to say that within

24   about a minute or so of going to the ground Mr. Higgins

25   did not spit on you again, just so we have it clear?

1                         MR. MAULDIN:   Object to the form.

2       A    Correct.

3       Q    (By Mr. Budge)   Do you think that Mr. Higgins was

4       knowingly and voluntarily spitting on you, or is it

5       possible that he did it in -- unintentionally or

6       without knowing what he was doing, or do you -- do you

7       know?

8                         MR. MAULDIN:   Object to the form.

9       A    I mean, there's -- there's no way to know for

10      sure, but I feel like he knew, but I -- I couldn't -- I

11      couldn't say 100 percent.

12      Q    (By Mr. Budge)   Do you recall Mr. Higgins saying

13      anything to you at any time?

14      A    To me personally?  I don't remember anything.

15      Q    Do you remember you saying anything to him, that

16      is, did you say anything to Mr. Higgins that you

17      remember at any point in time?

18      A    Other than telling him to let go of

19      Officer Brogglin, not that I recall, no, sir.

20      Q    After Mr. Higgins spit at you, did you tell him

21      that he was going to regret it, or words to that

22      effect?

23                        MR. MAULDIN:  Object to the form.

24      A    No, sir, not that I recall.

25      Q    (By Mr. Budge)   Do you think that's something that

1    Q    And in this paused image, can we see Mary Brogglin

2    is pointing with her right hand?

3    A    Yes, sir.

4    Q    And can we see that Union City Police Officer

5    Orsborne is in the lower right-hand corner of the

6    screen?

7    A    Yes, sir.

8    Q    And can we also see that you are near the top of

9    the screen, starting to make your way down the hallway?

10   A    Yes, sir.

11   Q    And why were you coming down the hallway at this

12   point in time?

13                  MR. MAULDIN:  Object to the form.

14   A    To help escort Mr. Higgins in case anything went

15   south.

16   Q    (By Mr. Budge)  As far as you were concerned, was

17   this just a routine intake at this point in time?

18   A    Yes, sir.  It was just a -- a normal thing.

19   Q    All right.  I'm going to play and pause it to

20   1:46 a.m. and 24 seconds.

21                  (The video was resumed and paused.)

22   Q    (By Mr. Budge)  Now, do you see the paused image

23   at 1:46 a.m. and 24 seconds?

24   A    Yes, sir.

25   Q    And in this paused image, can you see that there's

87

```
 1      a physical altercation going on between Sterling

 2      Higgins and Officer Brogglin?

 3                      MR. MAULDIN:  Object --

 4      A    Yes.

 5                      MR. MAULDIN:  -- to the form.

 6      A    Yes, sir.

 7      Q    (By Mr. Budge)  And can we see that Union City

 8      Police Officer Orsborne is standing right there just a

 9      few feet away?

10      A    Yes, sir.

11      Q    And can we see that you're nearing the site of

12      the -- the altercation with the hat on, putting some

13      blue gloves on?

14      A    Yes, sir.

15      Q    And you're wearing green pants and a black top; is

16      that right?

17      A    Yes, sir.

18      Q    And what is your purpose in coming to a physical

19      altercation at this point in time?

20                      MR. MAULDIN:  Object to the form.

21      A    To help Officer Brogglin.

22      Q    (By Mr. Budge)  And was it the case that although

23      Sterling Higgins was able to grasp Ms. Brogglin that

24      his hands were indeed handcuffed behind his back?

25      A    Yes, sir, he was.
```

88

1    Q    All right.  I'm going to play and pause it to

2    1:46 a.m. and 28 seconds.

3                    (The video was resumed and paused.)

4    Q    (By Mr. Budge)  I have now -- the -- the portion

5    that I paused at 1:46 a.m. and 28 seconds, what's

6    happened here?

7    A    That's --

8                    MR. MAULDIN:  Object to the form.

9    A    That's when I was telling Mr. Higgins to let Mary

10   go.

11   Q    (By Mr. Budge)  Was this about the point in time

12   that you took Mr. Higgins to the ground, or did that

13   come later?

14                   MR. MAULDIN:  Object to the form.

15   A    It comes later.

16   Q    (By Mr. Budge)  All right.  I'm going to play and

17   pause it to 1:46 a.m. and 55 seconds.

18                   (The video was resumed and paused.)

19   Q    (By Mr. Budge)  In this paused image at 1:46 a.m.

20   and 55 seconds, can we see Union City Police Officer

21   Orsborne and Officers Sanford and Brogglin looking at

22   the ground?

23   A    Yes, sir.

24   Q    And by this point in time, do you have Sterling

25   Higgins on the ground?

89

```
 1     A     Yes --

 2                    MR. MAULDIN:  Object to the form.

 3     A     Yes, sir.  He had fell to the ground.

 4     Q     (By Mr. Budge)  All right.  So by -- by at least

 5     1:46 a.m. and 55 seconds, you and Mr. Higgins are on

 6     the ground together; is that right?

 7     A     Yes, sir.

 8     Q     Did anybody use any type of, like, leg squeeze or

 9     any other type of maneuver or technique to take

10     Mr. Higgins to the ground, or did he just basically

11     slip and fall?

12     A     No, sir.  He fell.

13     Q     He fell down?

14     A     Yes, sir.

15     Q     Did Union City Police Officer Orsborne do anything

16     to take him to the ground?

17     A     No, sir.

18                    MR. MAULDIN:  Object to the form.

19     Q     (By Mr. Budge)  I'm sorry.  I didn't catch the

20     answer.

21     A     No, sir, he didn't.

22     Q     And, just for the record, Union City Police

23     Officer Orsborne is the one with the patch on the right

24     shoulder?

25     A     Yes, sir.
```

1    Q    And the other man who's standing there with the

2    star over his left breast, that's Jail Officer San --

3    Sanford; correct?

4    A    Yes, sir.

5    Q    And by this time you're on the floor with Sterling

6    Higgins, and Mr. Higgins' hands are still handcuffed

7    behind his back.  Right?

8    A    Yes, sir.

9    Q    And his hands remain handcuffed behind his back

10    until you uncuffed him after he was in the restraint

11    chair; correct?

12    A    Correct.

13    Q    You and Mr. Higgins are out of view of the camera

14    at this point in time; right?

15    A    Correct.

16    Q    What's happening on the ground, to the best of

17    your memory, at this point in time?

18                    MR. MAULDIN:  Object to the form.

19    A    To the best of my memory, I'm just trying to

20    corral him, just to contain him.

21    Q    (By Mr. Budge)  Do you remember -- do you remember

22    any other details about what was happening on the

23    ground at this point in time?

24    A    I do not.

25    Q    All right.  I'm going to play and pause it to

1      1:47 a.m. and 5 seconds.

2                          (The video was resumed and paused.)

3      Q    (By Mr. Budge)  And do you see the paused image on

4      the screen at 1:47 a.m. and 5 seconds?

5      A    Yes, sir.

6      Q    And in this image, can we see Union City Police

7      Officer Orsborne standing and looking at the ground

8      with a green sack in his left hand?

9      A    Yes, sir.

10     Q    What can you tell me about what's happening on the

11     ground at this point in time?

12                         MR. MAULDIN:  Object to the form.

13     A    It's -- it's the same thing, just trying to

14     contain Mr. Higgins.

15     Q    (By Mr. Budge)  Were you having a lot of trouble

16     containing Mr. Higgins at this point in time?

17                         MR. MAULDIN:  Object to the form.

18     A    I mean, he was just trying to get away from me.

19     Q    (By Mr. Budge)  Were you having a lot of trouble

20     containing Mr. Higgins at this point in time?

21                         MR. MAULDIN:  Object to the form.

22     A    No, sir, not -- not really.

23     Q    (By Mr. Budge)  You -- you pretty much had control

24     over him; is that correct?

25                         MR. MAULDIN:  Object to the form.

1    A    I -- I would say it was -- it was close.  I -- I

2    couldn't give you exact because I can't see.

3    Q    (By Mr. Budge)  Well, if -- if you were having a

4    lot of difficulty containing Mr. Higgins at 1:47 a.m.

5    and 5 seconds, you would expect that Union City Police

6    Officer Orsborne or one of the other two corrections

7    officers there would assist you.  Correct?

8              MR. MAULDIN:  Object to the form.

9    A    Yes, sir, I believe they would have.

10   Q    (By Mr. Budge)  So is it fair to say that you have

11   Mr. Higgins pretty much under control by 1:47 a.m. and

12   5 seconds?

13             MR. MAULDIN:  Object to the form.  It's

14   asked and answered numerous times.

15   A    I would -- I would say it was close, yes, sir.

16   Q    (By Mr. Budge)  All right.  I'm going to play and

17   pause it at 1:47 a.m. and 36 seconds.

18             (The video was resumed and paused.)

19   Q    (By Mr. Budge)  So in the paused image on your

20   screen at 1:47 a.m. and 36 seconds, you and Mr. Higgins

21   have already been on the ground for well over a minute.

22   Correct?

23   A    Yes, sir.

24             MR. MAULDIN:  Object to the form.

25   Q    (By Mr. Budge)  And so if -- if Mr. Higgins is

93

1     Q   (By Mr. Budge)  All right.  By 1:49 a.m. and

2     5 seconds, does it appear that the other officers have

3     put the leg shackles on Mr. Higgins?

4     A   Yes, sir, I believe so.

5     Q   And so by -- at 1:49 a.m. and 5 seconds,

6     Mr. Higgins is leg-shackled and handcuffed behind his

7     back.  Correct?

8     A   Yes, sir.

9     Q   And Mr. Higgins is on his back on the floor; is

10     that correct?

11     A   Yes, sir.

12     Q   And you're on top of Mr. Higgins; is that right?

13             MR. MAULDIN:  Object to the form.

14     A   Well, if -- if I remember correctly, my right leg

15     was on the floor next to him, and my left leg was

16     between his two legs, so I was -- I was, like,

17     straddling his left leg it would be, if I remember

18     correctly.

19     Q   (By Mr. Budge)  Okay.  So -- so just for the

20     record and to clarify, at 1:49 a.m. and 5 seconds,

21     Mr. Higgins was leg-shackled, handcuffed behind his

22     back, on the floor on his back, and you are over

23     Mr. Higgins with your body.  Correct?

24             MR. MAULDIN:  Object to the form.

25     A   Yes, sir.

1       get him into the chair and get him strapped in, but I

2       do remember him grunting and moaning when we were

3       putting him into the chair.

4       Q    Could you describe that grunting and moaning in as

5       much detail as you can?  As if I was an observer right

6       there at the scene, describe for me exactly what you

7       mean by "grunting and moaning."

8                     MR. MAULDIN:  Object to form.

9       A    I don't really know how to explain this.  Like,

10      are you wanting -- you wanting to know what it sounded

11      like or what -- I'm confused --

12      Q    (By Mr. Budge)  Yes.

13      A    -- on what you're asking.

14      Q    Yes.  I want to know what it sounded like in as --

15      in as much detail as you're able to describe it.

16                    MR. MAULDIN:  Object to form.

17      A    Well, when -- when we set him down, he was -- he

18      was, like (indicating), like that right there.

19      Q    (By Mr. Budge)  Sort of a -- a -- a snoring-type

20      of sound?

21                    MR. MAULDIN:  Object to form.

22      A    Yeah, kinda.

23      Q    (By Mr. Budge)  Like, a -- like, a -- like, a

24      sudden inhalation of breath accompanied by a noise?

25                    MR. MAULDIN:  Object to form.

1    A    Yes, sir, kind of like that.

2    Q    (By Mr. Budge)   Sort of like the sound that one

3    would make if they were to suddenly snore in bed?

4                    MR. MAULDIN:   Object to form.

5    A    If they were what?

6    Q    (By Mr. Budge)   Sort of like the sound that one

7    would make if one were to suddenly snore when they

8    were --

9    A    Oh, yes, sir.

10                    MR. MAULDIN:   Object to form, same.

11   I -- I -- Ed, I think he's described the sound.  I

12   mean, he's made the sound for you on the record.

13                    MR. BUDGE:   Right.   It's just that for

14   the -- for purposes of the transcript, I'm not sure the

15   sound is going to show up.

16   Q    (By Mr. Budge)   So would you describe it as a

17   snoring type of sound?

18                    MR. MAULDIN:   Object to form.

19   A    Yeah.   That's probably about the closest I

20   could -- sound that I could think of.

21   Q    (By Mr. Budge)   Okay.   And how many of those snore

22   types of sound did he make as he -- as you were putting

23   him in the chair?

24                    MR. MAULDIN:   Object to form.

25   A    Two, three, four -- I don't -- I don't really

1      remember how many, honestly.

2      Q    (By Mr. Budge)  All right.  As you were

3      manipulating the straps to strap Sterling Higgins' body

4      into the chair, how would you -- how -- how would you

5      go about doing that?  What was the general procedure?

6      A    Well, there's -- there's two for the feet, then

7      there's a strap on each armrest and a hand cuff on each

8      armrest, and there's a strap that goes around the

9      waist, and there's a strap that comes over the

10     shoulders and hooks around -- like, it goes -- I -- I

11     don't know the exact part of the body, but it's, like,

12     around -- around the ribs, almost.

13     Q    And as you move around the chair and tighten the

14     straps and pull on the straps and do what you need to

15     do to strap him into the chair, the straps pull on and

16     tighten against Mr. Higgins' body.  Is that correct?

17     A    Well, yes, sir.  We have to tighten the straps

18     down.

19     Q    And the chair has wheels; right?

20     A    The chair has what?  I'm sorry, Mr. Ed.

21     Q    The chair has wheels?

22     A    Yes, sir, it has wheels on it.

23     Q    And so from time to time, in the course of

24     strapping his body into the chair, would the chair move

25     slightly so that you have to brace the chair to keep

```
1    A    To reverse the effects of an overdose is what I

2    was told it was used for.

3    Q    (By Mr. Budge)   What, if anything, made you feel

4    that this was a situation with Sterling Higgins

5    involving an overdose?

6    A    We just suspected he -- it was a suspected

7    overdose.

8    Q    And my question is why you suspected that.

9    A    I -- I honestly couldn't tell you.

10   Q    When did you first suspect that Mr. Higgins might

11   have overdosed?

12               MR. MAULDIN:  Object to form.

13   A    Just -- just shortly before Officer Brogglin

14   entered that cell.

15   Q    (By Mr. Budge)  And can you tell me with any

16   degree of specif -- specificity or even generally why

17   you thought that as of this time it might have been an

18   overdose situation?

19   A    I can't.

20   Q    Okay.  I'll play and pause it to 2:10 and

21   26 seconds.

22               (The video was resumed and paused.)

23   Q    (By Mr. Budge)  Is this form of Narcan something

24   where you spray it up a person's nose?

25   A    You -- you hold it like this (indicating), and
```

169

1    A    Oh.  Okay.  Yes, sir.  I -- I see it now.

2    Q    Okay.  Do you see where it says "I had, like, one

3    leg on his stomach"?

4    A    Yes, sir.

5    Q    Did you, in fact, have one leg on Sterling

6    Higgins' stomach as you were over him on the floor?

7    A    It was -- it was around his groin area.  I don't

8    know if it was all the way on his stomach, but it

9    was -- it was in that general area.

10   Q    So is it or is it not the case that you had one

11   leg on his stomach?

12   A    I -- I would say in that general area.  Yes, sir.

13   Q    And how much -- how much weight did you have on

14   him at that time?

15                  MR. MAULDIN:  Object to the form.

16   A    Oh, I -- I don't know, but not all of it.

17   Q    (By Mr. Budge)  On page 7, beginning on line 23,

18   the transcript reads as follows -- and I'll begin at

19   line 23 and then continue -- "And that's when he went

20   to spit in my face.  And after -- after he spit, like,

21   two good times, I guess his mouth got real dry, and he

22   got cotton mouth.

23       "Question:  So" he was -- "so was he still trying

24   to spit?

25       "Answer:  He tried one more time, but he

193

```
 1         couldn't -- he couldn't get enough, like, spit to come

 2         up to do anything.  And he got -- he got kind of

 3         quiet."

 4              Do you see what I read to you?

 5    A     Yes, sir.

 6    Q     Did you tell Special Agent Tubbs in substance that

 7         Sterling Higgins spit two good times, but then his

 8         mouth got dry, and he tried one more time, but he

 9         couldn't do enough -- get enough spit to do anything

10         after spitting twice?

11                   MR. MAULDIN:  Object to form.

12    A     Yes, sir, I did tell him that.

13    Q     (By Mr. Budge)  Okay.  And is that true?

14    A     Yes, sir.

15    Q     And then the transcript goes on to say "He got

16         kind of quiet."  What did you mean by that, if you told

17         Special Agent Tubbs that?

18    A     That's when he just started calming down.

19    Q     By "calming down," do you mean going still or

20         nearly still?

21                   MR. MAULDIN:  Object to form.

22    A     Yes, sir, kind of.

23    Q     (By Mr. Budge)  In your interview with Special

24         Agent Tubbs of the TBI, do you think you told him

25         anything about Union City Police Officer Orsborne
```

194

```
 1                       )
        STATE OF TENNESSEE  )      C E R T I F I C A T E
 2                       )

 3                       I, Jill A. Schaffer, Registered

 4      Professional Reporter and Notary Public for the State

 5      of Tennessee, hereby certify that the witness in the

 6      foregoing deposition, OFFICER WAYLON SPAULDING, was

 7      first duly sworn by me, that the testimony of the

 8      witness was written stenographically by me, and that

 9      such deposition is a true and accurate record of the

10      testimony given by said witness on the 26th day of

11      October, 2020.

12                       I further certify that I am neither

13      related to nor employed by any of the parties to this

14      cause of action or their counsel, nor am I financially

15      interested in the outcome of this matter.

16                       I further certify that in order for this

17      document to be authentic it must bear my original

18      signature and embossed notarial seal, that reproduction

19      in whole or in part is not allowed or condoned, and

20      that such reproductions are deemed a forgery.

21                       Witness my hand and seal at my office on

22      this the 8th day of November, 2020.

23

24      My Commission Expires:    _____
             August 25, 2021      Jill A. Schaffer, RPR, TN #375
25      My License Expires:       Notary Public at Large for the
             June 30, 2022        State of Tennessee
```

227