*Jennifer Louise Jenkins, Administrator ad Litem of the Estate of Sterling L. Higgins*
*v. Obion County, Tennessee, et al.*

No. 20-cv-01056 STA-dkv

Exhibit 2
Excerpts from the Deposition of Robert Orsborne

1  _____

2         IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TENNESSEE
3                  EASTERN DIVISION

4  _____

JENNIFER LOUISE JENKINS,        )
5  Administrator *ad Litem* of the )
ESTATE OF STERLING L. HIGGINS, )
6                                 )
        Plaintiff,               )
7                                 )
v.                              ) CIVIL ACTION NO.
8                                ) 1:20-cv-01056-STA-dkv
OBION COUNTY SHERIFF'S          )
9  DEPARTMENT; OBION COUNTY,      )
TENNESSEE; UNION CITY POLICE    )
10 DEPARTMENT; UNION CITY,         )
TENNESSEE; ROBERT THOMAS        )
11 ORSBORNE, Individually; MARY    )
BROGLIN, Individually; WAYLON   )
12 SPAULDING, Individually; and    )
BRENDON SANFORD, Individually,  )
13                                 )
        Defendants.              )
14 _____

15

16

17

18    **VIDEOTAPE DEPOSITION OF OFFICER ROBERT THOMAS ORSBORNE**

19                  October 27, 2020

20

21

22

23           SCHAFFER REPORTING SERVICE
             JILL A. SCHAFFER, RPR
24                P.O. Box 3214
            Jackson, Tennessee 38303
25               (731)668-6880

1    Q    Okay.  Can you give me an approximation?

2    A    Somewhere between 30 degrees -- well, maybe even

3    less than that.  Maybe between 40 and 50 degrees,

4    something like that.

5    Q    It was certainly not below freezing; right?

6    A    No, sir.

7    Q    And about how long would you say that you yourself

8    interacted with Mr. Higgins during that first visit,

9    that first meeting?

10   A    15, 20 minutes.

11   Q    Tell me what you remember about his appearance,

12   Mr. Orsborne.

13   A    He had on a jacket, some pants, socks, and shoes.

14   I don't believe he had on a shirt.  He just had on a

15   jacket, no shirt under it, I don't think.

16   Q    And I believe at times the jacket was opened up,

17   so you could just see his chest.  Correct?

18   A    Correct.

19   Q    And now my question is about kind of his behavior.

20   What -- what do you recall about his behavior?  In

21   other words, the more you talked to him, give me your

22   impressions about his -- his behavior and his mental

23   state.

24   A    He was somewhat bizarre, some of the statements

25   that he was making that people were trying to get him.

                                                        32

1    Q    So you would also say he seemed a little bit

2    paranoid at times?

3    A    (The witness nodded.)

4         At times he was a little paranoid.

5    Q    And the bizarre behavior -- and you may have

6    stated this in your answer.  But just tell me again --

7    tell me some of the things that you -- that made you

8    believe that he was -- his behavior was rather bizarre

9    and paranoid.

10   A    Just the way he was moving around, the -- some of

11   the statements he made.  I -- I don't know the specific

12   statements other than someone was out to get him.  He

13   was able to answer questions that were posed to him by

14   myself or Sergeant Simmons.

15        He knew what -- where he was.  He knew who the

16   president was.  He knew questions about his mother,

17   where she was.

18   Q    I think he even told you his date of birth, didn't

19   he?

20   A    He -- I believe he -- he told us some personal

21   information.  Exactly what I'm really not sure.  He

22   tried to prove that he wasn't crazy by his answers.  I

23   know he said that in there somewhere.

24   Q    Right.  I mean, you would agree there were times

25   when he would have some fairly lucid moments.  Correct?

33

1    A    Correct.

2    Q    And then there were times when he would sort of go

3    the other way and engage in some rather bizarre

4    statements and bizarre activity.  Correct?

5    A    That is correct.

6    Q    Did you suspect him of any type of drug use at the

7    time?

8    A    Possibly, yes, sir.

9    Q    Did you see anything that made you think that he

10   was on drugs?

11   A    I didn't see anything that made me think that, no,

12   sir.

13   Q    Okay.  I know that he had some possessions there

14   at Pockets Market.  Did you see a -- a roach clip or

15   any paraphernalia, anything like that?

16   A    No, sir, did not.

17   Q    Mr. Orsborne, I guess this is as good a time as

18   any.  I want to try to bring up the -- the body cam

19   from Pockets Market, and I want us to -- to look at

20   that for a few moments.  Just give me one second.

21              (Mr. Cooper began sharing his screen.)

22   Q    (By Mr. Cooper)  All right.  So far so good.  I've

23   been able, I think, to pull up the -- the body cam --

24   your body cam from Pockets Market.  I'm going to go

25   back to the beginning, and I'm going to play just a

```
 1              That's what he said.
 2     Q    At that point did you have a little bit different
 3     opinion about him, Mr. Orsborne?
 4     A    Yes.  From the -- from now -- from the initial to
 5     now, yes, sir.
 6     Q    Okay.  And what -- what was that?
 7     A    Something may not be right with him as far as
 8     whether he be on something or he may have a mental
 9     issue.  I'm not a mental professional, but he was just
10     not acting like a normal person.
11     Q    Let me start it at 16:00.
12                    (The video was resumed and paused.)
13     Q    (By Mr. Cooper)  All right.  I've stopped it at
14     16:38.  Sergeant Simmons is asking Mr. Higgins if he
15     takes medication; correct?
16     A    Correct.
17     Q    And Mr. Higgins either doesn't respond or -- but
18     Simmons says, "You need to."  Did -- do you hear him
19     say that?
20     A    (The witness nodded.)
21              I heard him say that.
22     Q    Was that your impression at the time, that he
23     needed to be taking some -- some sort of medication
24     based on his mental state?
25                    MR. HILL:  Object to form.
```

60

```
 1      Q    And did you hear Mr. Simmons basically agree with

 2      him, said, "I know I do"?

 3      A    Yes, sir.

 4      Q    And did -- and you -- do you agree with that, that

 5      Mr. Higgins did have a problem, standing out there in

 6      the parking lot?

 7      A    Correct.

 8      Q    And would you go so far as to say it appeared he

 9      had a mental problem?

10                MR. HILL:  Object to form.

11      A    I wouldn't go that far.

12      Q    (By Mr. Cooper)  Well, he didn't appear to have

13      any physical problem, did he?  I mean, he was walking

14      around and moving all his limbs and all that; correct?

15      A    Correct.

16      Q    I mean, the problem seemed to be really between

17      his ears, didn't it, as far as his mental capacity

18      and -- and his ability to -- to sort of know lucid

19      moments from non-lucid moments?  Would you agree with

20      that?

21      A    Correct.

22                MR. HILL:  Object to form.

23      A    Some -- some moments were normal; some moments

24      were bizarre.  Yes, sir.

25      Q    (By Mr. Cooper)  Right.
```

```
 1    Q    Okay.  Was he sweaty or perspiring?

 2    A    No, sir.

 3    Q    Appear hot or flushed?

 4    A    No, sir.

 5    Q    He was fully clothed; correct?

 6    A    Correct.

 7    Q    All right.  He never tried to fight you or Duncan

 8    or Simmons; correct?

 9    A    That is correct.

10    Q    Didn't try to strike out at Ms. Frazier; correct?

11    A    Correct.

12    Q    Didn't try to fight anyone else out there in the

13    parking lot; correct?

14    A    Not while we were there, no, sir, he did not.

15    Q    Didn't lunge at anyone or attempt to lunge at

16    anyone in the parking lot; correct?

17    A    Correct.

18    Q    Didn't break anything or attempt to break anything

19    in the parking lot; correct?

20    A    Correct.

21    Q    I mean, when he had Ms. Frazier's cell phone in

22    his hand, he didn't just slam it down on the ground and

23    try to break that cell phone, did he?

24    A    He did not.

25    Q    Didn't try to run -- didn't try to run away from
```

1        you guys; right?

2        A      That is correct.

3        Q      In fact, when you took the handcoffs -- handcuffs

4        off of him, he just sort of peacefully walked away;

5        right?

6        A      Correct.

7        Q      And Simmons is just basically telling him, "Go,

8        go, go," and he continued to walk off.   Right?

9        A      Yes, sir.

10       Q      So he never really resisted any of the either

11       verbal or -- well, any of the verbal commands that you

12       guys gave him; right?

13       A      That's right.

14       Q      I asked you about his eyes and his pupils earlier,

15       if they were -- if they appeared to be dilated.   Were

16       you close enough to him to see that, Mr. Orsborne --

17       A      Yes, sir.

18       Q      -- in other words, up in his face?

19       A      Yes, I was close enough to see.

20       Q      Okay.   Were his pupils dilated?

21       A      Not that I remember, no, sir.

22       Q      And, all total, he didn't seem to be particularly

23       aggressive or dangerous either to you or anyone else

24       out there.   Right?

25       A      That is correct.

1              MR. COOPER:  Scott, I have brought it

2       up, but I can't get back to the share screen.  Help me,

3       please.

4              THE VIDEOGRAPHER:  It should be right

5       down at the very bottom.  If you hover your mouse on

6       the very bottom tool bar, it should be in green down

7       there.

8              MR. COOPER:  Got it.  Okay.  Thank you.

9              THE VIDEOGRAPHER:  You're welcome.

10             (Mr. Cooper began sharing his screen.)

11      Q   (By Mr. Cooper)  Okay.  Mr. Orsborne, I pulled up

12      on the screen what I believe to be the body cam footage

13      from the second interaction with Mr. Higgins at Pockets

14      Market.  Would you agree with me on that?

15      A    That appeared to be some of it.

16      Q    Okay.  And what was the call or what -- what was

17      told to you about the reason to go back to Pockets

18      Market the second time?  Could you tell me that?

19      A    I believe dispatch advised that a crazy man had

20      taken the phone from the Pockets clerk and run and hid

21      in the freezer.

22      Q    And tell me as best you recall the time period

23      between leaving Pockets Market the first time and

24      getting the report that a crazy man was over there,

25      where you had to go back a second time.  Could you do

1    that for me?

2    A    I'm going to say less than 10 minutes from the

3    first time we left till when we responded again.

4    Q    Did you engage in any other police activity with

5    anybody else between those -- that period of time from

6    leaving Pockets the first time and going back the

7    second time, or were you just simply out, riding around

8    on patrol?

9    A    There was no interaction, just on routine patrol.

10   Q    Okay.  Let's see.  I think you identified this as

11   the video from your -- your body cam for the -- the

12   second interaction with Mr. Higgins at the Pockets

13   Market.  Is that correct?

14   A    Correct.  The first time it came up on the screen

15   it was halfway into it, so I didn't -- now I can see it

16   starts at the beginning of the video -- or it appears

17   to start at --

18   Q    Sure.  And that's just me sort of having trouble

19   at the control wheel.  But -- but you can identify

20   that; correct?

21   A    That is correct.

22              MR. COOPER:  Let's, if we could, make

23   this video the -- Exhibit Number 2 from the second

24   encounter at Pockets Market.  Okay?

25              THE REPORTER:  Yes, sir.

84

```
 1    again, the crazy man in the back.  Is that correct?

 2    A    That's correct.

 3    Q    At this point do you know who's back there?

 4    A    I'm suspecting it is Sterling Higgins.

 5    Q    Okay.  I mean, that -- you've got a pretty strong

 6    suspicion it's Sterling Higgins back there; right?

 7    A    Yes, sir.

 8    Q    Okay.  And I think Duncan is there with you.

 9    Correct?

10    A    That is correct.

11    Q    And you guys walk in together; right?

12    A    Yes, sir.

13    Q    Okay.  I'll start it at 1 minute.

14                   (The video was resumed and paused.)

15    Q    (By Mr. Budge)  Now, I'm stopping it there at

16    1:25.  It sounded like the clerk said something about

17    he got her phone.  Is that right?

18    A    That's correct.

19    Q    Okay.  At this point -- and it's -- the video is

20    stopped at 1:25 -- you're approaching this -- looks

21    like a -- a cooler door in the back.  Are your guns

22    drawn?  Do you have your -- your weapon pulled out?

23    A    No, sir.

24    Q    Okay.  And, again, your strong suspicion is it's

25    Sterling Higgins back there; right?
```

```
1      A     That's correct.

2                        (The video was resumed and paused.)

3      Q     (By Mr. Cooper)  Stopping it at 1:45.  Cooler door

4      has been opened, and sounds like somebody is saying,

5      "Come on out."  Is that you?

6      A     That is me.

7      Q     Okay.  And you hear -- heard Mr. Higgins say, "Did

8      y'all get them?"  Did you hear that?

9      A     Yes, sir, I heard that.

10     Q     And how did you respond?

11     A     I said, "We got them."

12     Q     Do you know who "we" were who he was talking

13     about?

14     A     No, sir.

15     Q     You were just sort of going along with him; right?

16     A     Yes, sir.

17     Q     And was -- and this -- was this sort of the -- a

18     continuation of the bizarre behavior, Mr. Orsborne?

19     A     Yes, sir.

20     Q     This would be a continuation of the paranoid

21     behavior; correct?

22     A     Yes sir.

23     Q     Start it at 1:45.

24                        (The video was resumed and paused.)

25     Q     (By Mr. Orsborne)  And, of course, we heard
```

```
1        Mr. Higgins there say -- again asked, "Did y'all get
2    them?"
3            And you said, "Yeah."
4            And he said, "I'm scared."
5            I guess you heard that.  Right?
6    A    Yes, I heard that.
7    Q    And did he appear to be genuinely scared to you,
8    Mr. Orsborne?
9    A    Yes, sir.
10   Q    He almost appeared childlike, didn't he?
11   A    (The witness nodded.)
12        Almost.
13   Q    Let's start it again at 1:55.
14                (The video was resumed and paused.)
15   Q    (By Mr. Cooper)  Okay.  I've stopped it at 2:05.
16   And somebody has told him a couple of times to turn
17   around.  Was that you?
18   A    Yes, sir.
19   Q    All right.  And Mr. Higgins complied with that;
20   correct?
21   A    Yes, sir.  He had to be told several times, but he
22   did comply.
23   Q    Okay.  He wasn't being combative in any way, was
24   he?
25   A    No, sir.
```

1    Q    He wasn't throwing anything, wasn't grabbing any

2    of those boxes in that cooler, was he?

3    A    No, he was not.

4                    (The video was resumed and paused.)

5    Q    (By Mr. Cooper)  Okay.  I'm stopping it at two

6    oh -- 2:11.  It sounded like he said, "I want to go

7    with you guys."

8    A    To the best I can determine, that's kind of what

9    it sounded like what he said.

10   Q    Let's wind it back so we can make sure.

11                   (The video was replayed and paused.)

12   Q    (By Mr. Cooper)  Did you hear him say, "I want to

13   go with y'all"?

14   A    Yeah.  He said, "I want to go with y'all."

15   Q    Let's start it again at two -- that's -- that's at

16   2:12.  I'm going to start again.

17                   (The video was resumed and paused.)

18   Q    (By Mr. Cooper)  I've stopped it at 2:30 now,

19   Mr. Orsborne.  Did you hear him -- he's still talking

20   about this debit card and his tablet?  Did you hear

21   that?

22   A    Yes, sir.

23   Q    And at this point where I've stopped it, at

24   2:30 on the counter, he's handcuffed behind his back;

25   correct?

```
 1    Q     Did you talk to Keisha to ask if she had any kind

 2    of relationship with Sterling Higgins that -- before

 3    that evening?

 4    A     No, sir.  I didn't talk to her.

 5    Q     Because Keisha was the one that was -- originally

 6    came up with the clerk out there in the parking lot;

 7    correct?

 8    A     That is correct.

 9                  (The video was resumed and paused.)

10    Q     (By Mr. Cooper)  Okay.  I've stopped it at 3:11,

11    and he's now saying, "Keisha has got the gun."  Did you

12    hear that?

13    A     Yes, sir, I did.

14    Q     Now, was Keisha still there at the market?

15    A     I'm really not sure where she was.  Her car was

16    still there, but I'm assuming she was still in the

17    store.

18    Q     Okay.  I mean, in reality, there was -- Keisha did

19    not have any gun, to your knowledge.  Correct?

20    A     Correct.  To my knowledge, she did not.

21    Q     Let's start it again at 3:11.

22                  (The video was resumed and paused.)

23    Q     (By Mr. Cooper)  Okay.  It looks like it stops on

24    your body cam at 3:32, where you're putting Mr. Higgins

25    in the car.  Correct?
```

91

1    A    Correct.

2    Q    Where he's talking about Keisha and wanting you to

3    check her out; right?

4    A    Correct.

5    Q    Would you agree with me that this was a pretty

6    bizarre behavior on Mr. Higgins' part up to this point,

7    Mr. Orsborne?

8    A    Yes, sir.  He was acting bizarre.

9    Q    Would you say he was paranoid?

10   A    Yes, sir.

11   Q    Would you say that he was somewhat delusional in

12   some of his thoughts and ideas?

13               MR. HILL:  Object to form.

14   A    Yes, sir.

15   Q   (By Mr. Cooper)  It seemed that he had a

16   particular -- or let me strike that.

17         It seemed that he was somewhat afraid of women

18   from the interactions that we've now looked at on two

19   different videos.  Would you agree with me on that?

20               MR. HILL:  Object to form.

21   A    Yes, sir.  Most of the time it was females that he

22   was afraid of.

23   Q   (By Mr. Cooper)  And I don't want to go back

24   through that whole laundry list that I asked you about

25   signs and symptoms of excited delirium, but up to this

92

 1    disease or defect?

 2    A    Not to my knowledge.

 3    Q    Do you ever have an occasion where you have to

 4    take an individual, a suspect for a -- a psychiatric

 5    evaluation there in Union City, Mr. Orsborne?  Does

 6    that ever come up?

 7    A    There's been those occasions, yes, sir.

 8    Q    And when those occasions arise, where do you take

 9    the individual?

10    A    They go to the ER, Baptist Hospital -- Union City

11    Baptist Memorial.

12    Q    Okay.  And as you've said, that was about the same

13    distance away as the -- the local jail.  Correct?

14    A    Yes, sir.

15    Q    Now, whose decision was it to take Mr. Higgins to

16    the jail?  Was that your decision, or was that somebody

17    else's?

18    A    That was my decision.

19    Q    So you would have been considered the arresting

20    officer; correct?

21    A    That's correct.

22    Q    Now, did you and Sergeant Simmons after the body

23    camera was turned off, did you guys talk about, "Well,

24    maybe he just needs to go to the ER before we take him

25    over to the jail because of this bizarre behavior"?

1          I told him, "Hey, Sterling, there's no one around.

2     Just calm down.  There's no one here."  He insisted

3     that someone was out to get us, and they're coming to

4     get us.  Again, there's no one around, don't see any

5     other cars on the highway at that time.

6          We continue on to the jail.  As we turn in the

7     first gated area there at the jail, making my way to

8     the sally port, he sees some parked cars.  He claims,

9     "There they are right there."

10         I said, "Sterling, do you know where you are?"

11         He said, "Yes.  I'm at the Obion County Jail."

12         I told him, "The cars you're referring to are

13    actually marked patrol cars for the sheriff's

14    department."

15         We pull on into the sally port, and the gates shut

16    behind us, and then I get him out.

17    Q    Okay.  And I want to stop you there because when

18    we get into the sally port, I think we actually have a

19    video of that.  Is that correct, Mr. Orsborne?

20    A    That is correct.

21    Q    Okay.  Now, you've testified that about halfway

22    over on the ride from Pockets Market to the jail that

23    Mr. Higgins was saying again that there were people

24    trying to kill him and you both.  Is that correct?

25    A    That's what he was saying, yes, sir.

                                                           98

1    Q    Okay.  I take it you would put that in the bizarre

2    category in terms of that statement.  Right?

3    A    Bizarre, delusional.  Yes, sir.

4    Q    Right.  Paranoid?

5    A    (The witness nodded.)

6         Paranoid.

7    Q    Okay.  And this is going on about halfway over to

8    the jail.  Did you think at that particular moment,

9    Well, maybe I just need to swing around and take this

10   guy to the ER, as opposed to taking him to the jail?

11   Did you think that?

12   A    No, sir, I did not.

13   Q    You didn't consider that at all; is that correct?

14   A    That's correct.

15   Q    Now, at that point, when Mr. Higgins made that

16   statement to you about halfway to the jail, how close

17   were you to the ER?

18   A    It was 3, 3 and a half miles kind of going

19   opposite direction from the hospital.

20   Q    Well, that was going to be my next question.  So

21   the hospital is sort of the opposite direction from

22   where you were traveling to the jail; is that correct?

23   A    That's correct.

24   Q    Okay.  But it you had wanted to, you could have

25   easily turned around and taken Mr. Higgins to the ER.

```
 1      There was nothing to keep from you doing that; correct?

 2      A    There was no need.  I didn't deem him needing to

 3      go to the hospital.

 4      Q    But you could have taken him there; right?

 5      A    If he needed to, yes, sir.

 6      Q    Okay.  And so is there video footage of you

 7      interacting with Mr. Higgins in your car, going from

 8      Pockets over to the jail, in other words, your body

 9      cam?

10      A    No, sir.

11      Q    Why not?

12      A    I had turned it off there at Pockets, getting into

13      the patrol car.

14      Q    Is there any reason why you couldn't have turned

15      it on to record what Mr. Higgins and you were talking

16      about on the ride from Pockets to the jail?

17      A    (The witness nodded.)

18           I could have.

19      Q    I mean, there was nothing in policy or procedure

20      that made you turn it off, was there?

21      A    That's correct.

22      Q    You just chose to do that; right?

23      A    Yes, sir.

24      Q    And I believe you testified that as you got near

25      the jail, near the sally port, there was some cars
```

1    nearby, and Mr. Higgins began to display again this

2    bizarre behavior, making statements.   What again was

3    that?

4    A    He said, "That's them right there," referring to

5    the parked cars that are patrol cars -- marked patrol

6    units.   Some of them are marked; some of them may not

7    be.

8    Q    Did it appear to you that Mr. Higgins was somewhat

9    trying to protect you at this point, Mr. Orsborne?

10   A    He just appeared to be delusional about people out

11   to get him and, obviously, me too, I guess, that he's

12   saying, "They're coming to get us."

13   Q    And did it seem again because he said, you know,

14   both of you that he was being somewhat protective of

15   you, as opposed to just himself?

16   A    Correct.

17               MR. COOPER:  Okay.  I'm going to stop

18   the share on this, and I'm going to try to bring up

19   the -- the sally port video.

20   Q    (By Mr. Cooper)  All right.  Mr. Orsborne, I've

21   now brought up on the screen -- and I hope you can

22   see -- the -- the sally port video footage.  I've got

23   it stopped at 3:51, but I'll move it back to the

24   beginning.

25        But can you identify that?  Well, let me run it

1       to this point as rather bizarre?

2       A     Yes, sir.

3       Q     Start it at 2:10.

4                     (The video was resumed and paused.)

5       Q     (By Mr. Cooper)  All right.  Now, I froze it there

6       at 2:14 on the counter and 1:45:23 in the lower

7       right-hand corner.  Mr. Higgins is kind of up close to

8       you at this point, Mr. Orsborne.  Would you agree with

9       me on that?

10      A     That's correct.

11      Q     Did you feel threatened in any way when he was

12      standing there like that by you?

13      A     No, sir.

14      Q     Because it -- it was at this point or maybe some

15      other point -- excuse me -- when he was close to you

16      that that's when he was trying to protect you.  Right?

17      A     That is correct.

18      Q     Start again at 2:14.

19                     (The video was resumed and paused.)

20      Q     (By Mr. Cooper)  Now, I've stopped it there at

21      2:19.  So between 2:14 and 2:19 on the counter, it

22      looked to me like, Mr. Orsborne, that you may have put

23      your hands on him, but I wasn't sure about that.  Did

24      you see that?

25      A     It looked like I tried to grab him to escort him

1       into the building.

2       Q     Okay.  And he was having a little bit of

3       difficulty in wanting to go inside that door.  Would

4       that be a fair statement?

5       A     That's correct.

6       Q     Did he say why?

7       A     He did not.

8       Q     Was he continuing to say that he was trying to

9       protect you?

10      A     Best I recall, he only said that one time in the

11      sally port there.

12      Q     Okay.  Start it again at 2:19.

13                      (The video was resumed and paused.)

14      Q     (By Mr. Cooper)  I've stopped it now -- I've

15      frozen the image at 2:35 on the counter, and it's

16      1:45 a.m. -- 1:45 and 44 seconds, March 25, 2019.  And

17      it appears that Mr. Higgins is fixing to go through the

18      jail door.  Is that correct?

19      A     That's correct.

20      Q     Do you remember anything that he was saying up to

21      this point other than about trying to protect you?

22      A     No, I do not.

23      Q     Okay.  Your body cam -- you -- did you have it on

24      you at this point?

25      A     Yes, sir.  It's still attached to my uniform.

1    A    That is correct.

2    Q    All right.  By this point is Mr. Higgins and

3    Mr. Spaulding down on the floor?

4    A    Yes, sir.

5    Q    Tell me how they got there.

6    A    There was a interaction between Mr. Spaulding and

7    Mr. Higgins.  He was trying to gain control of him.  I

8    performed a knee strike to Mr. Higgins' right leg in an

9    attempt to get him on the ground so he could be taken

10   under control.

11   Q    All right.  So it's your testimony that somewhere

12   in that last 10 to 15 seconds that you employed some

13   sort a knee strike.  Is that correct?

14   A    That is correct.

15   Q    And is that knee strike, is that a part of your

16   training?

17   A    Yes, sir, it is.

18   Q    So at this point, at 1:46:36, what -- what, if

19   anything, is Mr. Higgins saying?

20   A    Best I remember, he was doing a lot of yelling

21   and -- and screaming, no discernable words.

22   Q    And do you know where Ms. Brogglin is at this

23   point?  Is she down on the ground with them, or is she

24   somewhere else?

25   A    I'm really not sure where she is at this point.

                                                          128

1    Q    Right leg or left leg?

2    A    Should be the right leg.

3    Q    Was Mr. Higgins on his stomach, or was he lying on

4    his back?

5    A    Lying on his back.

6    Q    And so you're telling me that you're stepping up

7    on his right leg.  Is that correct?

8    A    Yes, sir.

9    Q    And you're saying it's the point of his leg above

10   his right knee.  Is that correct?

11   A    Yes, sir.

12   Q    And were you standing on -- on his right leg above

13   his right knee with -- with both your legs, in other

14   words, your full body weight?

15   A    Just enough to secure his legs to keep him from

16   kicking.  I don't know if it was my full body weight.

17   Q    All right.  And you told me this morning that you

18   weighed back then 247 pounds, I believe.  Is that

19   right?

20   A    Very close to that, yes, sir.

21   Q    All right.  And you're, of course, wearing

22   patrolman's gear.  You've got a -- a safety belt, and I

23   assume you've got a bulletproof vest on.  Correct?

24   A    Yes, sir.

25   Q    How much would that gear weigh, Mr. Orsborne.

142

1     A     15, 20 pounds.

2     Q     All right.  So you were placing well over

3     250 pounds on Mr. Higgins' right leg at that time;

4     correct?

5     A     I really don't know how much weight.  Just enough

6     to secure him from kicking.

7     Q     Well, I mean, you're -- you're balancing -- would

8     you agree with me you're sort of balancing yourself

9     with your left hand, and you're standing on

10    Mr. Higgins' right leg?  Correct?

11    A     Yes, sir.

12    Q     I mean, you're not holding yourself up with

13    anything, are you?

14    A     Just the support of the wall.

15    Q     And would you agree with me that the support of

16    the wall is really more for balance?  Would you agree

17    with me on that?

18    A     It's for balance.  Yes, sir, it's for balance.

19    Q     Now, what police training taught you to do that,

20    Mr. Orsborne?  And when I'm saying "that," I'm talking

21    about standing on a suspect that's been shackled.

22    A     I don't know there's any specific training that

23    says -- it's based on trying to gain control when you

24    use the necessary force to gain control of the support.

25    Q     And tell me again why you were standing on his

1      jawline.

2      Q     Does it appear to you that they're on his neck in

3      any way, Mr. Orsborne?

4      A     No, sir.

5      Q     Let's start it again.

6                    (The video was resumed and paused.)

7      Q     (By Mr. Cooper)   I've stopped it at 5:06.   You're

8      still leaning up against the wall, still have your body

9      weight on Mr. Higgins.   Is that -- is that correct?

10     A     Yes, sir, on his legs.

11     Q     Did you ever step on his left leg?

12     A     I may have during the process of him squirming

13     around.   He was still trying to grab Officer Spaulding

14     even though he was handcuffed.   He was trying to get

15     his hands around to grab Officer Spaulding.

16     Q     Did you ever step on his right leg and his left

17     leg at the same time?

18     A     Could have, yes, sir, during that trying to gain

19     control of him while he was still being combative.

20     Q     And is this always in the thigh area, or is it

21     some other area of the body?

22     A     Yes.   On the -- the quadricep muscle area of his

23     legs just above his knee.

24     Q     Keep running it at 5:06.

25                   (The video was resumed and paused.)

146

```
 1     Q    (By Mr. Cooper)  Mr. Orsborne, I'm stopping it now
 2     at the 5:59 counting point, the counter, and it's
 3     1:52:28 a.m.  It appears at this point that you may
 4     have stepped off of Mr. Higgins.  Is that correct or
 5     incorrect?
 6     A    That's correct.
 7     Q    So it appears from the counter that you stepped up
 8     on him at about the 3:25 mark, and you stepped off of
 9     him about the 5:59 mark.  Would you agree with me
10     generally on that?
11     A    Yes, sir, generally.
12     Q    So from that, you would have stood on him, what,
13     about 2 and a half minutes?
14     A    Yes, sir.
15     Q    Maybe 3?  Is that right?
16     A    That's correct.
17     Q    Now, when you got down off of him, as we can see
18     in this video that's stopped at the 5:59 mark, what
19     is -- what, if anything, is Mr. Higgins doing?
20     A    He's growling, making a lot of weird grunting
21     noises.  More like trying to -- the only expression I
22     know is hock up a loogie, where he's trying to gather
23     spit so he could spit.
24     Q    Was he moving in any way?
25     A    Yes, sir, he was still moving.  He had -- he was
```

147

1    Q    And could you tell at this point if he was

2    breathing or not?

3    A    (The witness shook his head.)

4         I could not tell.

5    Q    And I take it from the time that -- up to this

6    point you couldn't tell whether he was breathing or

7    not.  Is that correct?

8    A    That's correct.  I didn't check.

9    Q    I'm going to start it again.

10                   (The video was resumed and paused.)

11   Q    (By Mr. Cooper)  Okay.  I'm stopping it there at

12   13:10.  Did you see where Waylon Spaulding went over

13   and sort of jiggled Mr. Higgins' head for a moment?

14   A    Yes, sir.

15   Q    Kind of touched it and moved it to the center, and

16   his head -- Mr. Higgins' head just fell right back to

17   the same place that it had been.  Correct?

18   A    Yes, sir.

19   Q    And, again, the same question I've been asking up

20   to this point:  From the time that he'd gone into that

21   restraint chair up to now at the 3 -- 2 a.m. mark,

22   2 a.m. 54 seconds, you don't know whether Sterling

23   Higgins was breathing or not, do you, Mr. Orsborne?

24   A    No, sir.

25   Q    Start it again.

                                                        156

```
 1                        (The video was resumed and paused.)

 2      Q    (By Mr. Cooper)  All right.  Now I'm stopping it

 3      there at 13:46 on the counter, 2:01 a.m. 33 seconds.

 4      Mr. Orsborne, it appears that you went over and did

 5      something to Mr. Higgins.  What did you do?

 6      A    A sternum rub.

 7      Q    All right.  And what is the purpose of a sternum

 8      rub?

 9      A    To try to get some kind of reaction.

10      Q    And did you get a reaction from Sterling Higgins?

11      A    No, sir.  He was strapped in the chair, and he

12      couldn't move.

13      Q    Okay.  So if he's strapped in the chair and

14      couldn't move, why did you do a sternum rub?

15      A    Just to try to check on him.

16      Q    All right.  And you checked on him.  What was your

17      conclusion from that sternum rub and checking him?

18      A    That there was no way for him to move the way he

19      was strapped down.

20      Q    Did you try to talk to him, yell at him, or

21      anything, wake him up?

22      A    No, sir, I didn't.

23      Q    You know, there's such a thing as verbal commands,

24      isn't there?

25      A    Yes, sir.
```

157

1    Q    Did you try any of that?

2    A    No, sir.

3    Q    So up to this point you've got a nonresponsive

4    detainee; correct?

5    A    Correct.

6    Q    Would that indicate that medical treatment needs

7    to at least be considered?

8    A    We was still unsure of his condition at that time.

9    Q    My question was did it appear to you at this point

10   that medical treatment should at least be considered?

11   A    No, sir.

12   Q    Now, let's start it again, 13:46.

13                 (The video was resumed and paused.)

14   Q    (By Mr. Cooper)  All right.  Now, I'm going to

15   stop it at 13:54.  Mr. Orsborne, you've done the

16   sternum rub; you got no reaction because, you

17   testified, he's strapped in.  Right?

18   A    Correct.

19   Q    And at this point you still don't know if he's

20   breathing; correct?

21   A    Correct.

22   Q    Did you check for a pulse?

23   A    I did not.

24   Q    Why not?

25   A    Because the corrections officers did.

```
1    Q    What did they tell you when they checked for a

2    pulse?

3    A    I don't remember them saying one way or the other.

4    Q    So, again, at this point, "this point" being

5    13:54 on the counter, 2:01 and 41 seconds a.m., you

6    don't know if he's breathing or not.  Correct?

7    A    Based on the information that Mr. Spaulding

8    wheeled him into the -- he -- he -- he determined he

9    was okay to go to the cell.

10   Q    My question -- based on everything objective --

11   your sternum rub, you know, not checking a pulse -- you

12   didn't know if he was breathing or not.

13   A    That --

14   Q    Correct?

15   A    That's correct, yes, sir.

16   Q    And as far as Spaulding checking for a pulse, you

17   can't remember what Spaulding said; right?

18   A    I don't remember his words.

19   Q    In fact, do you know if Spaulding can -- even --

20   even knows how to check for a pulse?

21   A    I do not know.

22   Q    You knew how to check for a pulse, didn't you?

23   A    I've had CPR training.  Yes, sir.

24   Q    Oh -- oh, you've had CPR training.  Okay.

25   A    Yes, sir.
```

```
 1      Q    Because his eyes and his mouth would not be
 2      strapped down.  I mean, they -- they could move if, you
 3      know, you applied the sternum rub; correct?
 4      A    I'm assuming that, yes, sir.
 5      Q    And the sternum rub, you're putting some pretty
 6      good force on Mr. Higgins' chest.  I mean, you're not
 7      just sort of lightly rubbing his chest; you're putting
 8      some pressure on.  Right?
 9      A    Your question bled out there at the end.  The
10      audio went out.
11      Q    Sure.  Be glad to try to repeat it.  You're
12      putting some pressure on Mr. Higgins' chest when you're
13      doing the sternum rub; correct?
14      A    Correct.
15      Q    And that pressure is designed to gain a reaction
16      from the individual to see if they're responsive;
17      correct?
18      A    Correct.
19      Q    And one of the things that would be responsive
20      with a sternum rub would be a person's eyes; correct?
21      A    It could be, yes, sir.
22      Q    And you didn't see any reaction with Mr. Higgins
23      in his eyes; correct?
24      A    No.  I was looking more for his hands, feet, any
25      kind of tensing up.
```

167

1        Q     Okay.  Well, let's go with fingers.  You didn't

2        see any reaction with his fingers in the sternum rub,

3        did you?

4        A     No, sir.

5        Q     And I think I asked you about his mouth.  But you

6        didn't see him twitch his mouth or move his lips or

7        anything like that on the sternum rub, did you?

8        A     That's correct.

9        Q     So when he was wheeled into cell number 15, at

10       least from the objective test that you had given him,

11       he was a nonresponsive individual.  Correct?

12       A     If he was -- he was not moving.

13       Q     Does that mean the same thing as nonresponsive?

14       A     I'm really not sure about that.

15       Q     Okay.  And I think you have -- you told me earlier

16       that from the time they put him in the -- "they" being

17       Brogglin and Sanford and Spaulding -- put him in that

18       restraint chair until the time that he was wheeled into

19       cell number 15, you don't know whether he was breathing

20       or not, do you?

21       A     I do not know.

22       Q     All right.  So we get to cell number 15.  We've

23       got the video pulled up.

24                  MR. COOPER:  And so that I don't forget

25       about it, I'm going to ask that it be marked as the

1    Q    And am I correct that you are walking out of that

2    cell not knowing whether or not Sterling Higgins is

3    breathing or not?  Is that correct?

4    A    That's correct.

5    Q    And you are trained in CPR; correct?

6    A    Correct.

7    Q    And at this point to properly perform CPR,

8    Mr. Higgins would need to be out of that restraint

9    chair; is that correct?

10   A    That's correct.

11   Q    Have you at this point taken any action to remove

12   Mr. Higgins from that restraint chair?

13   A    No, sir.  I know nothing about the restraint

14   chair.

15   Q    Well, that's fair enough.

16        At this point have you suggested to one of those

17   two other officers that "Hey, guys, you may want to get

18   him out of that restraint chair"?  Have you done that?

19   A    No, sir, I did not.

20   Q    Have you in any shape, form, or fashion suggested

21   that Sterling Higgins needs to be moved out of that

22   restraint chair so CPR can be performed on him?

23   A    No, sir, I did not.

24   Q    Why not?

25   A    I'd already contacted my supervisor and EMS, and

```
1    many emergency First Responders are in the cell now,

2    tending to Mr. Higgins?

3    A    It appears to be three.

4    Q    Okay.  Going back for just a minute, I had asked

5    you some questions about having Sanford and Spaulding

6    remove Mr. Higgins from the restraint chair so you

7    could perform CPR.  Do you recall that line of

8    questioning?

9    A    Yes, sir.

10   Q    Did you ever tell Spaulding or Sanford that you

11   knew CPR, to -- so you can get him out of the chair and

12   you can begin performing it?

13   A    No, sir.

14   Q    So you just never -- you never told them at all

15   that you were CPR-trained.  Is that correct?

16   A    No, sir.

17   Q    Why did you keep that a secret, Mr. Orsborne?

18   A    That was not intentional, keeping anything a

19   secret.

20   Q    Okay.  Well, why did you not share that with

21   Spaulding and Sanford when you were in there in the

22   cell with them?

23   A    I'm really not sure why I didn't say that, but...

24   Q    Okay.  I'm going to move the counter on up just a

25   tad.  Again, I don't think you come back into the cell
```

1    Q    Right.

2         In fact, you had felt for a pulse, and you hadn't

3    found one.  Correct?

4    A    Right.  I couldn't tell if there was one or not.

5    Q    And you did a sternum rub, and you got no response

6    from his eyes or his mouth or anything that would --

7    could possibly move; correct?

8    A    That's correct.

9    Q    So from your CPR training, what did that tell you

10   was going on with Sterling Higgins?

11   A    I was unsure at the time, so that's why I

12   contacted Sergeant Simmons and medical.

13   Q    Mr. Orsborne, as we sit here right now, do you

14   believe you did everything according to your CPR

15   training on the morning hours of March 25, 2019?

16   A    Yes, sir.

17   Q    You don't have any -- look back and say, I should

18   have performed CPR based on what I was seeing there

19   with Sterling Higgins.

20   A    At the time I --

21   Q    Is that correct?

22   A    At the time I did what I thought I needed to do.

23   Q    My question is, looking back on it now, knowing

24   what you know now, should you have tried to perform CPR

25   on Sterling Higgins?

1    that evening?

2    A    There may have been, but I'm really not sure what.

3    Q    Well, what may have -- what may have been that you

4    would have done different that evening, Mr. Orsborne?

5    A    (The witness shook his head.)

6         I -- I don't know.  There's a lot went on that

7    night, so I -- I don't know.

8    Q    Do you think you did anything that caused or

9    contributed to Sterling Higgins' death?

10   A    No, sir.

11   Q    Same question as to Spaulding:  Do you think he

12   did anything to cause or contribute to Sterling

13   Higgins' death?

14   A    No, sir.

15   Q    I think you told me earlier that you do not

16   believe that Spaulding was using any kind of a

17   chokehold.  Is that correct?

18   A    That is correct.

19   Q    And I think you also told me that as far as policy

20   with the Union City Police Department, chokeholds are

21   not permitted.  Is that correct?

22   A    That is correct.

23   Q    So if you had seen Mr. Spaulding using a chokehold

24   on Mr. Higgins, I guess policy would indicate that you

25   should have intervened.  Is that right?

1    A    That's correct.

2    Q    Try to stop the situation.  Correct?

3    A    Correct.

4    Q    Are you familiar with the phrase or the term

5    "positional asphyxiation" or "positional asphyxia"?

6    A    That's cor -- yes, sir.

7    Q    What is that?  Or have you been trained in that,

8    Mr. Orsborne?

9    A    Correct.  Yes, sir.

10   Q    What is it?

11   A    It's usually when someone is laying facedown when

12   they're handcuffed behind their back or hog-tied,

13   shackled behind, different places like that, where

14   they're laying facedown.

15   Q    Is it alway -- is your training -- or did your

16   training teach you it's always when the person is

17   facedown, or could they be face up?

18   A    Best I remember, it's facedown.

19   Q    Where did you receive that training?

20   A    Through the police department.

21   Q    And your CPR training, I know we've talked about

22   it.  Where did you get your CPR certification?

23   A    One of the firemen comes to the station and

24   certifies all of us at the police department.

25   Q    And how far back would you say you've been

1   of serious physical injury or death to themselves or a

2   third party if the officer does not do so or that it is

3   the only reasonable means of protecting themselves or

4   third parties."  Do you see that?

5   A    Yes, sir.

6   Q    And this would have been the policy in effect back

7   in March of 2019 as to the Union City Police

8   Department; correct?

9   A    Yes, sir.

10  Q    As it relates to chokeholds; right?

11  A    That's -- yes, sir.

12  Q    And I think it was your testimony that you didn't

13  see Spaulding demonstrate a chokehold or a strangle

14  hold on Mr. Higgins.  Is that right?

15  A    That is correct.

16  Q    But that if it had -- if you had've seen that, it

17  was your obligation to intervene and stop it.  Is that

18  correct?

19  A    That would be correct.

20  Q    Pull up another document.

21                  (Mr. Cooper stopped sharing his screen.)

22                  MR. BURLESON:  Hey, David, we've been

23  going a while.

24                  MR. COOPER:  Yeah.

25                  MR. BURLESON:  Are we where we could

```
 1                      )
         STATE OF TENNESSEE  )      C E R T I F I C A T E
 2                      )

 3                      I, Jill A. Schaffer, Registered

 4   Professional Reporter and Notary Public for the State

 5   of Tennessee, hereby certify that the witness in the

 6   foregoing deposition, OFFICER ROBERT THOMAS ORSBORNE,

 7   was first duly sworn by me, that the testimony of the

 8   witness was written stenographically by me, and that

 9   such deposition is a true and accurate record of the

10   testimony given by said witness on the 27th day of

11   October, 2020.

12                      I further certify that I am neither

13   related to nor employed by any of the parties to this

14   cause of action or their counsel, nor am I financially

15   interested in the outcome of this matter.

16                      I further certify that in order for this

17   document to be authentic it must bear my original

18   signature and embossed notarial seal, that reproduction

19   in whole or in part is not allowed or condoned, and

20   that such reproductions are deemed a forgery.

21                      Witness my hand and seal at my office on

22   this the 14th day of November, 2020.

23

24   My Commission Expires:    Jill A. Schaffer, RPR, TN #375
         August 25, 2021       Notary Public at Large for the
25   My License Expires:       State of Tennessee
         June 30, 2022
```

245