IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER LOUISE JENKINS, | ) | |
| **Administrator ad Litem of the** | ) | |
| **ESTATE OF STERLING L. HIGGINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | No. 20-cv-01056-STA-atc |
| | ) | |
| **OBION COUNTY, TENNESSEE;** | ) | |
| **ROBERT THOMAS ORSBORNE, Individually;** | ) | |
| **MARY BROGGLIN, Individually;** | ) | |
| **WAYLON SPAULDING, Individually; and,** | ) | |
| **BRENDON SANFORD, Individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Jennifer Louise Jenkins has filed this action as the administrator ad litem of the Estate of Sterling L. Higgins ("the Decedent"). She alleges in her amended complaint (ECF No. 37) that Defendants Obion County, Tennessee, Union City, Tennessee, and their employees Robert Thomas Orsborne, Mary Brogglin,[1] Waylon Spaulding, and Brendon Sanford, in their individual capacities, violated the civil rights of the Decedent during his pretrial detention and subsequent death. Defendants Obion County, Brogglin, Spaulding, and Sanford have filed a motion for summary judgment.[2] (ECF No. 100.) Plaintiff has filed a response to the motion (ECF No. 109),

---

[1] The Clerk of the Court is directed to change the spelling of Defendant's name on the docket sheet to "Mary Brogglin."

[2] The Court has received a notice of settlement as to Defendant Orsborne only.

and Defendants have filed a reply to the response.  (ECF No. 120.)    For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

After Defendants filed their motion for summary judgment, they filed a motion in limine to exclude the opinion of Plaintiff's expert, Michael Leonesio, an expert on generally accepted law enforcement practices.  The motion in limine was referred to the Magistrate Judge for determination, and, on April 1, 2022, she entered an order partially granting and partially denying Defendants' motion. (ECF No. 135.)  Neither party appealed that ruling.  The parties have updated their filings after the ruling by the Magistrate Judge.  (ECF Nos. 138, 140.)

In making its decision on the present motion, in accordance with the Magistrate Judge's decision, the Court will not consider Leonesio's testimony as to any legal conclusions on matters of law or legal standards, including legal mandates and whether something is "objectively reasonable" under the Constitution or case law, since whether Defendants' actions were reasonable is the ultimate issue. However, the Court will allow Leonesio to testify "to the prevailing law enforcement industry standards that may have informed his ultimate conclusions" and "whether Defendants acted consistently with those standards" in accordance with the Magistrate Judge's decision.  (Mag. J. Ord. pp. 8-9, ECF No. 135.) The Magistrate Judge also found that Leonesio should not be permitted to offer opinions that rely on specialized medical knowledge because he is not qualified "to offer medical opinions consistent with Federal Rule of Evidence 702" (*id.* p. 10), and the Court will adhere to this decision.

<u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

<u>Statement of Material Undisputed Facts</u>

Pursuant to the Local Rules of this Court, Defendants have prepared a statement of material undisputed facts (ECF No. 100-2) "to assist the Court in ascertaining whether there are any material facts in dispute." Local Rule 56.1(a). Plaintiff has responded to Defendants' statement and has attached her own statement of facts. (ECF No. 109-1.) Defendants have responded to Plaintiff's statement of facts. (ECF No. 121.) Additionally, both parties have submitted recordings

3

of the events of the night in question.  (ECF Nos. 105, 111.)

A fact is material if it "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson,* 477 U.S. at 247–48).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.  For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).  Here, as the nonmoving party, Plaintiff must respond to Defendants' statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed."  Local Rule 56.1(b). Additionally, Plaintiff may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

If Plaintiff asserts that a genuine dispute of material fact exists, she must support her contention with a "specific citation to the record."  Local Rule 56.1(b).  If a party fails to demonstrate that a fact is disputed or fails to address the opposing party's statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion.  Fed. R. Civ. P. 56(e)(2); *see also* Local Rule 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.").  Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record."

Fed. R. Civ. P. 56(c)(3).  In the present case, both parties object to certain portions of the opposing party's statement of facts.

The Court finds that there is no genuine dispute as to the following material facts, unless otherwise noted.[3]

During the early morning hours on March 25, 2019, Officer Robert Orsborne of the Union City Police Department arrested Sterling Higgins at the Pockets Market in Union City, Tennessee. After he arrested Higgins, Orsborne transported Higgins in his vehicle to the Obion County Jail in Union City. They arrived at the Sally Port of the Jail shortly before 01:44:00 a.m.  Correctional Officers Waylon Spaulding, Mary Brogglin, Brendon Sanford, and Stormy Travis[4] were working at the Jail at this time.

After Orsborne and Higgins exited Orsborne's vehicle, Higgins ran around the Sally Port.[5] Higgins entered the Jail at approximately 1:45:46 a.m.  Higgins entered the foyer of the Jail in handcuffs as Orsborne walked in behind him.  Orsborne led Higgins from the foyer of the Jail to a door leading into a hallway in the booking area of the Jail.  At the time Higgins entered the Jail, none of the correctional officers on shift knew the circumstances surrounding Higgins's arrest.

As Higgins entered the booking hallway, Brogglin directed him to walk down the hallway to the booking counter.  Higgins did not comply with Brogglin's directive. Higgins started yelling,

---

[3]  The facts are stated for the purpose of deciding this motion only.
[4]  Officer Travis is not a party to the lawsuit.
[5]  Plaintiff clarifies that Higgins "briefly" ran around the Sally Port.  (Pl's Resp to Defs' St. of Mat. Fct. ¶ 5.)

"That's her. She's got a gun!"  Higgins grabbed Brogglin, and Brogglin pushed him away from her.  Higgins, who remained handcuffed, then grabbed Brogglin by her hair.[6]

Spaulding approached Higgins as Higgins pulled Brogglin's hair and ordered Higgins to let go of her hair.[7]  Sanford approached Spaulding and Higgins at approximately 01:46:51 a.m. Spaulding pulled Higgins off Brogglin. Higgins and Spaulding fell to the floor.[8]  This occurred no later than 1:46:55 a.m.  Higgins is seen on video moving his legs and "squirming."[9]  During this time, Higgins was on his back and handcuffed, with Spaulding on top of him.

Because Higgins continued moving his legs, Sanford retrieved shackles to place on Higgins's legs. Brogglin, Sanford, and Orsborne placed the shackles on Higgins.  However, Higgins continued kicking and "flailing around."[10]  Orsborne stepped on Higgins's right leg. Orsborne weighed 247 pounds and had on fifteen to twenty pounds of police gear.  By 1:49:05 a.m. Higgins's legs had been shackled together by Sanford, Brogglin, and Orsborne. Higgins was now handcuffed and leg-bound on his back on the floor of the jail. He remained handcuffed and leg-bound either by leg shackles or in the restraint chair from that point forward.

---

[6]  The parties disagree as to whether Higgins lunged at and then grabbed Brogglin by her jacket with his left hand (Defs' St. of Mat. Fct. ¶ 12) or whether he "briefly grasped" Brogglin's jacket with his left hand. (Pl's Resp at ¶ 12.)

[7]  The parties dispute whether Higgins "pulled out a handful of hair out of Brogglin's scalp." (Pl's St. of Mat. Fct. ¶ 4; Defs' Resp. at ¶ 4.)

[8]  Plaintiff contends that Higgins went to the ground after Orsborne performed "a knee strike with the goal of taking him down." (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 9.)

[9]  Defendants maintain that Higgins was trying to get away from Spaulding (Defs' St. of Mat. Fct. ¶¶ 22-25), while Plaintiff contends that Higgins moved his legs and "squirmed" as a result of being deprived of oxygen due to having Spaulding's hands around his neck. (Pl's Resp. at ¶ 25.)

[10]  Plaintiff again responds that Higgins's leg movements were caused by a deprivation of oxygen. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 29.)

Higgins started spitting at Spaulding.[11]  Spaulding ordered Higgins to stop spitting.[12] After Higgins began spitting, Brogglin left the hallway to look for a spit mask but was unable to find one.  Spaulding placed his hands on Higgins's jaw area[13] and held Higgins's face away from him.[14] Spaulding asked Sanford to bring a cloth to wipe the spit off him. Sanford retrieved a cloth and returned to the scene at approximately 01:52:17 a.m.  Subsequently, Higgins stopped moving.[15]

The decision was made to put Higgins in a restraint chair, and Brogglin retrieved the restraint chair.  Spaulding and Sanford lifted Higgins off the floor and put him in the restraint chair, and Spaulding, Sanford, and Brogglin strapped him in. At 01:58:33.084 to 01:58:52.808 a.m., video shows some movement of Higgins's head as officers are strapping and tightening his body into the chair and manipulating the chair. It is unclear whether the movement was voluntary or involuntary.

---

[11]  Plaintiff claims that, at most, Higgins spat at Spaulding twice and within a minute of being taken to the floor by Spaulding. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 32.)

[12]  Plaintiff contends that Spaulding gave Higgins an "ultimatum" and said "dude, do not do that again" and "you will regret it" if you do it again. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 33. Defendants deny that Spaulding told Higgins that he was going "to regret it" or that he gave Higgins an "ultimatum. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 11.)

[13]  The parties dispute at what time Spaulding's hands first made contact with Higgins' jaw area. Defendants contend it was at 01:48:36 a.m. (Defs' St. of Mat. Fct. ¶ 37) while Plaintiff states it was at 1:48:49 a.m. (Pl's Resp to ¶ 37.)  They also disagree as to the length of time Spaulding had his hands on Higgins's jaw area.  (Defs' St. of Mat. Fct. ¶ 38; Pl's Resp. to ¶ 38), and whether Spaulding ever grabbed Higgins's neck and/or throat.  (Pl's St. of Mat. Fct. ¶ 28; Defs' Resp. to ¶ 28.) The parties dispute whether Spaulding had his hands around Higgins's throat and/or neck and placed pressure on those body parts at any time.  (Pl's St. of Mat. Fct. ¶ 15; Defs' Resp. at ¶ 15.)

[14]  Plaintiff describes this as "hyperextend[ing] his head and neck, and forc[ing] his mouth shut." (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 36.)

[15]  The parties dispute why Higgins quit moving and at what time he stopped moving voluntarily. (Pl's St. of Mat. Fct. ¶¶ 31-33; Defs' Resp. to ¶¶ 31-33); (Defs' St. of Mat. Fct. ¶ 90; Pl's Resp. to ¶ 90.)

At approximately 2:01:30, Orsborne performed a sternum rub[16] on Higgins and did not get a reaction from him.[17]   Higgins was breathing in some manner while restrained in the restraint chair prior to entering Cell 15.[18]

Spaulding wheeled Higgins into Cell 15, a cell in the booking area, at approximately 02:01:48 a.m. Officers decided to place Higgins in Cell 15 because a camera was installed in there. From approximately 2:02:07 to 02:02:40 a.m., officers observed Higgins through the window of his cell. Higgins was alone in Cell 15 and strapped in the restraint chair. At approximately 2:03:20 a.m., Sanford peered into Higgins's cell door to check on him.  Spaulding, Sanford, and Orsborne then entered Cell 15 and did not observe Higgins's chest expanding, nor were they able to detect a pulse.

Because they did not observe Higgins breathing, officers directed Brogglin to call for EMS. Subsequently, Brogglin called dispatch and requested that EMS be sent to the Jail.  Orsborne called his supervisor, Sergeant Simmons, to inform him that Higgins appeared to be nonresponsive and to ask whether he should call for an ambulance.  Orsborne called dispatch and requested that EMS be sent to the Jail. After both Orsborne and Brogglin called for EMS, Spaulding administered

---

[16] For the purpose of deciding this motion, the Court has defined a "sternum rub" as "consist[ing] of using the knuckles to cause a degree of pain at the subject's sternum area by a vigorous and forceful rubbing of that area with the knuckles. It causes pain at a level that is calculated to determine whether the subject is conscious or can be brought to consciousness." *See Ashford v. Brady*, 2011 WL 1789984, at *2 (M.D. Pa. May 10, 2011).

[17] Plaintiff contends that, in addition to the sternum rub, video shows that the officers (including Spaulding) were repeatedly checking for a pulse and pushing Higgins's limp head from side to side. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 65.)

[18] Defendants indicate that Higgins was breathing normally, while Plaintiff maintains that Higgins may have exhibited "agonal breathing,"— a medical emergency which is a brain reflex associated with cardiac arrest and a signal of imminent death, which produces sounds that are sometimes described as snoring, groaning, or moaning. (Defs' St. of Mat. Fct. ¶ 64; Pl's Resp. to ¶ 64.)

Narcan to Higgins through his nostril.  No one summoned medical aid until 2:04:07 a.m. at the earliest.  While waiting for medics, Defendants left Higgins in the restraint chair.[19]

On March 24, 2019, Orsborne, the arresting officer, was certified in CPR while Spaulding, Brogglin, Sanford, and Travis, the jail officers, had not received CPR training.  These four jail officers regularly worked that shift together.[20] If a CPR-trained officer called in sick for a shift, the County had no written policy to ensure the substitution of a CPR-trained replacement.[21]

EMS arrived at the Jail after 02:14 a.m. Medics began performing CPR on Higgins at approximately 02:16:03 a.m. Subsequently, EMS transported Higgins to a nearby hospital. Higgins was pronounced dead at 2:52 a.m.  The Medical Examiner concluded that Higgins died of "excited delirium due to methamphetamine toxicity."[22]

The specific time that Higgins went into cardiac arrest cannot be determined.  If someone is moving his fingers, he is likely not in cardiac arrest.

Higgins sustained hemorrhage of the left omohyoid muscle.[23]

---

[19]  Defendants do not dispute this but maintain that they were in the process of removing Higgins from the restraint chair when the medics arrived. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 55.)

[20]  Defendants state that more than four officers worked each jail shift. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 81.) However, they have not provided the Court with the names of the other officers who allegedly worked the relevant shift or stated whether those officers were trained in CPR.

[21]  Defendants state that the Jail's written policy required assigning a minimum of at least one staff member on each shift who was trained in first aid and CPR. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 82.)  Defendants explain that, on the night in question, the officer with first aid and CPR training assigned to work called in sick. (Defs' St. of Mat. Fct. ¶¶ 108-109; Defs' Resp. to Pl's St. of Mat. Fct. ¶ 79.) According to Defendants, if Chief Treece learned the shift was not staffed by a CPR-trained officer, he would find a replacement who was CPR-trained. It does not appear that a replacement was found for the night in question.

[22] Plaintiff disputes that this was Higgins's actual cause of death although she acknowledges that this was the Medical Examiner's conclusion. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 80.)

[23]  Plaintiff contends that this was caused by pressure that was applied to the neck by Spaulding while Higgins was alive, while Defendants deny that Spaulding placed pressure on his neck. (Pl's St. of Mat. Fct. ¶ 22; Defs' Resp. to ¶ 22.)  Plaintiff contends that Higgins also suffered bilateral hemorrhagic sclera. (Pl's St. of Mat. Fct. ¶ 23.)

The core series of events — from the point Higgins entered the Jail until his body was taken away by medics — was captured on the Obion County Jail Surveillance Camera system. Due to the variable image refresh rate of the Jail's video footage, the original video data from the Jail does not completely reproduce the experiences of the officers at the time of the events.[24] Due to the variable image refresh rate of the video footage, it is impossible to know if Higgins's chest was rising and falling at any specific point in time based upon observing the video footage.[25]

On the video, Orsborne is seen wearing a Union City Police uniform with a patch on the right shoulder while Sanford is wearing a short- sleeve shirt with a star emblem over his left breast.

Until 1:48:45 a.m., Spaulding and Higgins are out of view of the camera. Beginning at 1:48:45 a.m. — and continuing for the duration of the events — Spaulding and Higgins are in the camera's view.

The Tennessee Corrections Institute ("TCI") establishes the minimum standards for local jails, lock-ups, workhouses and detention facilities in the State of Tennessee.

At all times relevant, the Obion County Jail's policy on the use of force stated, in part, as follows:

> Use of force shall be restricted to instances of justifiable self-defense, protection of others, protection of property, prevention of escapes and to ensure compliance with lawful orders. The amount of force applied shall only be as much as is reasonable

---

[24] The video data produced at the Jail was recorded at a variable image refresh rate with sudden and random change of timing intervals between images.  The parties dispute whether the video is "fit for the purpose of assessing force." (Defs' St. of Mat. Fct. ¶ 86; Pl's Resp. to ¶ 86.)

[25] Plaintiff's forensic video professional, Conor McCourt, prepared a clarified, cropped version of the video showing the events in detail from 1:48:45 to 1:54:29 a.m., which Plaintiff contends captures the exact same events on the original video but in close-up with two viewing panes. Defendants object to this cropped version on the ground that it contains "significant timing errors, resulting in variable playback speeds that do not represent the original playback data and that further misrepresent the motion and speed of depicted events." Defendants also assert that "the original video recording does not accurately reproduce human movement from image to image, and is not fit for the purpose of assessing force or pressure." (Pl's St. of Mat. Fct. ¶ 14; Defs' Resp. to ¶ 14.)

and necessary to control a given situation. In no event is the force justifiable as punishment.

At all times relevant, the Obion County Jail's policy on the use of force is stated, in part, as follows:

> Physical force may be utilized when a lesser amount of force is inadequate to control a situation. It will be probable that from time to time, staff of the Center will be required to place their hands on an individual in order to control resistive, destructive or violent behavior. This will be accomplished with the utmost care and consideration of the subject in question.

At all times relevant, Obion County's Use of Force Policy allowed officers to use the amount of force necessary to take someone in control and to use only the amount of force necessary to be able to accomplish bringing that person under control.

At all times relevant, the Obion County Jail's policy on the use of an emergency restraint chair is stated, in part, as follows:

> The Emergency Restraint Chair (E.R.C.) is intended to help control combative, self destructive, or potentially violent detainees. If used properly it can reduce the risk of physical harm to both the detainee and staff. Violent behavior may mask dangerous medical conditions therefore detainees must be monitored for and provided with medical treatment if needed. Detainees should not be left in the Emergency Restraint Chair for more than two hours. The Emergency Restraint Chair should never be used as a means of punishment.

At all times relevant, the Obion County Jail's Restraint Chair policy required close observation of the individual while they are in the chair.  At all times relevant, the Obion County Jail's Restraint Chair policy allowed the use of a restraint chair to prevent injury to the individual arrested and the officers around him.

At all times relevant, the Obion County Jail's policy on providing detainees access to medical care is stated, in part, as follows: "Necessary medical services will be provided as needed to all inmates incarcerated in the Obion County Detention Center. This can include, but is not

limited to, first aid, doctor office visits, treatment in the emergency room, or admittance to the hospital."

At all times relevant, the Obion County Jail's policy on providing detainees access to medical care is stated, in part, as follows: "There will be a minimum of one (1) staff member on each shift who will be trained in first aid and C.P.R."

At all times relevant, the Obion County Jail's policy on providing detainees access to medical care is stated, in part, as follows: "During the intake process, the inmate will be screened for any serious health care or mental health problems, including obvious wounds, illness and medication use. This information will be properly documented."

In March 2019, the Jail contracted with Nurse Practitioner Renee Terrell to provide medical care to the detainees of the Jail.  Nurse Terrell served as an "on-call" nurse for the Jail. Nurse Terrell was on "24-hour standby" if there was a medical emergency or if something was deemed a medical emergency.

At all times relevant, Obion County Jail officers had the authority to call 911 and request an ambulance or emergency services at any time they believed there was a medical emergency.

At all times relevant, the Obion County Jail's policies, including its use of force policies, restraint chair policies, and access to medical care policies were approved by TCI.

The Jail's training program was accredited by TCI at all times relevant.  At all times relevant, the Obion County Jail was fully accredited by TCI.

Brendon Sanford was hired by Obion County as a correctional officer on February 20, 2019.  On March 24, 2019, Sanford had not completed TCI training, but TCI standards did not require him to have completed his TCI basic training at that point in time.

All Obion County officers who are assigned to the Obion County Jail are expected to complete TCI training pursuant to the law of Tennessee.[26]  Newly hired correctional officers at the Jail are expected to undergo on-the-job training for up to ten weeks after they are first hired under the guidance of a Field Training Officer.[27]

The Obion County Jail required all its officers to undergo at least forty hours of TCI in-service training every year.

In accordance with TCI standards, all Obion County Jail officers are expected to undergo forty hours of TCI basic training within one year of being hired.[28]

 Obion County Jail's regular training included training on the use of force in compliance with TCI standards. Obion County Jail's use of force policy allowed officers to use only the amount of force necessary to take someone in control and to use only the amount of force necessary to be able to accomplish bringing that person under control.

At all times relevant to this action, Mary Brogglin and Waylon Spaulding were TCI certified.

 Obion County Sheriff Karl Jackson is the final policymaker for the Obion County Jail. Chief Treece is the officer in charge of training for the Jail.  Sheriff Jackson, in his official capacity, believes that his three officers followed the policies and expectations of the Obion County Sheriff's Office based on his understanding of the facts, the Medical Examiner's findings, and the TBI's

---

[26]  Plaintiff agrees that the officers are supposed to, eventually, as a condition of continued employment receive this training but deny that all officers on the relevant shift received the requisite TCI training as of March 25, 2019. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 112.)
[27]  Plaintiff acknowledges this expectation but denies that this, in fact, occurred. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 113.)
[28] Plaintiff again acknowledges this expectation but denies that all officers on the relevant shift received TCI training as of March 25, 2019. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 115.)

determination that none of the officers engaged in wrongdoing.  He believes that his officers' actions were in compliance with County Jail policies and expectations in all respects.

<u>Analysis</u>

Plaintiff's claims brought under 42 U.S.C. § 1983 allege that Defendants violated Higgins's constitutional rights to adequate medical care and to be free from unreasonable force. Plaintiff also seeks to hold the individual defendants liable under Tennessee state law due to actions that allegedly resulted in the intentional, reckless, or otherwise unlawful death and pre-death suffering of Higgins.  Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983.  In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).  "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001).

In their motion for summary judgment, Defendants assert that (1) Defendant Obion County cannot be held liable under *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658 (1978), and (2) Defendants Spaulding, Brogglin, and Sanford are entitled to qualified immunity.

<u>Municipality Liability</u>

Generally, local governments such as Defendant Obion County are not considered to be "persons" under § 1983 and, thus, are not subject to suit. *Monell*, 436 U.S. at 691.  However, when "execution of a government's policy or custom, whether made by its lawmakers or by those whose

edicts or acts may fairly be said to represent official policy, inflicts the [complained of] injury [,]" municipalities and other local governments are considered a "person" for purposes of § 1983. *Id.* at 694; *see also Bd. Of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*). "Under § 1983, local governments are responsible only for their own illegal acts" and may not be held vicariously liable for the actions of their employees. *D' Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). That is, § 1983 liability does not attach to a municipality based on the actions of its employee tortfeasors under the doctrine of respondeat superior; instead, such liability may only be imposed on the basis of the municipality's own custom or policy. *Monell*, 436 U.S. at 691.

Thus, Plaintiffs who seek to impose liability on local governments under § 1983 must prove that an action pursuant to an official policy or custom caused their injury. *Id.* "[T]he official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body," *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 436 U.S. at 694), and that body may be held liable only for constitutional violations resulting from its official policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n. 6 (1986) (citations omitted). Official municipal policy includes the decisions of a government's lawmakers or the acts of its policymaking officials. *Id.* at 480 – 481 (1986). A municipality's "policies" are "decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality," *Bryan Cnty.*, 520 U.S. at 403-04, while a "custom" is a practice that, while not formally approved, "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404. A custom can be one of action or inaction and need not be formally approved by the entity. *City of Canton v. Harris*, 489 U.S. 378, 404 (1989).

Absent proof it resulted from an unconstitutional policy or custom, a county is not liable for a single incident resulting in a constitutional violation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985).  Furthermore, a county is not liable unless there is an "affirmative link between the policy and the particular constitutional violation alleged" or "causal connection." *Id.*  Thus, a plaintiff must "identify the policy, connect the policy to the municipality itself, and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

In her amended complaint, Plaintiff asserts claims against Defendant Obion County under the following theories:  Obion County (1) maintained unconstitutional policies and customs, (2) failed to appropriately train its officers, and (3) ratified the alleged unconstitutional conduct of its employees. (ECF No. 37 ¶¶ 61, 62, 64, 65, 69). Defendant has moved for summary judgment on all these theories.  In her response, Plaintiff states that she is not seeking liability under a ratification theory, and she does not point to any evidence in the record showing that Defendant maintained unconstitutional written policies.  To the contrary, the undisputed evidence shows that, at all times relevant, the Jail was fully accredited by the TCI, and the Jail's written policies that governed the use of force, the use of restraint chairs, and detainees' access to medical care were approved by the TCI.

Therefore, the Court grants summary judgment on claims that Obion County's written policies did not comport with constitutional standards and that Obion County ratified the unconstitutional conduct of its employees. However, as explained below, the Court denies summary judgment on Plaintiff's claim that Obion County did not adequately train its officers and that Obion County had a custom of not ensuring compliance with its written policy of requiring at least one staff person on duty to be trained in CPR.

Plaintiff's failure to train claim is based on the alleged failure of Obion County to train its officers on (1) the constitutional limits on the use of force against inmates or detainees, (2) the dangers associated with compressing a person in the area of the neck or on any form of restraint-related asphyxia or suffocation, (3) the obligation to summon medical care for detainees with serious medical conditions; (4) when to call for medical assistance for a detainee in need particularly in a restraint situation, (5) the use of the restraint chair and under what circumstances to remove an inmate who is no longer moving from the restraint chair, (6) the duty to intervene in a fellow officer's use of excessive or unreasonable force, and (7) accommodating detainees exhibiting signs of mental illness or drug intoxication.  The Court has grouped (3), (4), and (7) because these claims all relate to training on ensuring that inmates/detainees are provided with appropriate medical care. The Court has also grouped (1), (2), (5), and (6) in that the alleged failure to train in these areas relates to the use of force.

Clearly Higgins was entitled to receive medical care and to be free from excessive force, and there are disputed issues of fact in the record as to whether he received the requisite medical care and whether he was subjected to excess force as discussed below in the analysis of the claims against the individual officers.[29] There are also disputed issues of fact also discussed below as to whether Defendants' actions led to Higgins' death. However, to defeat summary judgment, Plaintiff must also show that there are disputed issues of fact showing that Defendant County failed

---

[29] The parties have presented disputed issues of fact as to whether Higgins's death was the result of "excited delirium due to methamphetamine toxicity," as determined by the Medical Examiner, or whether Higgins died from asphyxia or suffocation as opined by Plaintiff's experts J.C. Upshaw Downs, M.D., and Allecia Wilson, M.D. (Pl's Exhibits, ECF Nos. 109-2, 109-12.)  A jury could find that Higgins was deprived of his constitutional rights to medical care and to be free from excessive force, which resulted in his death.

to train its officers in the provision of necessary medical care for detainees and inmates and in the use of excessive force.

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61.  To succeed on a failure to train or supervise claim, a plaintiff must prove: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

As evidence of Defendant Obion County's alleged failure to train, Plaintiff points to the deposition testimony of Officers Spaulding and Sanford who testified they could recall no specific training in the areas of the constitutional limits on the use of force against inmates or detainees; the dangers associated with compressing a person in the area of the neck or on any form of restraint-related asphyxia or suffocation; any constitutional obligation to summon medical care for detainees with serious medical conditions; when to call for medical assistance for a detainee; any duty to intervene in a fellow officer's use of excessive or unreasonable force; and accommodating detainees exhibiting signs of mental illness or drug intoxication.  (Pl's Resp. to Defs' Mot. pp. 13-14, ECF No. 109.)  Plaintiff also points to the testimony of Obion County Sheriff Karl Jackson who was the final policymaker for the Jail at the time of the relevant events.  Sheriff Jackson was not aware of any training teaching officers about the dangers of restraining people by the neck or throat. (*Id.* at p. 14.)

Michael Leonesio, an expert about generally accepted law enforcement standards, opined that Defendant Spaulding "demonstrated no understanding of the concepts of objective

reasonableness, control versus compliance, compressional asphyxia, or the relationship between the need for force and the amount of force used." (Leonesio Rep. pp. 13-14, ECF No. 109-11.) He testified that Obion County gave its officers no more than a single hour of training on the use of force, which was "clearly not enough time to cover the material and assure that officers have a satisfactory level of understanding." (*Id.* at p. 17.) He further testified that the training plan lacked any performance objectives or measurable training goals and was "deficient in quantitative or competency-based testing methods." (*Id.*)

Lori Roscoe, Ph.D., an expert on correctional healthcare standards, reviewed the evidence and opined that the Jail officers had no training in the basic medical skills required to determine if an individual had a health condition requiring further assessment by a medical professional, particularly since there was no regular nurse on duty (and none on the shift in question), and that officers were supposed to have the necessary skills to identify serious medical conditions, such as those exhibited by Higgins. (Roscoe Rep. pp. 6, 8 -10, ECF No. 109-17.) She also opined that the Jail officers were inadequately trained on assessing and responding to inmates with serious health conditions, which placed individuals at the jail at unacceptable risk of injury or death. (*Id.*)[30]

There are also disputed issues of fact as to whether the officers were adequately trained in the use of excessive force and the duty to intervene based on the testimony of the individual county officers as to their lack of training and based on the testimony of Plaintiff's expert Leonesio, also summarized above.

---

[30] The Sixth Circuit permits the use of expert testimony in establishing failure to train claims. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) ("Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures.").

The testimony of the officers and Sheriff Jackson, as well as the testimony of Plaintiff's experts, could lead the jury to find that Defendant County failed to train its officers in the provision of necessary medical care for detainees and inmates and in the use of excessive force. Specifically, from Roscoe's testimony, as summarized above, the trier of fact could find that Defendant Obion County failed to adequately train its officers in how to identify mentally ill arrestees and provide for their medical care and/or those suffering from restraint-related asphyxia or suffocation and that failure was the "moving force" that resulted in Higgins's death and the violation of his constitutional rights.[31] *See Amerson v. Waterford Twp.,* 562 F. App'x 484, 491 (6th Cir. 2014) (reiterating that, to sustain § 1983 municipal liability, the plaintiff must establish that the inadequate training was the moving force behind the violation of his constitutional rights).

Having pointed to disputed facts concerning the adequacy of the training provided by Obion County, Plaintiff must show that there are facts from which the jury could find that the inadequacy was the result of the municipality's deliberate indifference.  As explained in *Connick*,

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous [when] a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823, 105 S. Ct. 2427, 85 L. Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton* [*v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197 (1989)]. Only then "can such a shortcoming be properly thought of as a city

---

[31]  Defendants contend that the individual county officers did not know about Higgins's mental health issues. However, a jury could find that, based on Higgins's erratic behavior as he was being booked at the Jail, the officers should have been alerted to possible mental health issues. In his report, Plaintiff's expert Dr. Downs noted that Higgins "displayed unusual behaviors which would be reasonably concerning for mental aberration." (Downs Rep. p. 11, ECF No. 109-2.) Furthermore, the officers' use of Narcan on Plaintiff indicates that they perceived that he may have been suffering from a drug overdose.

'policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S. Ct. 1197.

*Connick*, 563 U.S. at 61.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S. at 410. Thus, when municipal policymakers are on actual or constructive notice that a particular omission in their training program causes its employees to violate citizens' constitutional rights, the municipality (in this case Obion County) may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.* at 407. The entity's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities ...." *Id.* at 392; *see also Pembaur,* 475 U.S. at 483 ("[M]unicipal liability under § 1983 attaches [when] - and only [when] - a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ...").

For a finding of deliberate indifference, a plaintiff ordinarily must "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) (citation omitted). "Alternatively, [a] plaintiff[ ] could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the [entity] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 794 (6th Cir. 2012) (citing *Plinton v. Cnty. of Summit*, 540 F.3d

21

459, 464 (6th Cir. 2008) (requiring a "showing that the [c]ity had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation" under a single-violation theory).

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Canton*, 489 U.S. at 390.

Here, there is no evidence in the record showing "prior instances of unconstitutional conduct demonstrating that [Defendant Obion County] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." However, the "recurring situation" theory of liability does not require Plaintiff to show that Defendant had actual or constructive notice that its officers were deficiently trained. *See Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 739 (6th Cir. 2015) (citing *Connick*). Instead, to survive summary judgment, Plaintiff must point to evidence in the record showing that Defendant County failed to train Defendant Officers "to handle recurring situations presenting an obvious potential for such a violation." *Bryan Cnty.*, 520 U.S. at 409. Plaintiff must set forth facts to indicate that there was a "likelihood that the situation would recur" and that it was predictable "that an officer lacking specific tools to handle that situation would violate citizens' rights." *Id.*

The Court finds that there is evidence in the record which, if believed by the trier of fact, shows "a likelihood that the situation would recur" – in this case "the situation" being both the need for staff to recognize emergency conditions and to secure medical care for detainees in need and the need for an officer to subdue a detainee. The jury could find that the "need for more or

different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, [that] the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390.

If the jury finds in favor of Plaintiff on the cause of Higgins's death, the jury could further find that Spaulding's lack of training as to the constitutional limits of force needed to subdue an inmate was a moving force behind Higgins's death. The jury could also find that, had Brogglin and Sanford been trained as to when to intervene as a fellow officer is using excessive force, Higgins's death would not have occurred.[32]  The jury could also find that Defendant Officers' alleged inadequate training as to when to call for emergency medical services was a moving force behind Higgins's death.  That is, the jury could find that proper training would have prevented Higgins's death and that the County "could reasonably foresee that [its] employee's wrongful act would follow from the lack of training."  *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 409 (6th Cir. 2022) (citation omitted).[33]

Viewing the evidence in the light most favorable to the non-movant, the Court finds that Plaintiff has presented sufficient evidence to survive summary judgment on her failure to train claim, and this portion of Defendants' motion is denied.

---

[32]  The Court is in no way making findings as to the cause of Higgins's death or the events leading to his death.

[33]  This case does not present the same scenario as in *Gambrel* in which the allegation was that the officers "gratuitously beat" the decedent and "later shot him for no reason." 25 F.4th at 410. In *Gambrel*, the Sixth Circuit determined that "[b]ecause the need for training against this allegedly intentional misconduct was not 'obvious,' Gambrel cannot prove deliberate indifference through a single misdeed alone."  *Id.* Here, Officer Spaulding claims that he was trying to subdue Higgins, in particular to stop him from spitting. If the jury finds that Officer Spaulding choked Higgins while trying to subdue him (instead of merely pushing away his chin and jaw), the jury could also find that adequate training in the use of force would have prevented Officer Spaulding from doing so.

As previously determined, Defendant Obion County is entitled to summary judgment on any claim that its written policies were unconstitutional. Its written policies as to the use of excessive force and the restraint chair and the provision of medical care were in accordance with TCI standards. However, a jury could find that Defendant had a custom of not complying with its written policy for the provision of medical care – specifically the provision of CPR.

It is well-settled that pretrial detainees have a right under the Fourteenth Amendment to adequate medical treatment. *See generally Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005); *Britt v. Hamilton Cnty.*, 531 F. Supp. 3d 1309, 1322 (S.D. Ohio 2021), *aff'd*, 2022 WL 405847 (6th Cir. Feb. 10, 2022). Defendant points out that the Jail's written policy provided that medical services, including emergency medical services, would be provided as needed to all detainees. The Jail contracted with Nurse Practitioner Renee Terrell to provide medical care to the detainees of the Jail. Pursuant to her contract, Nurse Terrell was on "emergency call" for the Jail at all times. Jail officers possessed the authority to contact Nurse Terrell or other medical professionals if a detainee was in need of emergency medical care and/or summon Emergency Medical Services ("EMS") when necessary. Although Plaintiff complains of the length of time it took Defendant Officers to call EMS, she has pointed to no facts to show that there was a custom of failing to call Nurse Terrell or delaying EMS calls.  However, Plaintiff has pointed to evidence from which a jury could find that the County had a custom of not complying with its own written policy for the provision of CPR to detainees in crisis.

It is undisputed that Obion County's written policy required at least one CPR-trained and certified staff member per shift and that none of the jail officers on the relevant shift had this required training or certification.  Defendant claims that Ralph Molands, a CPR-certified officer, was assigned to work the night shift at the Jail on March 24, 2019, and into the morning hours of

24

March 25, 2019, but prior to his shift beginning, Molands called in sick. However, Defendant has provided no evidence about the scheduled shift to support this claim, and Defendant Spaulding testified that the officers working the shift in question — none of whom were CPR-trained — were the ones who regularly worked that shift together. Moreover, even accepting the assertion that a CPR-trained officer called in sick for the shift in question, the jury could find that Obion County had a custom of not ensuring the substitution of a CPR-trained replacement.  And, the jury could find that, if Obion County had not had such a custom, a CPR-trained replacement would have been present on the night in question, and this would have resulted in prompt medical aid to Higgins which, the jury could find, would have saved his life.[34]

> According to Plaintiff's medical expert, Dr. Matthew Delaney,
>
> In terms of a particular patient's odds of surviving an out of hospital cardiac arrest, the most important, and often the only alterable, factor is the time between cardiac arrest and the start of high-quality CPR. Previous studies have reported that a patient's odds of survival following a cardiac arrest decrease up to 5% for each minute that passes between collapse and the start of resuscitative efforts. Even if there is some delay between a patient's cardiac arrest and the arrival of EMS, the available medical literature tells us that CPR from bystanders is associated with an almost doubled rate of survival.  In this case while it may be hard to generate an exact estimate of Mr. Higgins's survival if he had been treated by the staff of the jail, very clearly his odds of survival would have been significantly higher had the staff made any attempts to perform CPR.

(Delaney Rep. p. 5 (footnotes omitted), ECF No. 109-13.)

Defendant points out that an officer is not under a constitutional obligation to render CPR. *See Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 846 (6th Cir. 2018). Rather, "[d]ue process requires that police officers seek the necessary medical attention for a detainee when he

---

[34]  When Orsborne's supervisor, Talmadge Simmons, arrived at the Jail after receiving a phone call from Orsborne, he instructed the officers to get Higgins out of the restraint chair and start CPR.  According to Simmons, "I couldn't understand why it hadn't already been done, but I said we've got to start CPR."  (Simmons Dep. p. 4, ECF No. 109-14.)

or she has been injured . . . by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Id.*; *see also Tatum v. City and Cnty. of S.F.*, 441 F.3d 1090, 1099 (9th Cir. 2006) (holding that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR.").[35]  However, whether the officers failed by not rendering CPR is not at issue in this claim, although the jury could find that implicit in the policy to have a CPR-trained officer on duty at all times was an obligation to actually provide CPR if the situation so warranted. Instead, the issue is whether a jury could find that Defendant Obion County violated the constitutional and civil rights of Higgins by having a custom of not complying with its own policy of staffing CPR-certified officers on each shift.[36]  The Court determines that a jury could so find.

Defendant contends that, even if Plaintiff could show prior instances of Jail officers failing to provide its detainees access to medical care, she still cannot establish liability because she cannot show that an Obion County policymaker acquiesced in such conduct. A municipality can be shown to have a "custom" causing constitutional violations only if the plaintiff offers proof of a policymaking officials' knowledge and acquiescence to the established practice. *Monell*, 436 U.S. at 690-691. It is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. In other words, in order to establish that a government's "custom" caused the constitutional deprivation at issue, the plaintiff must prove that the proper policymaking officials acknowledged and acquiesced in

---

[35]  In this case, there is a disputed issue of fact as to whether Defendant Officers "promptly" summoned emergency help as discussed below.

[36]  Defendant notes that Union City Officer Orsborne was CPR-certified. (SUMF ¶ 110). Orsborne's certification is not relevant to the issue at hand.

the custom. *See e.g.*, *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) ("A municipality can be shown to have a 'custom' causing constitutional violations…provided that the plaintiff offers proof of policymaking officials' knowledge and acquiescence to the established practice."); *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice.").

Here, Plaintiff has pointed to evidence in the record from which a jury could find that Sheriff Jackson, an Obion County policymaker, approved and/or acquiesced in a custom of not ensuring that an officer trained in CPR was on duty on each shift as required by its written policy. Sheriff Jackson testified in his deposition that he fully approved of his officers' actions and inactions and believed they "went by policy." Accordingly, the Court denies summary judgment on Plaintiff's claim that Obion County had a custom of not following its written policy of making sure that at least one CPR-certified officer was on duty and that this custom led to the denial of Higgins's constitutional rights.

In summary, Defendant Obion County is granted summary judgment on Plaintiff's claims that its written policies violated Higgins's rights and on the claim that it ratified the actions of the individual officers. Summary judgment is denied on Plaintiff's failure to train claim and on the claim that Obion County had a custom of not ensuring that someone trained in CPR was on duty at the Jail during each shift.

Individual Liability

Officers Brogglin, Sanford, and Spaulding are sued as individuals. Plaintiff claims that Spaulding subjected Higgins to excessive force and that Sanford and Spaulding violated Higgins's rights by failing to intervene. Plaintiff also claims that the officer defendants failed to provide

Higgins with proper medical care in violation of his civil rights.  Defendants have responded that they are immune from suit under the doctrine of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Wood v. Moss*, 572 U.S. 744, 757 (2014) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)) (internal quotation marks omitted). A right is clearly established if "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *City of Escondido, Calif. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)). Practically speaking, "a body of relevant case law is usually necessary to clearly establish the answer." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018).  Once qualified immunity is raised, the plaintiff bears the burden to prove that the defendant is not entitled to it. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Thus, to determine whether qualified immunity is warranted, a court must first ask (1) whether the alleged facts, taken in a light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established in the specific context so that a reasonable official would understand that he is violating that right. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).[37]

---

[37] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Court "reconsider[ed] the procedure required in *Saucier* [and concluded] that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

Although it is well-settled that the right to be free from excessive force is clearly established, the *Emmons* Court expounded on the need for specificity in establishing the contours of that right.

> "This Court has repeatedly told courts ... not to define clearly established law at a high level of generality." *Kisela*, 584 U.S., at ——, 138 S. Ct., at 1152 (internal quotation marks omitted). That is particularly important in excessive force cases, as we have explained:
>
> > "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue....
> >
> > "[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*, at ——, 138 S. Ct., at 1153 (quotation altered).

*Emmons*, 139 S. Ct. at 503.

Here, Plaintiff identifies the contours of her excessive force claim as an officer "kneeling on the body of a handcuffed [detainee] and gripping him by the neck – forcibly keeping his mouth closed and hyperextending his head and neck" and "[f]or five-and-a-half minutes … remain[ing] in this position – maintaining significant pressure on the neck of [the detainee], compressing his blood vessels, and cutting off his oxygen supply" and "continu[ing] to kneel on [the detainee's]

torso and exert substantial pressure on his neck for an additional two minutes after he became unresponsive."[38] (*Id.*)

Plaintiff is correct that Higgins had a clearly established right not to be "gratuitously assaulted [and choked] while fully restrained and subdued."[39]  *See Kidis v. Reid*, 976 F.3d 708, 720 (6th Cir. 2020) ("And while it was conceivable that Moran would need to apply some force to arrest Kidis safely, there was no conceivable need for Moran to knee strike, choke, and punch Kidis once Moran was on top of Kidis while Kidis was making no effort to resist arrest. Once Moran had physical control over the surrendering and unresisting Kidis, Moran's subsequent aggression violated Kidis's clearly established right to be free from excessive force." (citing *Coley v. Lucas County*, 799 F.3d 530, 540 (6th Cir. 2015) (explaining that pretrial detainees have "a clearly established right not to be gratuitously assaulted while fully restrained and subdued" and "assaults on subdued, restrained and nonresisting ... arrestees ... are impermissible")).  Moreover, "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Michalski v. Sonstrom*, 2018 WL 4853525, at \*2 (E.D. Mich. Oct. 5, 2018), *aff'd*, 773 F. App'x 299 (6th Cir. 2019) (citing *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (citing cases); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was.").

---

[38] Plaintiff acknowledges that the early efforts to subdue Higgins, *e.g.*, pulling Higgins away from Brogglin, the scuffle on the floor, and the placing of leg restraints on Higgins, do not constitute excessive force.  (Pl's Resp. p. 19.)

[39] The parties dispute at what point Higgins was "subdued and fully restrained."

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that she has set forth sufficient facts to establish a genuine issue of material fact as to whether Officer Spaulding used excessive and unjustified force against Higgins after Higgins was subdued and fully restrained and whether his actions were objectively unreasonable. Whether a reasonable officer in Spaulding's position would have known that the force he used violated Higgins's rights turns on the question of where Spaulding's hands were during the encounter.  The jury could find, after looking at the Jail's surveillance tapes, that Officer Spaulding had his hands around Higgins's neck and/or throat after he was subdued as opposed to Spaulding's claim that he merely placed his hands on Higgins's chin to keep Higgins from spitting on him.  Lending support to Plaintiff's claim of excessive force are the opinions of Plaintiff's experts J.C. Upshaw Downs, M.D., and Allecia Wilson, M.D., that Higgins sustained hemorrhage of the left omohyoid muscle as the result of pressure being placed on his neck and/or throat and that he died from asphyxia or suffocation. Dr. Downs opined that Higgins "sustained significant neck trauma with significant bleeding into the muscle layers within the neck, near the airway" along with additional physical findings consistent with strangulation. (Downs Rep. p. 11, ECF No. 109-2.)

Accordingly, summary judgment is denied on the excessive force claim.

The Court turns next to Plaintiff's claim that Officers Brogglin and Sanford violated Higgins's rights by failing to intervene during Spaulding's interactions with Higgins, especially when he allegedly choked Higgins.[40]  It is undisputed that law enforcement officers can be held liable when another officer uses excessive force in their presence if they are aware of the excessive force and fail to intervene. *See Bunkley v. City of Detroit, Michigan,* 902 F.3d 552, 565 (6th Cir.

---

[40] The failure to intervene claim is based on the jury's first finding for Plaintiff on her excessive force claim.  If the jury finds against Plaintiff on her excessive force claim, then she cannot prevail on her failure to intervene claim.

2018) (noting that, in *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), the Sixth Circuit relied on *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) (per curiam), in holding that an officer could be liable for failing to intervene in an excessive force case).

Here, the parties agree that "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  Officers cannot be held liable for a failure to intervene if they lacked "a realistic opportunity to intervene and prevent harm." *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (citing *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 507 (6th Cir. 2007)).  "Generally the issue of whether an officer had sufficient time to intervene or was capable of preventing the harm is a question of fact for the jury unless, based on all the evidence, a reasonable jury could not possibly conclude otherwise." *Bunkley*, 902 F.3d at 566.

Plaintiff has pointed to video evidence in the record from which the trier of fact could find that Officer Spaulding had his hands around Higgins's neck/throat for approximately five minutes. Based on video evidence,[41] the jury could find that Officers Brogglin and Sanford were present during this encounter and assisted with shackling Higgins's legs. The jury could also find that each officer was present for at least part of Spaulding's encounter with Higgins and perceived Spaulding's alleged use of excessive force and yet did not intervene to stop him. Therefore,

---

[41]  Defendants continue to maintain that Plaintiff should not be allowed to rely on video footage to create an issue of fact because the video submitted by Plaintiff has an image refresh rate that does not reproduce motion accurately. Defendants may challenge the accuracy of the video at trial.

Officers Brogglin and Sanford are not entitled to qualified immunity of Plaintiff's failure to intervene claim.

Finally, Plaintiff claims that the individual officers violated Higgins's right to medical care, specifically in being deliberately indifferent to his serious medical needs and failing to provide medical care.  Defendants contend that they are entitled to qualified immunity on Plaintiff's claim.

The Eighth Amendment prohibits cruel and unusual punishments. This protection "includes a right to be free from deliberate indifference to an inmate's serious medical needs." *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021) (citing *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)).  However, the Eighth Amendment does not apply to pretrial detainees like Higgins. *Graham ex rel. Est. of Graham v. County of Washtenaw*, 358 F.3d 377, 382 n.3 (6th Cir. 2004). Instead, pretrial detainees have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment. *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 566 (6th Cir. 2020).

Until recently, courts "analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Brawner*, 14 F.4th at 591 (citation omitted). The Eighth-Amendment framework for deliberate indifference claims has an objective and a subjective component. *Griffith*, 975 F.3d at 567. "The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the [Constitution]," while the subjective component requires a plaintiff to show that "each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id.* at 567-68 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)).

Relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015),[42] the Sixth Circuit Court of Appeals in *Brawner* concluded that *Kingsley* required "modification of the subjective prong of the deliberate-indifference test for pretrial detainees." *Id.* at 596 ("Given *Kingsley's* clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable.")  The *Brawner* Court modified the second prong of the deliberate indifference test applied to pretrial detainees to require only recklessness: "A pretrial detainee must prove 'more than negligence but less than subjective intent — something akin to reckless disregard.'"  *Id.* at 597 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). Thus, a plaintiff must prove that the defendant acted "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (citation and quotation marks omitted).

The parties disagree about which standard should be used to analyze Plaintiff's claim. Defendants point out that, at the time of the incident, the Sixth Circuit applied the pre-*Kingsley* analysis standard to a pre-trial inmate's claims that officers failed to provide him with medical

---

[42] In *Kingsley*, the Supreme Court compared the standard for excessive force claims brought by pretrial detainees under the Due Process Clause of the Fourteenth Amendment to excessive force claims brought by convicted prisoners under the Eighth Amendment. 576 U.S. at 400. The Court was asked to determine "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were subjectively aware that their use of force was unreasonable, or only that the officers' use of that force was objectively unreasonable." *Id.* at 391–92. The Court answered that the proper standard was objective based on the differences between the Due Process Clause and the Cruel and Unusual Punishments Clause. *Id.* at 400 ("The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all[.]"). However, the Court did not "address whether an objective standard applies in other Fourteenth Amendment pretrial-detainment contexts[,]" such as deliberate indifference. *Brawner*, 14 F.4th at 592.  The Sixth Circuit answered that question in *Brawner*.

care. They argue that, at the time of the incident, the officers could not have known that an objective 'reckless disregard' for a detainee's medical condition could lead to a constitutional rights violation."[43]

Plaintiff has correctly responded that the Sixth Circuit rejected the same argument in *Hopper v. Plummer*, 887 F.3d 744 (6th Cir. 2018), where defendants facing excessive force claims based on pre-*Kingsley* conduct argued for qualified immunity because it would not have been clear to them that claims against them would be governed by an objective standard. "[W]e have rejected this argument before because 'a defendant is not entitled to qualified immunity simply because the courts have not agreed upon the precise formulation of the [applicable] standard.'" *Id.* at 755-56 (citations omitted). "Rather, the relevant question under the clearly established prong is whether defendants had notice 'that [their] conduct was unlawful in the situation [they] confronted.'" *Id.* at 756 (quoting *Saucier*, 533 U.S. at 202).

Therefore, this Court must determine whether the individual officers were deliberately indifferent to Higgins's serious medical needs using the guidance provided by *Brawner* and its progeny as set forth in *Trozzi v. Lake Cnty., Ohio*, 29 F.4th 745 (6th Cir. 2022).

> [A] plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk. This third inquiry faithfully applies *Kingsley*, 576 U.S. at 396, 135 S.Ct. 2466 (recognizing that liability for a constitutional tort, even one that includes an objective inquiry, must still be "purposeful or knowing" and that criminal "recklessness" might suffice, ensuring that there is a sufficiently culpable mental state to satisfy the "high bar" for constitutional torts grounded in a substantive due process violation. In practice, that may mean that a prison official who lacks an awareness of the risks of her inaction (because, for example, another

---

[43] *Kingsley* was decided in 2015; the incident occurred in 2019; and *Brawner* was decided in 2021.

> official takes responsibility for medical care, a medical professional reasonably advised the official to not act, the official lacked authority to act, etc.) cannot have violated the detainee's constitutional rights.

*Trozzi*, 29 F.4th at 757-58 (citations omitted). "Put another way," on summary judgment, the Court must determine whether the plaintiff "has presented sufficient evidence for a reasonable jury to conclude that: (1) a reasonable officer (knowing what the particular jail official knew at the time of the incident) would have known [the detainee] was suffering from a serious medical need[44] that posed an excessive risk to [his or] her health; and (2) [the officers] knew that non-intervention would create an unjustifiably high risk of harm to [the detainee's] health and ignored that risk." *Id.* at 758.[45] The Court finds that Plaintiff has presented sufficient evidence to defeat summary judgment on this claim.

The Court first finds that there is evidence in the record from which a jury could find that the individual county officers should have known of Higgins' serious medical needs and that they posed an excessive risk to his health. There are two different points during the incident in question in which Higgins might be said to have had a serious medical need. The first was when Officer Orsborne arrested Higgins and brought him to the Jail. Viewing the evidence in the light most favorable to the Plaintiff, the jury could find that Higgins's erratic behavior upon entering the Jail would have put a reasonable officer on notice that Higgins had mental health issues and/or had possibly ingested drugs which posed an excessive risk to his health. Evidence that the officers did believe that Higgins had ingested drugs is shown by the deposition testimony of Spaulding.

---

[44] A medical need is objectively serious if it is "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Phillips v. Roane County*, 534 F.3d 531, 540 (6th Cir. 2008).

[45] The Court is mindful that generally it must evaluate each officer individually, see *Trozzi*, 29 F.4th at 58; however, in this particular case, the parties have not differentiated between the actions of the officers as to the medical indifference claim.

According to Spaulding, Higgins was "grunting and moaning" as the officers were putting him in the restraint chair. (Spaulding Dep. p. 35, ECF No. 109-5.)   The officers suspected that Higgins had overdosed on drugs ("It was a suspected overdose.") (*Id.* at p. 38.) Eventually the officers administered Narcan to Higgins. The jury could find the officers' failure to administer Narcan sooner created an unjustifiably high risk of harm to Higgins, and they knew of this risk and yet ignored that risk until it was too late.

The next point was when, according to Plaintiff, Higgins's "lifeless" body was dragged to the restraint chair. Defendants contend that Higgins was not "lifeless" because the video shows some movement on the part of Higgins during this time.  Plaintiff counter that the movement was not volitional and, instead, was "agonal breathing." Regardless of whether the movement was volitional or not, the jury could find that reasonable officers would have known that Higgins was in acute distress at least from the moment that Spaulding released him and that this acute distress constituted a serious medical need that posed an excessive risk to his health and yet they ignored this risk.

For example, it is undisputed that, after Higgins stopped spitting, he went "still or nearly still." (Spaulding Dep. p. 40, ECF No. 109-5.)  Plaintiff's experts confirm that Higgins ceased moving and went unresponsive and lost consciousness at approximately the same time that he quit spitting. (DeLaney Rep., ECF No. 109-13; Leonesio Rep., ECF No. 109-11; Wilson Rep. ECF No. 109-12.)

In particular, Dr. Matthew Delaney noted that

[o]n video, the last obvious movement from Mr. Higgins occurs at around minute 1:52 while he is still on the ground. At this point Officer Spaulding still has hands on Mr. Higgins's chin/neck/throat area. While we don't know if Mr. Higgins has a pulse at this point it is very clear that his clinical condition has quite suddenly changed as he has stopped obvious movement and is no longer responsive. This is the first point where Mr. Higgins clearly needs a medical evaluation and also the

> point at which a medical evaluation would have most likely been beneficial. Most likely his loss of consciousness was related to the actions taken by officers while he was on the ground. The available evidence would strongly argue that evaluating and treating a patient with CPR shortly after they become unresponsive would result in the best possible outcome.

(Delaney Rep. at p. 5, ECF No. 109-13.)   The jury also could view the video as showing that Higgins was not combative, and was, in fact, unresponsive and motionless for approximately two minutes leading up to and including being put in the restraint chair.

It took approximately five to seven minutes for the officers to strap Higgins in the restraint chair.  (Spaulding Dep. p. 23, ECF No. 109-5.)  Sanford did not see Higgins move while he was putting him in the restraint chair. (Sanford Dep. p. 18, ECF No. 109-9.)  Sanford did not feel a pulse while Higgins was in the cell and cannot remember if he felt one while Higgins was still in the hallway. (Sanford Dep. at p. 20.)  While Higgins was in the restraint chair, Officer Travis observed a "white-appearing substance around his nose or mouth" but assumed the "substance" was Higgins's teeth. (Travis Dep. p. 6, ECF No. 109-6.)

Orsborne testified that at some point he saw Spaulding go to Higgins and "jiggle" his head for a moment, and Higgins's "head just fell right back to the same place it had been." (Orsborne Dep. p. 14, ECF No. 109-3.)  Orsborne also testified that, even after Higgins failed to respond to the sternum rub, the officers were "still unsure of his condition" and it did not appear "at this point that medical treatment should at least be considered" even though Higgins was nonresponsive. (*Id.* at p. 16.)  He also testified that he did not check for a pulse because the other officers had done so. (*Id.* at p. 17.) The jury could find that the execution of the sternum rub contradicted the officers' claim that they did not believe that Higgins was in distress.[46]

---

[46] If the officers did, in fact, believe that Higgins had "calmed down" prior to being placed in the restraint chair and they did not detect any signs of distress, it is puzzling why they felt the need to execute a sternum rub.

All of this evidence combined, viewed in the light  most favorable to Plaintiff, could lead the jury to find that the actions of the officers show that they knew that Higgins was suffering from a serious medical need that posed an excessive risk to his health and that not calling for emergency services sooner would create an unjustifiably high risk of harm to Higgins and yet they ignored that risk until it was too late. For these reasons, summary judgment is denied on Plaintiff's medical indifference claim.

State Law Claims

Because most of Plaintiff's federal claims remain pending, the Court will retain supplemental jurisdiction over Plaintiff's state law claims.  *See* 28 U.S.C. § 1367 (a) (authorizing district courts to exercise supplemental jurisdiction over "claims that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy.")

Summary and Conclusion

Defendants' motion for summary judgment is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.  The motion is granted on Plaintiff's claim that Defendant Obion County's written policies violated Higgins's rights and on the claim that the County ratified the actions of the individual officers.  The motion is denied on all other claims.

**IT IS SO ORDERED**.

s/ S. Thomas Anderson
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date:  October 20, 2022.